

LAW GROUP

February 13, 2017


Honorable Cynthia M. Rufe
U.S. District Court for the Eastern District of Pennsylvania
601 Market Street
Philadelphia, PA 19106-1797


Re: Barrett v. CIA, Case No. 16-CV-4279

Dear Judge Rufe,

Pursuant to Local Rule 5.1.2.6, enclosed please find one complete copy of the material released to the Plaintiff in this lawsuit, namely a redacted version of the draft Volume V of the CIA's History of Bay of Pigs. Local Rule 5.1.2.6 permits "ECF Filing Users who file excerpts of documents as exhibits or attachments electronically pursuant to these ECF Procedures…to file timely additional excerpts," and further states, "[p]ages of attachments and exhibits in excess of 50 may be filed in paper copy filed in the traditional manner."

The brief delay between filing an electronic excerpt of this document and the enclosed full hard copy occurred owing to Counsel's illness coinciding with a law office move. I respectfully request inclusion of the full release in the record.

Sincerely yours,

Beth Lyon

Enclosure

cc:     Gerald Sullivan (with attachment)


**TUAN N. SAMAHON**
Admitted to practice in PA & DC
samahon@torchlightlaw.com
(484) 949-5645

**BETH LYON**
Admitted to practice in PA & NY
lyon@torchlightlaw.com
(484) 802-3548

September 2016

**Context for Readers of the Attached CIA Draft Volume**

Between 1979 and 1984, Central Intelligence Agency (CIA) staff historian Jack Pfeiffer prepared five volumes of the Agency's *Official History of the Bay of Pigs Operation*.  The titles of the first four volumes were *Air Operations, March 1960-April 1961*; *Participation in the Conduct of Foreign Policy*; *Evolution of CIA's Anti-Castro Policies, 1951-January 1961*; and *The Taylor Committee Investigation of the Bay of Pigs*.  All have been declassified and are available to the public on CIA's website in the electronic reading room.  Pfeiffer also wrote a draft fifth volume, *CIA's Internal Investigation of the Bay of Pigs*, being released today, which the CIA Chief Historian rejected as inadequate at the time, instructing Pfeiffer to make substantial revisions.  Pfeiffer did not complete those revisions before retiring in 1984.

***Unlike his four other histories, this fifth draft volume was not publishable in its present form, in the judgment of CIA Chief Historians as well as other reviewers, because of serious shortcomings in scholarship, its polemical tone, and its failure to add significantly to an understanding of the controversy over the Bay of Pigs operation***—much of which has now been discussed in open source histories and memoirs.  CIA's Chief Historians have assessed that addressing those deficiencies would have required much more effort than the draft volume's potential value would justify.  Consequently, it remains an unfinished and unpublished draft.

In the attached draft volume, Pfeiffer took very strong issue with the findings of the CIA Inspector General, Lyman Kirkpatrick, who blamed the Bay of Pigs debacle on the Agency task force in charge of an operation that Kirkpatrick assessed was misconceived, mismanaged, and bound to fail from the outset.  Kirkpatrick's report evoked a fervent defense from CIA's operations directorate (both of those documents have been declassified and are on CIA's website in the electronic reading room), and Pfeiffer in large part accepted the operations directorate's viewpoint.  He contended that Kirkpatrick, for a variety of motives, conducted his inquiry from the start with the purpose of laying responsibility for the Bay of Pigs fiasco on the officers who planned and ran the operation and on two Agency leaders, Deputy Director for Plans Richard Bissell and DCI Allen Dulles.

We are releasing this draft volume today because recent 2016 changes in the Freedom of Information Act (FOIA) requires us to release some drafts that are responsive to FOIA requests if they are more than 25 years old.

David S. Robarge
CIA Chief Historian, 2005 - present

Approved for Release: 2016/08/09 C01254908

TOP SECRET

This file contains CIA Historian Jack Pfeiffer's

unpublished "Volume V" of his Bay of Pigs history,

"CIA's Internal Investigation of the Bay of Pigs."

I have added this cover sheet to indicate that

the document must be controlled as TOP SECRET

because Appendices B, C, &D are marked TS.

TOP SECRET

Approved for Release: 2016/08/09 C01254908

Approved for Release: 2016/08/09 C01254908

SECRET

**DRAFT**

CIA Internal Use Only
Access Controlled by
CIA History Staff

OFFICIAL HISTORY
OF THE
BAY OF PIGS OPERATION

DRAFT Volume V

**CIA's Internal Investigation of the Bay of Pigs**

Jack B. Pfeiffer

Submitted to the
Center for the Study of Intelligence
Central Intelligence Agency

18 April 1984

(b)(3)

SECRET

Approved for Release: 2016/08/09 C01254908

SECRET

NOTE:  The following draft history has three TOP SECRET
appendices (B, C, & D) that are handled separately from this
SECRET manuscript:

OFFICIAL HISTORY
OF THE
BAY OF PIGS OPERATION

DRAFT Volume V

CIA's Internal Investigation of the Bay of Pigs

Jack B. Pfeiffer

Submitted to the
Center for the Study of Intelligence
Central Intelligence Agency

18 April 1984

(b)(3)

SECRET

Approved for Release: 2016/08/09 C01254908

Approved for Release: 2016/08/09 C01254908
SECRET

## Table of Contents

| | | Page |
|---|---|---|
| Chapter 1 | Introduction | 1 |
| Chapter 2 | The Inspector General's Survey of the Cuban Operation | 5 |
| | A. Background | 5 |
| | B. The Inspector General's Survey | 11 |
| | 1. Format, Description and Sources | 11 |
| | 2. Findings | 19 |
| | 3. Interviews | 48 |
| | 4. Conclusions and Recommendations | 77 |
| | C. The Question of Intent | 82 |
| Chapter 3 | The Deputy Director for Plans Analysis of the Cuban Operation, 18 January 1962 | 95 |
| | A. Description of the Report | 95 |
| | B. Refuting the Inspector General's Charges | 96 |
| | C. Readers, Reactions, and Responses to the DDP Analysis of the IG's Survey | 122 |
| Chapter 4 | Evaluation of the Evaluations | 139 |
| Appendixes | | |
| | A. Correspondence between Jack B. Pfeiffer and Charles A. Briggs, 29 May 1981-4 June 1981 | 147 |
| | B. Memorandum for Mr. McCone from Lyman B. Kirkpatrick, 20 November 1961, sub: Survey of the Cuban Operation | 150 |
| | C. Memorandum for Director of Central Intelligence from Lyman B. Kirkpatrick, 24 November 1961, sub: Report on the Cuban Operation | 153 |
| | D. Questions for Mr. Dulles | 156 |

SECRET
Approved for Release: 2016/08/09 C01254908

## Table of Contents
### (continued)

<u>Page</u>

**Source References**

Notes on Source References                160

Chapter 1      (No Source References)     161

Chapter 2                                 161

Chapter 3                                 169

Chapter 4                                 172

SECRET
Approved for Release: 2016/08/09 C01254908

DRAFT                    DRAFT                    DRAFT

## Volume V

## CIA's Internal Investigation of the Bay of Pigs

### Chapter 1

### Introduction

Even as the search for survivors of the failed invasion at Playa Giron was underway, two investigations of the causes for the failure at the Bay of Pigs were being authorized. One investigation was called for by President Kennedy and was directed by General Maxwell Taylor. The Cuban Study Group (CSG), as Taylor's committee was known, conducted its investigations and presented its findings to the President within a period of roughly two months (20 April-13 June 1961). By the end of 1961, the general tenor of the committee's findings were public knowledge, and, as noted in the preceding volume in this series,* by the early 1980's, the bulk of the Taylor report, including the testimony of witnesses who appeared before the committee had been declassified for public release.**

----

\* Pfeiffer, Jack, B., <u>The Taylor Committee Investigation of the Bay of Pigs</u> (Draft), 22 Nov 83.

\*\* <u>Operation Zapata</u> (Frederick, MD: University Publications of America, Inc., 1981).

SECRET

Approved for Release: 2016/08/09 C01254908

SECRET
Approved for Release: 2016/08/09 C01254908

In contrast to the Taylor Committee Report, the work of the second official investigation of the Bay of Pigs operation--the investigation which DCI Allen Dulles directed CIA's Inspector General, Lyman Kirkpatrick, to conduct--continues to be regarded by CIA as "classified and sensitive." Consequently requests for declassification and/or sanitization of the Inspector General's report consistently have been denied. Information about the report--including an official history of the Inspector General's office by a former member of the IG staff--has been markedly deficient in substance and factually in error.* Paradoxically, however, Kirkpatrick's own overt publications, although obviously self-serving, provide the most useful source of unclassified information available at the present time.**

Although it was initiated about the same time as the Taylor Committee investigation--and despite the fact that it carried a date of October 1961--the Inspector General's "Survey of the Cuban Operation" was not forwarded until 20 November 1961. Based on their interviews with Kirkpatrick himself, the expectation of the key

---

\* Greer, Kenneth E., <u>The Office of the Inspector General,</u> <u>January 1952-December 1971</u> (October 1973, DCI-7).

\*\* Kirkpatrick, Lyman: <u>The Real CIA</u> (New York: MacMillan, 1968) and "Paramilitary Case Study: The Bay of Pigs," <u>Naval War College</u> <u>Review</u>, Nov-Dec 1972. Kirkpatrick was appointed Inspector General 1 April 1953 and served in that capacity until appointed Executive Director of CIA, 10 April 1962. On 18 Nov 1963 the offices of the Executive Director and Comptroller were combined and Kirkpatrick was appointed Executive Director Comptroller on 26 November 1963. He resigned from CIA 27 September 1965.

2

SECRET

Approved for Release: 2016/08/09 C01254908

personnel involved in the Agency's anti-Castro project* was that the investigation would reveal that the failure was due to the breakdown of communications between the CIA and the DOD on one side and the White House--the President and his cohorts--on the other.  The Inspector General's report, however, was a thinly veiled attempt to lay full blame for the failure on the Deputy Director for Plans, Richard M. Bissell, Jr. and, by his association with Bissell, on DCI Allen Dulles.

The internecine struggle which the IG's "Survey" prompted led to a formal response, "An Analysis of the Cuban Operation by the Deputy Director (Plans) Central Intelligence Agency."  Completed 18 January 1962, the "Analysis" attempted a point by point refutation of the charges surfaced by the IG.  In the end, John A. McCone--Allen Dulles's replacement as DCI and the initial recipient of Kirkpatrick's report (even prior to Mr. Dulles's retirement)--directed that the two TOP SECRET reports and several pertinent memorandums should be bound together so that readers would have both stories available.**  McCone, pleading inexperience, refused to make any attempt to have the divergent views reconciled in order to present a single CIA position on the causes of the failure at the Bay of Pigs.

Since their completion, both volumes have been held very closely--even in-house.  External requests for access to the reports

_____

*   Particularly Richard Bissell (DDP), Jake Esterline (Chief, Wh/4), Col. Jack Hawkins (Chief, WH/4/PM), and Richard Drain (COPS/WH/4).

** Dulles's date of resignation was 29 November 1961 and McCone was appointed and sworn in on that same date.  Richard Bissell resigned 17 February 1962.

SECRET

Approved for Release: 2016/08/09 C01254908

SECRET

Approved for Release: 2016/08/09 C01254908

have caused and continue to cause great consternation at the highest

levels in the Agency. After more than twenty years, it appears that

fear of exposing the Agency's dirty linen, rather than any

significant security information, is what prompts continued denial

of requests for release of these records. Although this volume may

do nothing to modify that position, hopefully it does put one of the

nastiest internal power struggles into proper perspective for the

Agency's own record. In the context of a recent CIA sponsored

conference on "Ethics in the Profession of Intelligence" this

episode could have provided a classic and practical case study.*

---

\* This conference was held in May 1983.

SECRET

Approved for Release: 2016/08/09 C01254908

SECRET
Approved for Release: 2016/08/09 C01254908

Chapter 2


The Inspector General's Survey of the Cuban Operation


A.  Background

A previous volume on the Bay of Pigs operation discussed in
detail the investigation which was conducted by General Maxwell
Taylor's committee.  Even as the first meeting of that committee was
under way on 22 April 1961, it was reported that "Mr. Dulles tells
us that the history of this operation [the Bay of Pigs] is in the
course of preparation now by CIA." [1]  The investigation to which
the Director of Central Intelligence referred was one which he had
proposed on the morning of the meeting in question to CIA's
Inspector General, Lyman Kirkpatrick.  Kirkpatrick's diary of 22
April 1961 stated:

> The DCI called me in to ask my recommendation on what action
> should be taken to cope with the Cuban disaster.  I told
> him...that we [should] do an inspection of the operation at a
> later date.  He agreed. [2]

In the first commercial volume to be published by a CIA
insider, Mr. Kirkpatrick made the following comment about that
assignment:

> Within the CIA, Allen Dulles directed me, as Inspector
> General, to do a complete review of the [Bay of Pigs]
> operation and its implementation.  We were to stay out of
> national policy decisions, but to examine how well the Agency
> carried out its responsibilities.  For the next several
> months, several of the staff went through every aspect of the
> operation, talked to nearly all of the Agency participants
> and reviewed every pertinent file.  The report that was
> produced was a critical one dealing with operational matters
> and therefore one that should always remain classified.
> Rather than receiving it in the light in which it was
> produced, which was to insure that the same mistakes would
> not be repeated in the future, those that participated in the
> operation resented it and attacked it bitterly. [3]*

5

Approved for Release: 2016/08/09 C01254908

The key phrase in the above quotation concerns "the light in which it was produced." This was the issue which would be raised by the Director of Central Intelligence, the Deputy Director of Central Intelligence, the Deputy Director for Plans, and the Assistant Deputy Director for Plans for Action in the almost immediate response which the Inspector General's survey generated. Because the IG's report has been held so closely, even within the confines of the Central Intelligence Agency, this chapter is intended to provide the reader with the details concerning the procedures which were followed in preparing the report; the format, findings, and sources which were used in the preparation of the report; an examination of the facts and opinions in the report; and, finally, some discussion regarding the question of intent of the Inspector General's report.

Although Kirkpatrick had indicated at the time of his 22 April meeting with Mr. Dulles that the inspection of the operation should begin "at a later date," this instruction was modified very soon thereafter when Kirkpatrick noted:

> Talked with the DCI about the present problem regarding the Cuban operation. He directed that we immediately commence a thorough review of the operation and suggested that possibly we could give a preliminary report to General Maxwell Taylor before the Taylor report is submitted to the President. 1/**

---

\* There is nothing in Kirkpatrick's diary--nor is there other evidence--to indicate that he was asked or instructed to "stay out of national policy decisions." This remark would seem to have been made in reaction to bitter criticism of Kirkpatrick's report for its narrow focus.

\*\* The instruction to do a "thorough review" would seem to belie Kirkpatrick's subsequent overt comment that the investigation was to "stay out of national policy decisions."

6

SECRET

Approved for Release: 2016/08/09 C01254908

SECRET
Approved for Release: 2016/08/09 C01254908

At this same session on 30 April 1961, the DCI apparently promised the Inspector General that he would have full access to the minutes of the Taylor Group meetings. 5/*  On 1 May 1961 Kirkpatrick told his staff to begin their review, and by 4 May 1961, it was apparent, when Mr. Dulles suggested that perhaps Kirkpatrick's inspection should be delayed for a few days, that the Inspector General had the bit in his teeth and was forging rapidly ahead.  He noted in his diary:

> The DCI called about the Cuban Inspection.  He said that he would provide me all the papers from the Taylor Committee. He said he thought that perhaps our inspection of it should be postponed for 10 days because the people were so busy preparing reports for the Taylor group.  I told him that we were not bothering those people that were preparing reports but were trying to see the people that would be leaving very shortly.  He agreed to this. 6/

Kirkpatrick already had conversed with some of the principals of the Cuban Task Force, including Jake Esterline, Chief of the project, Richard Drain, Chief of Operations for the project, and Col. Jack Hawkins, Chief of the Paramilitary Staff.  Esterline had asked Dick Drain to be the point of contact with the Kirkpatrick group. 7/

---

* Giving Kirkpatrick access to the minutes of the Taylor committee meetings would appear to have been in contravention of General Taylor's desire to limit accessability to those minutes to the immediate members of his committee.  As noted in another volume, a copy of the daily testimony was to be provided to each of the four committee members for review and then returned to the Executive Secretary of the committee, Colonel Benjamin Tarwater. The Attorney General, Robert Kennedy also was in contravention of General Taylor's instructions for he retained copies of the papers which he received.

7

SECRET

SECRET
Approved for Release: 2016/08/09 C01254908

In addition to the assurance from the Director that he and
his inspection team would have full access to both the minutes and
the papers prepared for the Taylor Committee, the IG was given
similar access to the records of WH/4, the Cuban Task Force.  Dick
Drain reported that the guarantee of such access to WH/4 records for
the IG team was the quid pro quo he insisted on prior to accepting
the job of being the point of contact with Kirkpatrick:

> The one post mortem that I got involved in--I wasn't.
> Although I was standing by all the time, I was never called
> before Bobby Boy's [Robert Kennedy] little proctological
> group.  But when Kirkpatrick got Dulles's permission to do an
> instant IG review of this [the Bay of Pigs Operation],
> Esterline, who was pretty damned well worn out at this point,
> turned to me and he said, "Well, here is one more service you
> can perform.  You used to be an assistant to the IG, now you
> take these types on."  I said, "Well, Jake, I am only going
> to take them on with this understanding--that if they're
> licensed to do this, then they are required to know all the
> facts.  We're not holding anything back are we?"  He said,
> "Hell no.  What's done is done; but I ain't got time for
> them." 8/

The record reflects clearly that the documentary materials
promised by both the Director and by the Chief of the Task Force
were made available to Kirkpatrick and his inspectors; and, in
addition, interviews or discussions were held with 125 individuals
involved in the anti-Castro project. 9/*  The team which was named
by the Inspector General to review the documents and conduct the
interviews consisted of three individuals:

William Gibson Dildine had entered on duty with CIA in
March, 1952 and was a GS-14 at the time of the Inspector
General's survey.  He had served overseas from March
1953-July 1955, and as an ex-newspaper man, he was involved

---

* Between 11 and 13 July 1961, Kirkpatrick was furnished at least
  124 of the documents which had been made available to the Taylor
  Committee.

8

Approved for Release: 2016/08/09 C01254908

Approved for Release: 2016/08/09 C01254908

in political and psychological activities related to the
press in foreign areas.  He also had served in the Operations
School and had joined the Inspector General's Staff
officially in August 1960.  Subsequent to his tour with the
Inspector General, he went overseas, continuing his career as
a DDP officer.  Prior to serving on the inspection team for
the Bay of Pigs operations, Dildine had no experience in the
Latin American area.

A second DDP careerist, also a GS-14 on the Inspector
General's staff--and also without any Latin American
experience or background--was Robert D. Shea.  He was a
trained lawyer, had served in the OSS, and had been overseas
with the Agency⸻⸻⸻⸻⸻⸻⸻⸻.                    (b)(1)
Most of Shea's experience had been in liaison affairs.       (b)(3)

The third member of the inspection team was Robert B.
Shaffer, a GS-15 and an OTR careerist whose only overseas
experience had been one tour as a training officer in
⸻⸻⸻.  Shaffer was a Ph.D. in art history from Harvard    (b)(1)
University.  Except for his stint on the Inspector General's   (b)(3)
staff, he had no Agency experience other than in the Office
of Training.

The highest praise which the author heard for the members of
the Inspector General's team was that they were "poor."  A more
colorful description of the team members was provided by Dick Drain
who had the closest continuing contact with the team members.  An
exchange of conversation with Drain went as follows:

9

SECRET

Approved for Release: 2016/08/09 C01254908

Drain:  Although I had worked for Kirk...a total time of
three years and had then, and still have, a very high regard
for him, I think Kirk got a little mixed up.  I think Kirk
was out to prove something as a result of this particular IG
survey--which didn't characterize any survey I ever worked
on.  I don't know, but I think Kirk was trying to point blame
at enough DDP people so that there would be different
personnel involved later on.

Interviewer:  Namely a new DDP named Kirkpatrick?

Drain:  Yeh, yeh.  That's a dirty thing to say, but I'll tell
you what made me think so.  He had talent on that IG staff,
and he did not send that talent to us.  He sent a couple of
old farts that went to sleep in the middle of briefings; that
didn't know their tails from third base; and they performed
as though what they were doing wa a mere drill because, in
point of fact, Mr. Kirkpatrick was going to write this
report.  I don't know, but that's the way it looked to me.  I
was pretty goddamned emotionally tied up and tired at this
point, too.  But I tried.  I took those two old assholes with
me...I forget....

Interviewer:  Bob Shaffer and Dildine?

Drain:  Yeh...No...not Gib...Gib was a good man....It was
Shaffer and a guy even fuzzier than Shaffer.

Interviewer:  I have forgotten his name [Bob Shea].

Drain:  Hell, I would get from them their agenda--what they
wanted for the next day, and I would line guys up in the
project who were damned well wrung out at this time; and I
would say, "O.K. we're going to get together in the
conference room at 2:00 p.m. with these guys.  If they want
to ask questions about this matter, be prepared."  By God,
our good soldiers would be in there; and these guys would
wander in a half hour late.  We would start to brief
them--and look over--one would be sound asleep and the other
would be picking his nose.  It was lousy performance. 11/*

---

* Comments in Kirkpatrick's diary indicate that Shea and Dildine
were not necessarily the most congenial individuals to deal with.
Kirkpatrick's relations with both dated back to 1959. 12/

SECRET

Approved for Release: 2016/08/09 C01254908

Approved for Release: 2016/08/09 C01254908

B.  The Inspector General's Survey

    1.  Format, Description, and Sources

The Inspector General's Survey of the Cuban Operations consists of 219 pages including the Table of Contents and five Annexes with a total of 57 pages.  It also includes a two page Index and five Memorandums totalling eight pages.  The Table of Contents to the report shows 15 major headings but fails to indicate the plethora of subheadings--many of which are no longer than a sentence or two--which appear in the text.

In a meeting with Jake Esterline, Chief/WH4 (the anti-Castro project) and Dick Drain, COPS/WH4, on 1 May 1961, Inspector General Kirkpatrick discussed the way in which he intended to conduct his survey.  It was a most interesting conversation, particularly in view of the final product, and it went as follows:

> K.  Well, I know you guys have other things to do today, and, Jake, I think what we might do now is to just outline how we progress from here with this, with the minimum of stress and strain and burden on your people.  Because I don't want to do what the Taylor Group is doing, because they apparently have a shortage of time and ask for a lot of papers prepared.  We'd much rather see the papers that are already prepared.  We will use three men on this, in addition to myself.  Gib Dildine, I don't know whether you know him or not?
>
> E.  I gave him today our log of the Taylor papers with the single copy but I'm going to have those back tomorrow, because we have ten more papers to put in to Taylor.
>
> K.  You can get anything back anytime you want, we'll just buck them down.  I'll try to break the Director's set away from him as soon as I can.  Dildine is a DD/P man, and also has been in OTR for a while.  Shaffer is the second one, he is former Deputy Director of Training, and Bob Shea is the third, he is also a DD/P man.  The three of them will work with me.  How is your space situation down there?  Are you still sitting on each other's shoulders?

SECRET

Approved for Release: 2016/08/09 C01254908

SECRET
Approved for Release: 2016/08/09 C01254908

E.  No.  We can make room for them.

K.  Can you give them a little room with a telephone
and a file-cabinet so that we don't have to carry the
papers up and down, if they are right down there in
the building they will be closer to access.  I'll try
to come down as much as I can, so that you people
won't have to come up here.  I think one thing that
might be very useful, if you agree, is to get it
around that we are doing this, and anybody who wants
to talk to us, can talk to us.  So that if anybody
really wants to unload and cry.

D.  That would be very helpful.  I, for example, have
been bursting a gut to talk to this Taylor Group and
it is becoming increasingly apparent to me that that
is not going to happen.  I don't want to talk to you
anymore.  I have said my say, but I'll bet there are
a lot of people that would like to say something to
somebody.

K.  Let them say it to us, the odds are pretty good
they are not going to get a chance to talk to the
Taylor Group.  I imagine Taylor will break off the
engagement before this week is over.  He is going to
write his report and hand it to the President by the
end of next week.

E.  I understand it was due the 15th, but he wants to
move it up.

K.  Up, which way?  Toward the end of June--I mean
the beginning...

E.  Beginning of May, closer than the 15th.

K.  In other words, this week.

E.  Yes.

K.  Well, I did hear that he was under pressure to
get it out.  So I doubt if your people are going to
have a lot of chance to talk to them, but I think
they ought to have a free shot at us, and I
particularly think that anybody returning to the
military services who wants to talk should have the
opportunity to talk to the IG people.  Now, Jake, as
I told you this morning over the phone, the way we'll
handle this is that as we are working we will make
the drafts available to you to read and go over.  Not
only for your help and suggestions and correction of
factual errors, but also if you disagree with us, why
say so.  And when the report is written, according to
your [our?] usual practice we'll give a copy to the
Director and a copy to Cabell, one to Bissell and one
to WH. I don't know yet, I don't know what the
12

Approved for Release: 2016/08/09 C01254908

Approved for Release: 2016/08/09 C01254908

Director's view is, the sensitivities, the political
situation, as to whether we go outside this Agency
and skirmish with the Department. 13/*

The report drew nine Conclusions and made ten Recommendations
on the basis of the work which was done by the inspection team and
the Inspector General himself.  The manner in which the inspectors
performed their task was described by one team member as follows:

> He [Robert Shaffer] remembers the survey well
> because of the controversy it caused, and because it
> was his last assignment on the Inspection Staff.  He
> recalls that Kirkpatrick did not follow the course of
> the survey closely and that the team did not function
> as a team.  Each inspector went largely on his own
> way, with Shea concentrating on FI matters, Shaffer
> on PM, and Dildine on PP and the chronology of the
> operation. After the team members began writing their
> contributions to the report, the team met with Jacob
> Esterline, who was Chief of the Cuban Task Force, and
> with others, whose names Shaffer does not now
> remember, for a roundtable discussion of the
> operation. Each inspector then completed his portion
> of the report with little consultation with the other
> team members.  Dildine assembled the contributions
> into a draft report, which was reviewed by Deputy
> Inspector General David McLean from the sole
> standpoint of any minor editing that might be
> required.  It then went to Kirkpatrick, who
> apparently approved it virtually as submitted.
> Shaffer recalls that there was no rewriting at all.
> He also remembers that Kirkpatrick directed the team
> members to destroy all of their working papers
> relating to the survey because of the report's
> sensitivity. 14/**

---

\* K-Kirkpatrick, E-Esterline, D-Drain.  Writer's emphasis.
\*\* Writer's emphasis.  Based on Kirkpatrick's diary, Shaffer's
suggestion that the IG team members were going it alone is in
error.  Specific meetings with Dildine and/or Shea are noted for
the following dates:  1 May, 11 July, 26 July, 30 August, and
10 October 1961; and meetings were held with the IG team on
2 May (two meetings), 7 July, and 17 July 1961.  Also, there
is no evidence to support Shaffer's reference to a "roundtable
discussion" with Esterline and other members of WH/4.

SECRET

Approved for Release: 2016/08/09 C01254908

Approved for Release: 2016/08/09 C01254908

Kenneth E. Greer, the author who reported on the interview with Shaffer, also made the following comment about the documentary evidence for the IG report:

> An IG survey team customarily assembles a
> considerable volume of paper in the course of a
> survey consisting of documents and of notes and
> memorandums of interview[s].  When the report of
> survey is completed and the response is in and is
> accepted, the backup material is disposed of.  Some
> of it is destroyed, and some of it is returned to the
> suppliers.  Those documents that are felt should be
> retained for record purposes are filed in what is
> commonly referred to as "the green folder" (because
> it is a green pressboard binder), which is
> permanently retained with the report of survey.
> Unfortunately for the historian, Kirkpatrick's
> practice was to strip the green folder when the file
> was retired to Records Center.  The green folder on
> the Cuban operation contains two sheets of paper, one
> listing the names of the team members and of the
> typists and the other being a brief transmittal
> memorandum requesting the DDP's comments on the
> report.  A review of Kirkpatrick's diary failed to
> find any entries relating to this survey between the
> date the survey began and the date the report was
> submitted. 15/*

In June 1976, approximately three years after publication of the above quotation, Don Chamberlain, then Inspector General, and Scott Breckenridge of the Inspection Staff were questioned about the possible existence of documentary materials which had been used by the IG team investigating the Bay of Pigs.  They, too, contended

---

* As already noted, Kirkpatrick's diary recorded at least eight entries relating to the survey during the interval between the beginning of the survey and its transmittal to Mr. McCone.  As will be obvious to even the most casual user of this report, Mr. Greer's search for documentation concerning Kirkpatrick's investigations defies belief.  To say that it was incompetent understates the case and gives one concern about any other inspections in which Greer was involved.  One might also reflect on the qualifications of the IG's to whom Greer reported during his tenure on the staff from 1962-1971.

14

SECRET

Approved for Release: 2016/08/09 C01254908

Approved for Release: 2016/08/09 C01254908

that no such materials existed. 16/  Even as this volume was being

drafted, this negative information regarding documents on the Bay of

Pigs investigation was restated by then Inspector General, Charles

A. Briggs, who informed the author that:

> We [the IG's office] have no record of any
> Kirkpatrick "working papers" on this subject.  As far
> as we can tell, all of the OIG survey team's working
> papers related to the Bay of Pigs Operation survey
> were destroyed in accordance with Kirkpatrick's
> instructions. 17/*

In interesting contrast to the statements which were provided

by Mr. Shaffer were Lyman Kirkpatrick's comments in his memorandum

of 20 November 1961 transmitting a copy of his report to Mr. John

McCone, who had been named to become--but had not yet sworn in

as--Director of Central Intelligence.  Kirkpatrick wrote: "While

the analysis and conclusions presented herewith regarding the

operation are those of the Inspector General, the basis for these

conclusions are extensively documented in the files." 18/  In that

same memorandum, Kirkpatrick also specified that, "My meeting with

the top three officers of the Branch reviewing the operation the

week after the landing failed is reported in some 70 pages."  A

similar statement regarding the availability of

---

\*  The correspondence between the writer and Inspector General
   Charles A. Briggs concerning this material is given in Appendix A.
   It clearly raises questions about the competence and/or reliabil-
   ity of that key office.  Quite obviously the working habits or re-
   search capabilities of the IG's office had not improved since 1973
   when Greer's volume appeared.  In the spring of 1981, through
   inquiry of another source, the author of this volume recovered a
   nearly complete set of the working papers of the Bay of Pigs
   inspection team.  One might even wonder if the failures of the IGs
   to locate the papers in question were intentional.  The extreme
   sensitivity concerning Kirkpatrick's reports at this time in the
   Agency's life can only be interpreted as a rear guarding action
   rather than any serious concern over security

SECRET

Approved for Release: 2016/08/09 C01254908

Approved for Release: 2016/08/09 C01254908

documentation--including documentation concerning the meeting with the three top officers of the Cuban Task Force--appears in Kirkpatrick's memorandum of 24 November 1961, transmitting a copy of his report to Mr. Dulles. 19/*

Another point of difference with Mr. Shaffer's recollection is that in his memorandum of 24 November 1961 to Mr. Dulles, Kirkpatrick's memorandum seems to indicate that David McLean may have been involved in something more than minor editing of the final report. 20/  In the instance of the letters of transmittal to both the Director of Central Intelligence and the upcoming Director of Central Intelligence, Kirkpatrick made it quite clear that the opinions expressed in the report were his own.

Even though Kirkpatrick in both his 1968 book, The Real CIA, and a 1972 article in the Naval War College Review made public the role that his office played in reviewing the Bay of Pigs Operation, little else has appeared in the public domain about the IG investigation.  In fact, very little has appeared about the investigation even in the classified literature.  In 1973 two volumes in the CIA Historical Series devoted segments to the Inspector General's report.  One of these segments appeared in Volume 3 of Wayne Jackson's history, Allen Welsh Dulles as Director of Central Intelligence, 26 February 1953 - 29 November 1961.  The other segment appeared in Kenneth Greer's, The Office of the Inspector General, January 1952 - December 1971.**

---

\* This 70 page document was among those retrieved at the author's request from a non-IG source.
\*\* The Jackson volume was issued in July 1973 and is recorded as DCI-2 in the CIA Historical Series.  Greer's volume was published in October 1973 as DCI-7 in the CIA Historical Series.

16

SECRET

SECRET
Approved for Release: 2016/08/09 C01254908

Unfortunately, neither author had sufficient background knowledge of the Bay of Pigs Operation to make objective judgments about many of the points which were raised in Kirkpatrick's study; and neither author had access to the reports of the Taylor Committee.  Even under the best of circumstances, it probably would have been difficult for Mr. Jackson to have rendered an objective judgment about Kirkpatrick's report because of the close association that had been established between Dulles and many of the officers on the Board of National Estimates--of which Jackson was a long term member.  The principal emphasis by both authors concerned speculation regarding Kirkpatrick's motives in terms of the thrust of the report and the handling of the transmittal of the final report.  Both Greer and Jackson engaged in more discussion of the rebuttal by Deputy Director of Plans to the Kirkpatrick report than they did to the IG's report.  Such substantive information as was presented was done in a slipshod manner, as witness Greer's presentation of the nine conclusions of the Inspector General's survey, but with no indication that the conclusions were followed by ten recommendations.  Similarly, Jackson also mentioned several of the conclusions of the Inspector General's report but had little or nothing to say with reference to the recommendations.

After studying the background materials that had been generated during the course of the planning and the conduct of the Bay of Pigs Operation and the Taylor committee report which had been requested by President Kennedy, it is apparent, simply from review of the Introduction, that the Inspector General's survey was guaranteed to arouse strenuous objections among those who had been associated closely with the anti-Castro effort.  Among other comments, the IG's Introduction stated: 21/

17

Approved for Release: 2016/08/09 C01254908

This is the Inspector General's report on the Central
Intelligence Agency's ill-fated attempt to implement
national policy by overthrowing the Fidel Castro
regime in Cuba by means of a covert paramilitary
operation:

The purpose of the report is to evaluate selected
aspects of the Agency's performance of this task, to
describe weaknesses and failures disclosed by the
study, and to make recommendations for their
correction and avoidance in the future.

The report concentrates on the organization, staffing
and planning of the project, and on the conduct of
the covert paramilitary phase of the operation,
including comments on intelligence support, training,
and security.  It does not describe or analyze in
detail the purely military phase of the effort.

The report includes reference to the roles played by
Agency officials in Presidential conferences and
interdepartmental meetings at which policy decisions
affecting the course of the operation were taken, but
it contains no evaluation or judgment on any decision
or action taken by any official not employed by the
Agency.

The IG's suggestion that the operation was "ill-fated,"

particularly in view of the controversy which was precipitated by

the cancellation of the D-Day strike, automatically would put

participants in the operation on the defensive.  In addition, to

suggest that the Central Intelligence Agency alone should wear the

albatross for the failure of the operation would reinforce the

belief that the IG and his inspectors were out to "get" the DDP--and

even the DCI.  To reemphasize that the study was going to focus

exclusively on the "weaknesses and failures" rather than to present

an objective overview of all actions--successful and

unsuccessful--was another guarantee of automatic resentment.  The

report's reference to the focus on the "paramilitary" phase of the

operation as distinct from the purely "military" phase certainly

would raise a question concerning the point at which the inspectors

18

SECRET

Approved for Release: 2016/08/09 C01254908

Approved for Release: 2016/08/09 C01254908

were making this particular break.  Was it in November 1960 when
the emphasis shifted from the infiltration of guerrilla teams into
Cuba to the decision to form a basic infantry unit?  Or was it at
the point that the Cuban brigade began to move out of Guatemala
through Nicaragua for the landing in Cuba?  Finally, in terms of the
Introduction, the suggestion that decisions or actions taken by the
CIA officials who participated in Presidential conferences and
interdepartmental meetings could be judged in isolation and apart
from the interests of other agencies' representatives in any given
meeting was absurd on the face of it.


   2.  Findings

      Following the Introduction, the Inspector General's survey
has a 31 page segment on the history of the operation as it
developed in CIA.  Basically this is a straight-forward and
non-controversial exposition of the evolution of the anti-Castro
program in the Agency from the end of 1958 through the organization
of WH/4.  It describes briefly the various initial
activities--propaganda, paramilitary training, financing, and
organizing the anti-Castro Cuban elements in the United States; and
it then turns to the change in concept from guerrilla type
infiltration activities to the development of the plan for an air
supported amphibious invasion.  It also related the participation
through the Presidential level of the other agencies of the
government which worked with the Agency in support of the
anti-Castro effort--an effort which the Inspector General's report
clearly understood was the official policy of the United States
Government. 22/

19

SECRET

Approved for Release: 2016/08/09 C01254908

Approved for Release: 2016/08/09 C01254908

The survey then contained a series of segments which were
identified as evaluations of such things as the organization and
command structure and staffing and planning. 23/  In reviewing
these evaluations there are some which were in complete agreement
with those of the Maxwell Taylor Committee.  There are others which
were unique to the Inspector General's study.  There were some which
were closely related to items which were subject to discussion by
the Taylor Committee, but contrary to General Cabell's opinion that
"some of these conclusions are in conflict with General Taylor's
conclusions," there are no apparent conflicts with the findings of
the Taylor Committee Report. 24/*

In the "Summary of Evaluation" of the Bay of Pigs Operation,
the Inspector General's report once again introduced the issue of
fate as having pre-ordained the failure of the planned overthrow of
Castro stating:  "In evaluating the Agency's performance, it is
essential to avoid grasping immediately, as many persons have done,
at the explanation that the President's order cancelling the the
D-Day air strikes was the chief cause of failure."  The report
proceeded to suggest that the whole question might have been avoided
through better planning, organization, and leadership; but more
importantly:

> It is essential to keep in mind the possibility that
> the invasion was doomed in advance, that an initially
> successful landing by 1,500 men would eventually have
> been crushed by Castro's combined military resources
> strengthened by Soviet Bloc supplied military
> materiel. 25/
> These opinions, of course, were surfaced by various

individuals during the Taylor Committee hearings--all after the

---

* Unfortunately, General Cabell failed to specify such differences
  as he had in mind.

20

SECRET

Approved for Release: 2016/08/09 C01254908

Approved for Release: 2016/08/09 C01254908

Brigade collapsed.  As with the Taylor Committee report, such
presumptions completely ignored the possible disruption of Castro's
military which might have resulted if the Brigade's B-26's had
controlled the air over Cuba.  They also ignored the impact which
unopposed B-26 operations might have had in stimulating potential
dissidents throughout Cuba to active efforts to overthrow Fidel
Castro.  The Inspector General's evaluation then struck its cruelest
blow of all at the Central Intelligence Agency saying:

> The fundamental cause of the disaster was the
> Agency's failure to give the project, notwithstanding
> its importance and its immense potentiality for
> damage to the United States, the top-flight handling
> which it required--appropriate organization, staffing
> throughout by highly qualified personnel, and full
> time direction and control of the highest quality.
> Insufficiencies in these vital areas resulted in
> pressures and distortions, which in turn produced
> numerous serious operational mistakes and omissions,
> and in lack of awareness of developing dangers, in
> failure to take action to counter them, and in grave
> mistakes of judgment.  There was failure at high
> levels to concentrate informed, unwavering scrutiny
> on the project and to apply experienced, unbiased
> judgment to the menacing situations that developed.
> 26/*

In evaluating the organization and command structure, the
IG's survey elaborated on the foregoing criticism of the Agency's
leadership during the operation.  In specifying that although WH/4
under the direction of Jacob D. Esterline was technically in the
fourth echelon in the Agency's overall organization, in fact,

---

* Perhaps because of the presence of Mr. Dulles as a member of the
Taylor Committee, any sharp criticism of the Agency's most senior
leadership during the course of Taylor Committee investigation
seems to have been avoided, intentionally or unintentionally.
Based on the sharp questioning by Attorney General Robert Kennedy,
in particular, and sometimes by General Taylor, it is possible
that those two members of the committee would have found agreement
with this strong statement made by Inspector General Kirkpatrick.

SECRET

Approved for Release: 2016/08/09 C01254908

Approved for Release: 2016/08/09 C01254908

Esterline really was further down the ladder than that. Esterline could report directly to the Deputy Director for Plans, Mr. Bissell, but he also had some reporting responsibilities to Col. J.C. King, Chief of the Western Hemisphere Division.*  In addition, Esterline also had to deal with both General Cabell, Deputy Director of Central Intelligence and Col. Stanley Beerli, Acting Chief, Development Projects Division, over questions involving air operations.  Mr. Bissell's Assistant Deputy Director of Plans for Action, C. Tracy Barnes, and the Chief of WH/4's Paramilitary Staff, Col. Hawkins, also played key roles in the decisionmaking process for the operation.  There was mention in the IG's comment that: "There were too many echelons' the top level had to be briefed by briefers who themselves were not doing the day-to-day work." 27/ No one was more in agreement with that statement than Jake Esterline who, during an interview nearly fifteen years after the event, stated:

> I don't think just because a person is a GS-18, or because he has four stars on his shoulder, that he should have gone [to briefings] himself.  He should have at least--if he had to go--he should have at least had one of the principal lieutenants charged with the operation--and that would be Hawkins and myself--someone who knew intimately what, how soon, or how easily disaster could come, should have been there. 28/

The Inspector General's survey also raised another point briefly touched on by the Taylor Committee--the relationship during the on-going anti-Castro activity between DDP Richard Bissell and Richard Helms, Chief of Operations, DDP.  Mr. Bissell has explained

---

* As mentioned in the discussion of the Taylor Committee Report, however, Col. King had only a marginal, somewhat honorary, role in the Bay of Pigs chain of command.

SECRET

Approved for Release: 2016/08/09 C01254908

Approved for Release: 2016/08/09 C01254908

SECRET

that there was no formal arrangement between himself and Helms over
the division of efforts during the Bay of Pigs Operation and that it
was more or less tacitly agreed that Helms would concern himself
with all other operations activities while Bissell focused most of
his attention on the anti-Castro effort. 29/  The Inspector
General's survey, however, specified that "on at least two occasions
COPS [Chief Operations] was given express warnings that the project
was being perilously mismanaged, but he declined to involve himself
with the project." 30/  The isolation of COPS/DDP also was sharply
criticized by Dick Drain, COPS/WH/4.  Drain not only suggested that
perhaps Helms was gun-shy but stated:

> I think that was an error.  I've been a COPS now,
> several times; and a COPS, goddamn it, is a COPS.
> When anything as big as this is going on, some person
> has got to be in charge of the interrelationship---
> real or imagined--of this thing and the other things.
> 31/

Kirkpatrick's evaluation also found considerable fault with
the fact that the Agency's air arm, the Development Projects
Division (DPD), remained an independent entity throughout the course
of the Bay of Pigs Operation.  It was specified that coordination
problems between DPD and WH/4 tended to exacerbate relations between
the two organizations, but despite strong arguments from Jake
Esterline (and Col. Jack Hawkins) that DPD should be integrated for
purposes of the anit-Castro operation, Mr. Bissell insisted on
maintaining the independence of DPD. 32/

Another of the points made by the IG concerned the staffing
of WH/4--another area about which COPS/WH/4, Dick Drain, also had
very firm opinions.  According to Drain, Allen Dulles had said
repeatedly that the anti-Castro operation was the most important
project that the Agency had under way and that he wanted "the very
best people" even if it required that "people [be] pulled off tours
overseas if necessary."  Drain went on to say:

> Everybody would solemnly nod, and then, much like the
> case of Vietnam...we would tend to get the people
> that the area Division Chiefs found "excess"--which
> normally meant "found insufficient."  With many
> notable exceptions, we did not get the very best
> people available 33/

23

Approved for Release: 2016/08/09 C01254908

SECRET
Approved for Release: 2016/08/09 C01254908

According to the Inspector General's survey:

This recognition of the need for high quality
personnel is nowhere reflected in the history of the
project.  The DDP's Deputy for Covert Action advised
his subordinates that the Director's words did not
mean that the project was to be given carte blanche
in personnel procurement but that officers could be
adequately secured through negotiation.  In actual
fact, personnel for the project were secured by the
customary routine method of negotiation between the
project and the employee's office of current
assignment; no recourse was had to directed
assignment by the Director of Central Intelligence.
...In many cases, the reasons for assigning a given
person to the project was merely that he had just
returned from abroad and was still without an
assignment. 34/*

The point about the Inspector General's survey with reference

to personnel that struck a nerve, however, concerned his evaluation

about the marginal character of the qualifications of the people who

ended up in WH/4, or as the report said, "It is apparent from these

ratings [the relative retention lists of the Clandestine Service]

that the other units had not detailed their best people to WH/4, but

had in some instances given the project their disposal cases."

35/  Another of the IG's criticisms concerned the severe shortage

of Spanish language capability among those who were assigned to the

task force.  Kirkpatrick's report charged, "This lack occurred in

part because of the scarcity of Spanish linguists in the Agency and

in part because WH Division did not transfer to the project

sufficient numbers of its own Spanish speakers." 36/  Although

many of the senior WH/4 personnel who were fluent in Spanish came

---

* Dick Drain, Chief of Operations for WH/4 specified that this had
been the rationale for his assignment to the Cuban Task Force.
Having returned [        ] and being without an assignment for two
or three months, he was tapped for assignment to WH/4.

(b)(1)
(b)(3)

24

Approved for Release: 2016/08/09 C01254908

Approved for Release: 2016/08/09 C01254908
SECRET

from WHD, there is no question that the project suffered a severe
shortage of Spanish speakers throughout its life.

The principal exception to the questionable caliber of
personnel in WH/4 was the large number of assignees from the Deputy
Director of Support.  Col. Lawrence K. White, the Deputy Director
for Support (DDS), took Mr. Dulles at his word and did assign his
best people to the WH/4 activity.  This was particularly noticeable
with reference to the senior support officer, William E. Eisemann,
and personnel who were assigned to logistics, security, finance, and
communications.  The Inspector General's report noted specifically
that because of the lack of talent among the DDP assignees, there
was heavy dependence on DDS personnel to run the various bases that
were associated with the WH/4 project .  Bill Eisemann, Chief,
Support, WH/4, was particularly critical of the DD/P for its failure
to abide by its own contingency assignment plans, thus increasing
the burden on the more competent support officers. 37/

Despite the fact that the project eventually employed nearly
600 people, the Director of Central Intelligence, Allen Dulles,
never gave proper attention to the personnel situation as the
project was developing:

> When the thing [the Bay of Pigs Operation] was all
> over, Allen Dulles felt that, given the state of
> morale, he had better pull together in the
> auditorium, in R&S building, all those that were by
> this time back in the States and give them a little
> pep talk....This must have been about April
> 20th....Now, when he walked in there--and I was at
> his elbow with Jake--he looked out at the sea of
> faces in his sweet way, and he said, "My goodness.  I
> had no idea that there were this many people
> associated with this project!"  Well, why not?  It
> was clear.  There wasn't any mystery about it.  But
> higher management, Bissell excepted, never did really
> load into their thinking how very much of a drain on
> the total manpower this thing was.  It never got

25

SECRET

SECRET
Approved for Release: 2016/08/09 C01254908

clear to the other Division Chiefs, it seems to me,
that they really had to make a sacrifice of their
own--at this point relatively second priority
operations--to staff this thing up. 38/

In that part of the Inspector General's survey that is

devoted to an evaluation of the planning which culminated in the

invasion at Playa Giron, the report commented on the change in

concept from the initial program of guerrilla type activities with

infiltration of trained teams to work with dissident groups inside

Cuba to the amphibious invasion which took place on 17 April 1961.

Despite the statement that the IG's survey would focus exclusively

on internal CIA affairs, it was noted that the changes in concept

reflected policies that were determined on the basis of both

interagency discussions and amendments from the Executive Branch of

government.  The reference to the switch in the site of the

operation from Trinidad to Playa Giron (the Zapata plan) in the

Inspector General's report repeated a major error that also had

occurred in the course of the Taylor Committee hearings regarding

the airfield at Trinidad.  The IG report stated: "The airfield

requirement obliged the planners to shift the invasion site from

Trinidad to Zapata.  The former area was close to the Escambray

Mountains and therefore offered better guerrilla possibilities, but

only the latter had a suitable airfield." 39/*  This same critical

error also had gone unchallenged during the Taylor Committee

_____
* The basic reason for the shift from Trinidad had nothing to do with
  the airfield.  Trinidad was going to be "too spectacular" and too
  much like a WWII invasion for the President's taste.

26

Approved for Release: 2016/08/09 C01254908

Approved for Release: 2016/08/09 C01254908

investigation.  Not only could the Trinidad airfield have supported
B-26 operations, it could have supported them much more easily and
adequately than could the airstrip at Playa Giron.*

The Inspector General's report placed great emphasis on the
failure of CIA's planners to make a proper assessment of the
potential for internal support from anti-Castro dissidents--even had
the planned lodgement of the Brigade been successful.  The report
stated:

> It is clear that the invasion operation was based on
> the hope that the Brigade would be able to maintain
> itself in Cuba long enough to prevail by attracting
> insurgents and defectors from the Castro armed
> services, but without having in advance any assurance
> of assistance from identified, known, controlled,
> trained, and organized guerrillas.  The Agency hoped
> the invasion would, like a <u>deus ex machina</u>, produce a
> "shock", which would cause these defections.  In
> other words, under the final plan the invasion was to
> take the place of an organized resistance which did
> not exist and was to generate organized resistance by
> providing the focus and acting as a catalyst.
>
> The Agency was matching the 1,500 man brigade, after
> an amphibious landing, against Castro's combined
> military forces...estimated as follows:  the
> revolutionary Army--32,000 men; the militia--200,000

---

* Although the story given in the Inspector General's survey of the
changing concepts and the evolution of the final plan which
required the capture and use of an airstrip on Cuban soil clearly
indicates that the shift from Trinidad to Zapata was a result of
political rather than military decisions, in a subsequent discus-
sion of the IG survey, Kirkpatrick seems to have been confused
about the D-Day plan.  In writing for the <u>Naval War College Review</u>
in 1972, he stated:  "The President was under the impression ini-
tially that the H-hour air strike was actually going to be made
from the beachhead.  But, of course, the airstrip was never se-
cured to that degree, and the concept of eight B-26's bombing from
the beachhead was simply not feasible."  <u>40</u>/  It must be assumed
that the President was fully aware of the fact that the H-hour
air strike was going to be launched from the beachhead--after all,
he not only had been involved in the discussions, but he was the
one who authorized the plan which required that before air opera-
tions could begin on D-Day, at least two B-26's touch down at the
airstrip on Cuban soil.

27

SECRET

Approved for Release: 2016/08/09 C01254908

Approved for Release: 2016/08/09 C01254908

men; employing more than 30-40,000 tons of Bloc
furnished arms and heavy materiel of a value of
$30,000,000.  The argument has been made that the
Agency's theory of an uprising to be set off by a
successful invasion and the maintenance of a
battalion for a period of a week or so has not been
disproved.  It was not put to the test, this argument
goes, because the cancelled D-Day air strikes were
essential to the invasion's success.  Such an
argument fails in the face of Castro's demonstrated
power to arrest tens of thousands of suspected
persons immediately after the D-Day-minus-2 air
strikes and the effectiveness of the Castro security
forces in arresting agents....

Timely and objective scrutiny of the operation in the
months before the invasion...would have demonstrated
to Agency officials that the clandestine paramilitary
operations had almost totally failed, that there was
no controlled and responsive underground movement
ready to rally to the invasion force, and that
Castro's ability to both fight back and to roll up
the internal opposition must be very considerably
upgraded....It might also have suggested that the
Agency's responsibility in the operation should be
drastically revised and would certainly have revealed
that there was no real plan for the post invasion
period, whether for success or failure. 41/

Both Richard Bissell and Jake Esterline were fully aware of

the fact that the 1,500-man brigade was going to have little support

from organized internal resistance groups inside Cuba.  One

authority on Cuba in fact has quoted Bissell as saying, "Our

operations were not hampered by the arrest of so many people in

Havana after the [D-2] raids...we did not expect the underground to

play a large part." 42/*

In addition to denigrating the potential impact on dissident

elements had the Brigade Air Force controlled the air, the IG's

survey also ignored the effect which might have resulted had the

lodgement been maintained long enough for the representatives of

---

* Kirkpatrick, however, referred to the arrests following the D-2
  airstrike as "the first catastrophic blow to the...operation." 43/

28

SECRET

Approved for Release: 2016/08/09 C01254908

SECRET
Approved for Release: 2016/08/09 C01254908

the CRC under the leadership of Miro Cardona to have landed and
declared themselves to be the Provisional Government of Cuba. They
would have appealed immediately for support and recognition from the
United States and from the anti-Castro governments of the Latin
American area. 44/

        In its evaluation of the planning for the Bay of Pigs
Operation, the Inspector General's report strongly impled that the
Joint Chiefs of Staff were led down the primrose path by the Central
Intelligence Agency.  The IG report stated that "Agency participants
in the project have sought to defend the invasion plan by citing the
approval given to the plan by the Joint Chiefs of Staff."  The
survey reiterated some of the areas which were called into question
during the course of the Taylor Committee's interrogation of members
of the JCS regarding the role that their respective services had
played in the course of the planning for the Bay of Pigs Operation.
The suggestion in the IG's report "that the final plan was presented
to them [the JCS] only orally" makes it appear that this was a
deliberate plot to deny information to the Joint Chiefs. 45/  As
noted in an earlier volume in this series, the ongoing changes from
the middle of March to the time of the invasion negated the
possibility of preparing formal papers.  Comments by members of the
JCS to the Taylor Committee recognized this as a fact of life.

        The IG report also read that "they [the JCS] went on the
assumption that full air support would be furnished and control of
the air secured" and makes it sound as if the Agency knew all along
that at the last hour the D-Day air strike would be cancelled.
Similarly, the IG's assertion that the JCS had been assured that if

• SECRET

Approved for Release: 2016/08/09 C01254908

Approved for Release: 2016/08/09 C01254908

things got tough at the beach the Brigade could go guerrilla is not
an accurate representation of the beliefs which the various members
of the Joint Chiefs expressed to the Taylor Committee. 46/  The
most important point concerning the JCS evaluation of the planned
anti-Castro operation was ignored by the Inspector General's
report--each one of the individual Chiefs believed that the
operation could succeed.  In several instances, General Taylor
himself asked one or another of the Chiefs:  "If you had believed
that the operation was going to fail, would you have told the
President?"  In each instance where one of the service Chiefs was
asked this question the answer was unhesitatingly given as "yes."*

      In his further critique of the planning for the Bay of Pigs
operation, the Inspector General indicated that the finished
intelligence produced by the United States Intelligence Board
(USIB), the Office of National Estimates (ONE), and the Office of
Current Intelligence (OCI) provided ample warning for those in
charge of the anti-Castro operation to have called for a time-out to
restudy the whole plan.  There is no question that the publications
of these offices had been read by senior personnel involved in
planning the operation. 47/  Despite the availability of such
finished intelligence reports and a plethora of raw intelligence on
the internal Cuban situation, the Chief of the anti-Castro task
force indicated that he did not believe that the available
intelligence on the Cuban internal situation was adequate to the
needs of the time.  In response to a question on this specific

---

\* The reader also is referred to Pfeiffer, Taylor Committee
  Investigation of the Bay of Pigs, for the testimony of the Joint
  Chiefs of Staff.

SECRET

Approved for Release: 2016/08/09 C01254908

Approved for Release: 2016/08/09 C01254908

matter, he replied, "No, I think the Harris poll would have been
more effective--a Harris or a Gallup poll would have been more
effective.  I don't think that we had any quantitative or any
qualitative measure of just what the degree of infection with Castro
was." 48/

(b)(1)
(b)(3)

In addition to the embarrassment that might have been caused
to senior personnel both within and outside of CIA by the
cancellation of the anti-Castro project, the Inspector General's
survey added another fillip of a highly personal nature to his
critique of the Agency's role in the Bay of Pigs operation.  He
stated that the atmosphere was not conducive to any re-evaluation:

> The Chief of the project and his subordinates had
> been subjected to such gruelling pressures of haste
> and overwork for so long that their impetus and drive
> would have been difficult to curb for such a
> purpose.  The strike preparations, under the powerful
> influence of the project's paramilitary chief, to
> which there was no effective counterbalance, had
> gained such momentum that the operation had surged
> far ahead of policy. 49/

The implied criticism of Col. Jack Hawkins (USMC) who was Chief of
the paramilitary staff for the task force seems completely
unwarranted inasmuch as Hawkins's basic task was to prepare the
strike operations.  In fact, Hawkins suggested that it was the CIA's

31

Approved for Release: 2016/08/09 C01254908

Approved for Release: 2016/08/09 C01254908

personnel who were so caught up in the effort that they couldn't
bring themselves to cancel the operation.*

In a manner similar to that of the Taylor Committee Report,
the Inspector General's survey also noted that by November 1960, the
operation had received so much publicity that attempts to maintain
deniability should have been abandoned.  The survey emphasized that
not only were Cuban exiles in the United States loose lipped, but
the news media--particularly the Miami and New York papers--also
were eager to publicize any information they could get about plans
involving the United States in an effort to overthrow Fidel Castro.
Kirkpatrick's report, however, went a step further than that of
General Taylor's committee in pointing out that the attempt to
maintain the fiction of plausible deniability imposed such
restrictions on the types of military equipment that could be used
and on the use of US training bases and air facilities as to be
positively detrimental to plans for mounting a successful effort to
oust Castro.  Once the covert nature of the operation was blown, it
was Kirkpatrick's opinion that the Agency's leaders had a
responsibility to call a halt to the operation and go to the
President and ask for further guidance. 51/**

---

* Col. Hawkins took more than his share of criticism at the hands of
the Taylor Committee; and it seems possible that the IG's survey
may have been reflecting the opinions of that study.  Those most
closely associated with Hawkins in the operation, however, spoke
most highly of him.  One source stated: "Hawkins, who undoubtedly
would have gotten his star as a result of a successful Bay of Pigs
Operation...had been hand picked by the Commandant of the [Marine]
Corps, General Shoup, to come over and do this job.  A very
decent, honest, hard working man about whom all the fault finders
then [following the collapse of the invasion] began to say, 'Well,
I guess Hawkins just wasn't up to it'." 50/

**Or to quote Kirkpatrick's retrospective view:  "Trying to mount
an operation of this magnitude from the United States is about as
covert as walking nude across Times Square without attracting
attention." 52/

32

SECRET
Approved for Release: 2016/08/09 C01254908

Approved for Release: 2016/08/09 C01254908

Referring to the cancellation of the D-Day air strike by
President Kennedy on the evening of 16 April 1961, the Inspector
General's survey placed more blame on the Deputy Director of Central
Intelligence, General Cabell, and the Deputy Director of Plans,
Mr. Bissell, than on Mr. Kennedy and Secretary Rusk--even suggesting
that perhaps the President "may never have been clearly advised of
the need for command of the air in an amphibious operation like this
one." (This, of course, was the position taken by Robert Kennedy
during the hearings.) It was not that the President had not been
advised, it was simply a case that he and Rusk apparently did not
want to risk international criticism of the US.

During the meeting in Rusk's office on the night of 16 April
1961, General Cabell clearly spelled out that unless the brigade
aircraft were permitted the strike on the morning of
D-Day--particularly the attack on the three air fields which
contained the remaining combat aircraft--the Brigade's shipping
probably would be lost and resupply of the beachhead would be
impossible. Similarly, at 0430 hours on the morning of the 17th
when Cabell went to Rusk's home and got permission to telephone
Kennedy at Glen Ora to ask for naval air cover in lieu of the
cancelled air strike, the criticality of control of the air over
Cuba should have been obvious even to the slow witted.*

Following the IG's evaluation of the Agency's planning
efforts, the official report then grimly detailed the differences of

---

* In this context, Kirkpatrick repeated his earlier speculation that
if Jack Hawkins had been with Cabell and Bissell he could have
made a stronger, more effective case than either of the other
two. In view of Rusk's intransigence--even in view of the fact
that the D-2 air strikes had already blown the cover as far off of
plausible deniability as it could be--it is doubtful that
Hawkins's presence would have made any difference at that
particular moment.

33

Approved for Release: 2016/08/09 C01254908

Approved for Release: 2016/08/09 C01254908

opinion between Headquarters and the Miami Base.  Points of focus
were on the duplication of various activities and the strong desire
of the Base to become a Station--despite the firm opposition of
Headquarters.  Even though "the inspectors agree that this divided
effort represented an ineffective and uneconomical use of time,
money, and material, and less than maximum utilization of Agency
employees, plus unexploited, delayed, or poorly coordinated use of
Cuban agents and assets," this administrative debate had no bearing
on the success or failure of the Bay of Pigs operation which
supposedly was the principal objective of the Inspector General's
study. 53/  The best that can be made of the emphasis given this
segment in the IG's report is that it was a cheap shot at the
managerial abilities of the Deputy Director of Plans--or possibly
the COPS/DDP, Richard Helms.

Following the discussion of the Miami base, the IG survey
examined Intelligence Support.  The thrust of this section, as with
the segment on the Miami base, was out of focus, if not out of
context.  The survey reported that WH/4 not only ran the anti-Castro
operation but also had the Headquarters responsibility for
intelligence collection and dissemination of intelligence reports on
Cuba.  The IG survey belabored some of the obvious problems such as
the shortage of trained personnel to do intelligence analysis, the
lack of proper clearances for some of the personnel who should have
been analyzing the materials being collected, and competition
between WH/4/FI and what Kirkpatrick identified as "a G-2" unit in
WH/4 concerning their respective responsibilities for the
interpretation and utilization of the intelligence being
collected. 54/

SECRET

Approved for Release: 2016/08/09 C01254908

Approved for Release: 2016/08/09 C01254908

In focusing on the territorial responsibilities of these units, Kirkpatrick's discussion of intelligence support ignored the more obvious failure of WH/4 to make the fullest use of the capabilities of the Agency's Directorate of Intelligence to provide analytical support and finished intelligence for the anti-Castro operation. Certainly Kirkpatrick was aware of this, for in The Real CIA he asked:

> Why did the Bay of Pigs fail? How could the Central Intelligence Agency with its information gathering facilities, its highly developed analytical processes, and sophisticated personnel and procedures make such a mistake?
>
> In my opinion it failed not because of the CIA, but despite what was available in the CIA. The policy makers were not adequately informed of the capabilities and limitations of the instrument of foreign policy that they had chosen to use. The men in charge of the project chose to operate outside the organizational structure of both the CIA and the intelligence system and consequently forfeited a considerable amount of the expertise and judgment available in Washington. There was no really detached body of experts giving a critical evaluation as to the chances of success or failure. It was essentially the same group of people processing the intelligence, planning the operation, "selling" the project to the policy makers, and finally directing the final effort. It was a classic example of the correctness of those who maintained that there should be clear separation between those who evaluate intelligence and those who mount operations based on that intelligence. 55/

Kirkpatrick's comment beginning "the men in charge of the project" was both misleading and confusing. It would seem to make sense only if it read "the men in charge of the project failed to make full use of the organizational structure of either the CIA or the intelligence community and consequently forfeited a considerable amount of the expertise and judgment available in Washington." There was never any indication during the course of the Taylor

35

Approved for Release: 2016/08/09 C01254908

SECRET
Approved for Release: 2016/08/09 C01254908

Committee investigation that Bissell, Esterline, et al took off an
any unauthorized tangents during either the Eisenhower or the
Kennedy administrations.*

The IG's survey next examined "The Political Front and the
Relations of the Cubans to the Project." At the same time that this
was one of its most critical attacks on the DDP, it also was highly
ambivalent. On the one hand the IG's report seemed to take as
gospel all that had been heard about the denigration of the Cuban
leaders, particularly of Manuel Ray, Miro Cardona, and Antonio
Varona. While criticizing the Agency for not giving the Cubans a
greater voice in the efforts to organize the anti-Castro effort, the
recitation of the brief history of such attempts clearly indicated
that the leaders of the principal exile organizations which the
Agency was seeking to combine in a united front in opposition to
Castro were basically self-seeking, near ego-maniacs, more concerned
with what their positions would be in Cuba once Castro was ousted
than they were in working for the common cause.

As a case in point, for example, in November of 1960 when the
concept of the operation changed from guerrilla activity to
invasion, the Agency made it clear that it was no longer going to
focus its attention exclusively on the FRD. In terms of providing
support for groups inside or outside of Cuba which sought aid for

---

* One of the complaints voiced to the author by those he interviewed
was that the Agency was too closely confined to the organizational
structure. Kirkpatrick's comment also ignores the fact that the
military plan had been evaluated by the JCS and its findings went
to the Secretary of Defense. The political decisions by the White
House at the critical hour cancelled the D-Day air strike and
ignored the intelligence estimate that control of the air was
essential to success.

36

SECRET

Approved for Release: 2016/08/09 C01254908

paramilitary operations against Castro, decisions would be made on a case by case basis.  The survey noted:

> This complicated relations between project case
> officers and the FRD leaders.  It also appears to
> have resulted in some diffusion of effort in the
> attempts of clandestine infiltration of arms and
> paramilitary leaders into Cuba.  It seriously
> hampered progress toward FRD unity, sharpened FRD
> internal antagonisms, and contributed to the decline
> in strike force recruiting efforts. 56/

Despite its own references to the disputatious nature of the Cuban leadership, the Inspector General's report criticized the project for not giving the FRD leadership freer access and more voice in the military training programs in the camps in Guatemala--objecting in particular to the ban that was placed on visits to the camps by Cuban politicians.  The survey suggested:

> This was probably a mistake and an unreasonable
> interference in the Cubans' management of their own
> affairs.  Controlled contact between the FRD and the
> troops could have done much to improve the morale and
> motivation of the troops and make the training job
> easier....This was one example of a high-handed
> attitude toward Cubans that became more and more
> evident as the project progressed.  Cubans were the
> basic ingredient for a successful operation and,
> although the aim of having the exiles direct
> activities was probably idealistic and unattainable,
> nevertheless the Agency should have been able to
> organize them for maximum participation and to handle
> them properly to get the job done.  But with the
> Americans running the military effort, running Radio
> Swan, and doing unilateral recruiting, the operation
> became purely an American one in the exile Cuban
> mind, and in the public mind as well.  In by-passing
> the Cubans the Agency was weakening its own cover.
> 57/

The Inspector General's report indicated horror not only that the Agency was going to have control over the choice of leaders who were going to be pushed for positions in the Provisional Government, but:

> The crowing incident which publicly demonstrated the
> insignificant role of Cuban leaders and the contempt

37

Approved for Release: 2016/08/09 C01254908

Case 2:16-cv-04279-CMR   Document 16   Filed 03/30/17   Page 45 of 182
SECRET
Approved for Release: 2016/08/09 C01254908

in which they were held occurred at the time of the
invasion.  Isolated in a Miami safe house,
"voluntarily" but under strong persuasion, the
Revolutionary Council members awaited the outcome of
the military operation which they had not planned and
knew little about while Agency-written bulletins were
issued to the world in their name.

They had not been puppets in the early days of the
project.  Some of the Cubans had drawn up detailed
operational plans for resistance in areas of Cuba
that they knew intimately; other provided cover and
support....But when the project began to shift from a
clandestine operation to a military operation, Cuban
advice and participation no longer seemed
necessary....To the [US] military officers on loan to
the project, the problem was a military one, and
their attitude was "to hell with the Revolutionary
Council and the political side." 58/

This segment on the relationship with the Cubans closed with

some philosophical maundering about the question of whether any

operation could be successful--whether Cuban, Latin American, Black

African, or Southeast Asian--when US attitudes toward other people

were so unfavorable.  Projecting from that, the IG's report read

like a UN appeal:

The Agency, and for that matter, the American nation
is not likely to win many people away from Communism
if the Americans treat other nationals with
condescension or contempt, ignore the contributions
and knowledge which they can bring to bear, and
generally treat them as incompetent children whom the
Americans are going to rescue for reasons of their
own. 59/

Strangely enough, the IG's recommendations about giving the

Cubans a freer hand in directing the planning and training of the

brigade runs contrary to everything that the IG's survey

subsequently had to say about the security consciousness of the

exiles and the expectation--or hope--on the part of most of the

brigade trainees that the US military would become directly involved

in the attempt to oust Castro.  The concern of the Cuban political

38

SECRET

Approved for Release: 2016/08/09 C01254908

leaders with their macho image, their childlike and petty rivalries,
and their tendency toward impetuosity are but briefly touched on in
the Inspector General's report. Review of the records of WH/4 makes
clear the difficulties of dealing with the exile leadership
throughout the course of the operation. Former Agency employee, E.
Howard Hunt, has provided an excellent account of the difficulties
encountered in the Miami area as he and his boss, Gerard Droller,
tried to persuade a group of self-centered, factional leaders that
the anti-Castro effort would require more than bombast if it were to
succeed. In a similar vein, one of the Cuban pilots, who was among
the first contingent to be sent to Guatemala for training,
highlighted the political frictions among the pilot trainees that at
one point led to the resignation of nearly a dozen pilots.*

The threat of disruption of the military training effort
apparently was a fact a life for those assigned to the infantry
training base in Guatemala. The WH/4 logistics officer at Finca
Helvetia from December 1960 until after the invasion told an
interviewer that:

> Various groups of Cubans were always creating
> problems, complaining, and talking about revolting.
> About a month before the invasion (just after Artime
> and some other political leaders came down from
> Miami), the camp was split nearly 50/50 into political

---

* The volumes in question are E. Howard Hunt's Give Us This Day (New
Rochelle, H.Y.: Arlington House, 1973) and Eduardo Ferrer's
Operacion Puma (Miami: International Aviation Consultants, 1975).
Whatever else may be said about Howard Hunt's subsequent involve-
ment in the Watergate episode, it cannot be disputed that he was a
most effective hand-holder for the Cuban leadership in the Miami
area during much of the Bay of Pigs operation. Hunt not only was
fluent in Spanish, but he also was thoroughly familiar with the
Latin American temperament, having served a number of years in
various Latin American countries.

39

SECRET

Approved for Release: 2016/08/09 C01254908

camps.  The split was so bad that Lt. Col. Frank Egan
had to separate the groups, moving one to another
location.  Egan pleaded with the men to be military
and leave politics to the politicians.  Brigade
Commander San Roman threatened to resign.  After
three or four days--thanks to the efforts of the
deputy commander, a large black man, the two factions
agreed to work together again....

[The logistics officer] recalls talking to San Roman
a couple of weeks later.  He quotes San Roman as
saying Cubans did not know how to work as a team, and
adding:  "Every man here wants to be commander of the
brigade."  60/

The next topics examined by the IG were the air and maritime

paramilitary operations prior to the invasion of Playa Giron.  The

bulk of the discussion concerning air operations focused not on the

critical issue of planned combat air operations but on the failure

of the air drops to provide necessary supplies and equipment to

dissident elements in Cuba.  The IG blamed the failure in large part

on the separation of the Agency's air arm (DPD) from the Cuban task

force operation.  Sharp criticism was directed at the Deputy

Director of Central Intelligence, General Charles P. Cabell, who was

the senior air adviser for the anti-Castro operation.  To illustrate

Cabell's questionable performance, the IG's survey cited the classic

case which earned the General the sobriquet of "Old Rice and

Beans."  In what apparently was an early cost effectiveness fit,

Cabell insisted that on air drop operations aircraft must be fully

loaded even if it meant filling the cargo space with sacks of rice

and beans.  The first such drop which used this formula provided not

only the 1,500 pounds of materiel which had been requested by an

anti-Castro unit in Cuba, but also loaded them down the 800 pounds

of beans, 800 pounds of rice, and 160 pounds of lard!  61/

The Kirkpatrick report criticized the Cuban pilots for lack

of discipline in their failure to follow instructions in various of

40

Approved for Release: 2016/08/09 C01254908

Approved for Release: 2016/08/09 C01254908

the air drop operations, but also said that the American trainers should share in the blame.  It did soften that criticism somewhat by noting that policy banned US observers from accompanying any of the air drop flights over Cuba.  It failed to record that from the initiation of the air training program there had been an almost standing request from the air training base at Retalhuleu that American observers or pilots be assigned to the drop missions. 62/

Interestingly enough, the IG report said not a single word about the training activity or the overall air operation. Considering the handicaps under which they labored once the D-Day cancellation broke the planned air operations cycle and despite the fact that as the invasion was collapsing, few of the pilots proved unwilling or unable to continue to function in their combat role.* The performance of the B-26 pilots, in particular, reflected to the high credit of both the Cuban pilots and the US instructors and pilots who were willing to risk the invasion of the air space over Cuba in B-26's which stood no chance in combat against Castro's T-33's and Sea Furies.  As a particular demonstration of skill on the part of the Cuban pilot-trainees was the fact that following the combat operations on D-Day several of the pilots, even though unable to return to the home base at Puerto Cabezas were able to save their aircraft through emergency landings at Grand Cayman Island.

The Inspector General's survey then reviewed maritime operations and came up with further interesting observations. 63/

---

* The US air commander told the Cuban Study Group that only three
  Cuban pilots were found wanting during the crisis.

41

SECRET

Approved for Release: 2016/08/09 C01254908

Approved for Release: 2016/08/09 C01254908

Finding that there was no effective overall plan for using small boats to deliver materiel and to infiltrate or exfiltrate personnel to or from Cuba, the report stated: "One officer remarked that the Cubans were running the operations." In context, the implication of the IG's statement being "Why weren't the Americans doing this?" would seem in some contradiction to the previous complaint that the Cubans were not given enough responsibility in terms of supporting the anti-Castro effort. The section on maritime operations also made the point that Cuban pride was offended easily and the idea that cooperation was a two way street was better understood by the American personnel than by the Cubans to whom the word "cooperation" had little or no meaning--here again a contradiction of the IG's position that the Cubans should have been given more responsibility. In the investigation of maritime operations the IG's survey evidenced much concern over the cost-effectiveness of small boat purchases--a picking at nits and lice which had absolutely no bearing on the success or failure of the operation. 64/

More pertinent to the Inspector General's inquiry would have been some attention to the last minute need to acquire aluminum boats for use in the landing operation when the target area was changed from Trinidad to Zapata. This was a subject of some concern to the Taylor Committee investigation, but was a matter which had been left in limbo in the final report.* Considering that the IG

---

* Pfeiffer, The Taylor Committee Investigation of the Bay of Pigs.

SECRET

Approved for Release: 2016/08/09 C01254908

Approved for Release: 2016/08/09 C01254908

had access to the Taylor report, this would seem to have been a
rather strange and inexplicable omission on the part of the
Inspector General's investigation, particularly in view of the high
rate of failure of these boats at the time of the invasion.

In addition to its criticism of both air and maritime
training, the Inspector General's report also reviewed the training
of underground leaders who were expected to be placed in Cuba to
rally guerrilla support about them.  Following the basic training
program for a group of some 60 men in Panama in the summer of 1960,
the IG noted that in July 1960, 32 trainees were sent to Guatemala,
the first of the contingent which would be trained at Finca
Helvetia, about 10 miles north of Retalhuleu, and other properties
owned by Roberto Alejos, close friend and confidant of President
Ydigoras Fuentes of Guatemala.

Of the facilities obtained from Alejos, the IG survey stated:

A worse training site could hardly have been chosen
than the one in Guatemala, it being almost
inaccessible, with no training facilities and almost
no living facilities.  The trainees were put to work
building the camp, working during the day, and
studying at night....The number of Americans at the
camp was held to a bare minimum for security
reasons.    The camp commander was also the chief of
training and the project officer for Guatemala.  When
he arrived, he had to set up the temporary camp, find
an area for a permanent camp, contract for buildings,
supplies, and equipment; and he had to find sites for
a suitable air base, a maritime base, and a prison
and contract for these facilities to be built.  65/

Once again the IG report was severely critical of events
which really had no bearing on the ultimate outcome of the
anti-Castro operation.  There was considerable discussion of the
problems and delays which occurred during the course of the training
program for those who had expected to be infiltrated into Cuba to

43

Approved for Release: 2016/08/09 C01254908

Approved for Release: 2016/08/09 C01254908

work singly, in pairs, or in small teams with dissident elements
inside Cuba. But the criticism of WH/4 for failing to place these
individuals and teams in Cuba ignored the fact that Headquarters
plans were in flux because of the increasing evidence of
improvements in Castro's security measures. In criticizing this one
particular element of the training program, the IG survey overlooked
the two more important training programs--particularly when the plan
for infiltration gave way to invasion--those for the infantry and
the air force.

The IG's charge that: "There was no full-time chief of
training in the project to oversee requirements, define
responsibilities, set up facilities, and provide support" may have
applied, at least in part, to the training program for potential
underground leaders; but it in no way applied to the infantry or air
force training. 66/ The infantry training program was directed by
Lt. Col. Frank Egan, USA, and the air training program was run by
Major Billy Campbell, USAF. Both of these officers also were
responsible to Col. Jack Hawkins, Chief, Paramilitary Staff, WH/4.*

The Inspector General's survey of security practices during
the anti-Castro operation was introduced as follows:

> The assault on Cuba is generally acknowledged to have
> been a poorly kept secret. It could hardly have been
> otherwise, considering the complexity of the
> operation and the number of people involved, both
> Cuban and American. 67/

To be precise, the operation was exposed to the world on 15 April
1961 with the D-2 air strike. Perhaps the IG's understatement of

---

\* This was a technical responsibility in the case of Campbell who
reported directly to Colonels Gaines or Beerli of DPD.

SECRET

Approved for Release: 2016/08/09 C01254908

Approved for Release: 2016/08/09 C01254908

the situation should be excused because:  "The inspection team did
not make a detailed study of security aspects of the operation but
came across many weaknesses in the protection of information and
activities from those who did not 'need to know'."

Having criticized the task force planners for their failure
to give the Cubans more authority, the IG report then went into
detail to demonstrate that the Cubans had no sense of security or of
the need to keep quiet about their involvement in anti-Castro
activities.  This laxity was obvious throughout the community of
Cubans in Miami.  Those who would go on infil-exfil operations would
come back, and the news would soon become quite public.  Many of the
trained agents also knew the identities of other agents who had been
trained for covert activities inside Cuba; and according to the
survey:  "Agents who were supposedly well trained disregarded
elementary rules of personal security and were arrested because they
needlessly gave away their true identities by visiting relatives who
were under surveillance or by carrying identifying documents in
their pockets."  68/  What the discussion of security failed to
bring out, however, was that despite the so-called lapses in
security there were no Castro troops waiting on the beaches at Playa
Giron or Playa Larga for the invading forces when they landed.

In the course of its critique on security practices, the IG's
survey once again pointed to the hazards posed by the use of
Guatemala as a training site.  Belaboring the obvious, the survey
pointed out that the brigade could have been trained more securely
at some location in the United States--a position with which the
planners of the anti-Castro operation were in complete agreement.

45

SECRET

Approved for Release: 2016/08/09 C01254908

The point was, however, that the use of a non-US location was a political decision over which the Agency had no control and the IG's criticism created a straw man.

The final area investigated by the IG's staff concerned the use of Americans in combat and simply reiterated the stories put before the Taylor Committee that Rip Robertson and Gray Lynch had led the landing parties that marked the beaches at Playa Girón and Playa Larga and that US pilots had participated in air strikes against Castro's forces on the afternoon of D+1 and again on D+2. On the morning of D+2, two B-26's with US crews had been lost over Cuba. With reference to these aircraft, the IG survey erred in stating that both were lost to the T-33's. Actually, only one was shot down by a T-33. The other B-26 was lost to ground fire. The IG report also asserted that some of the American pilots who were shot down had been executed by Castro after capture. 69/* It appears, in fact, that the IG survey's greatest concern was not over the loss of four US fliers but over the administrative problems that were going to be presented in trying to keep their Agency affiliation secret. This involved maintenance of the cover stories for the families of the deceased Americans, backstopping the notional companies that had been formed in order to protect the identities of the individuals, and the solution of legal claims which would be involved in settling the estates of the deceased. There was little evidence that the IG's office had any concern for the welfare of the widows and children who were left by the four men

---

* There is no evidence to support the story that two American pilots were executed after capture.

46

SECRET

Approved for Release: 2016/08/09 C01254908

who had died in an operation conducted by the Central Intelligence Agency in support of US national policy. [70]/*

Fortunately, however, affairs concerning the widows and children of the four airmen were handled very competently and capably by the Agency's Office of Personnel and the Office of the General Counsel.  It was not until the late 1970's that it was acknowledged that the four flyers had been in the employ of the Central Intelligence Agency, and the fact that they were postumously awarded the Agency's highest medal for valor, the Distinguished Intelligence Cross, has not yet been revealed publicly.

With reference to the participation of Americans in the combat operation, Kirkpatrick's 1972 article in the <u>Naval War College Review</u> stated:  "the post-operation inspection was specifically directed to the question of whether any of the US personnel told the Cubans that US military forces would back them up."  In the context of the review article, it appears that this could have been a reference to his own Inspector General's survey, but it probably referred to the Taylor Committee report.  Certainly there is nothing in the IG's survey that bears on this question, and Kirkpatrick's comment in the <u>NWCR</u> article was very similar to the testimony of some of the CSG witnesses who said that anyone who had been involved in training the Cuban brigade would have been out of his mind if prior to the departure of the brigade for the invasion

---

* That the Agency did not take steps immediately to acknowledge the affiliation of the four Alabama Air National Guard flyers who lost their lives certainly did nothing to improve the Agency's image. In fact, had Castro not volunteered the return of the body of Pete Ray that had been kept frozen in a morgue since Ray's death on 19 April 1961, the existence of the body might yet have remained unknown, even though Castro, on 23 April 1961, had made it quite clear that at least two Americans had been killed in the B-26 which was shot down by anti-aircraft fire over Cuba on 19 April 1961. [71]/

47

Approved for Release: 2016/08/09 C01254908

he had given the slightest hint that the United States would let the
invasion go down the tubes. 72/

### 3. Interviews

Before examining the conclusions and recommendations of the
IG survey, an attempt must be made to understand--if not explain--
the findings of the survey which have been reviewed above.  To do
this, the records of the meetings of the IG and his team with
personnel affiliated with the BOP operation were examined
carefully.  Sins of both commission and omission by several key
witnesses were similar, if not identical, to their testimony before
the Taylor Committee.  Based on the records of meetings with the
principals in the operation, however, it is difficult to understand
how the IG's survey arrived at some of its evaluations--assuming the
intent of the survey was objectivity.  It appears that the most
severe criticisms found in the survey were made on the basis of
conversations with individuals who, in almost all instances, were
minor--if not marginal--participants in the operation.  Some of
those whose remarks were given the greatest weight had been involved
in the project for the shortest time.

In contrast to the Taylor Committee's records of the
testimony of witnesses--in summary rather than in verbatun form--the
Inspector General's survey retained verbatum records of the sessions
with most witnesses.  This was true almost without exception in the
case of key personnel.  Obviously such records provided an
opportunity for more accurate appraisal of the final report than was

48

SECRET

Approved for Release: 2016/08/09 C01254908
SECRET

true in the case of the Taylor Committee.  Moreover, there is no
question of identifying the comments of each individual participant.

As nearly as can be determined, Mr. Kirkpatrick took part in
only one joint interview with his inspection team--the second
interview with Richard Drain.  Kirkpatrick did conduct individual
intereviews with Richard Bissell, J. C. King, and Tracy Barnes; and
he also held a joint session with Colonel Hawkins, Dick Drain, and
(for part of the meeting) Jake Esterline.  Practically all of the
interviews which were conducted by inspection team members also were
done on a one-to-one basis.  Strangely enough Mr. Dulles and General
Cabell, in particular, and Colonels Beerli and Gaines were among the
key personnel who were not questioned by either Kirkpatrick or
members of his team.

Review of the record of the interviews in which Kirkpatrick
was involved are of greatest interest because they were with the
personnel most closely involved in the planning and conduct of the
anti-Castro effort from its initiation to its conclusion.  One of
the first such interviews conducted by the IG was a joint session on
1 or 2 May 1961 with Dick Drain, Colonel Jack Hawkins, and Jake
Esterline.  Dick Drain introduced Colonel Hawkins to the IG, noting
that as a non-Agency military assignee, Hawkins was--even more than
Drain himself--very conscious of "some of the half-assed ways we do
things, some of which have been fairly critical to this operation."
The following interesting exchange then took place between
Kirkpatrick and Jack Hawkins:

> K.  I want to take the opportunity this week before
> you get away and go back to the Marine Corps to get
> the benefit of as many thoughts [as] you have that
> will enable us to write a report on inside CIA of
> [what] went wrong.  I think the Taylor Group is
> probably going to cover some of the higher level
> aspects.  I don't envisage at the moment our getting

49

into any lengthy discussion with the people in State
or the Pentagon or the others unless directed to. But
I certainly want to find our what's right for [as] an
objective and useful report as we can produce.  The
Director told me yesterday that he wanted this done.
We both hoped that we could get a preliminary report
for General Taylor before his report goes before the
President.  Well, I don't see the slightest
possibility of that, but we'll certainly do our best,
I'm going to put three men on it plus myself.*

H.  Well, I don't think that the major difficulty or
the responsibility for the failure of the project
rests within the CIA at all.  In my opinion I think
that the responsibility rests upon our national
organization of the Government right here in
Washington, the lack of coordination between the
agencies concerned and a certain attitude on the part
of certain policy makers that always ends up with too
little too late...In other words I'll start off by
saying that the difficulty about the Cuban Operation
was not primarily a difficulty within CIA, it was
from beyond and above and about.  Although I have
seen some things about the CIA organization and
procedure which I thought hampered the thing, but not
critically.  For example, I think there has been
over-centralization of the control.  They formed the
task force to perform certain tasks, and yet the Task
Force Commander did not have the authority to issue
directives to the field in the form of cables or
otherwise. 73/

It should be emphasized that when the IG introduced the idea
of investigating only CIA to Hawkins, Hawkins immediately indicated
the fallacy of such an approach.  The final report, however, ignored
this advice and attempted to demonstrate that all faults were
internal to CIA.  There is no evidence in the Kirkpatrick Diary to
indicate that the DCI at any time had suggested that the IG should
be limited only to an investigation of in-house failures.

---

* The report of this interview is undated, but based on the referral
to Kirkpatrick's meeting with Dulles "yesterday," the interview
probably took place on 1 May 1961.  Kirkpatrick's Diary of
30 April indicates that he had a discussion with the DCI on that
date and the question of getting a preliminary IG report to the
Taylor Committee "before the Taylor Report is submitted to the
President" was discussed.  The text shown here is from an unedited
carbon. The author has a carbon copy showing numerous grammatical
corrections--many of which neither improve the grammar nor add to
the substance.

Approved for Release: 2016/08/09 C01254908

Kirkpatrick either was inconsistent on this matter--or devious--for at another point in his meeting with Hawkins and company he made clear that he was well aware that the cancellation of the D-Day air strike was the result of Department of State objections.  Additionally he stated:  "Well now it seems to me, those [cancellation of the D-Day air strikes]--of any single event--those might have [had] as much an affect on the outcome as any." 74/

When the IG's discussion with Hawkins and Drain introduced the question of the advantages of Trinidad over Zapata, Hawkins emphasized that the change to Zapata was dictated by State's concern that an airfield be seized before any B-26's could go into action on D-Day.  (Unfortunately he erred, as he had done when testifying to the Taylor Committee in stating that the airfield at Trinidad was too short for B-26 operations.*)

The response to Kirkpatrick's question concerning the Agency's expectation of strong support from the anti-Castro forces inside Cuba involved Drain, Hawkins, and Esterline; but it was Drain who introduced two important points which were ignored by the Taylor Committee--and excluded from Kirkpatrick's report.  With reference to the prospects for "a great uprising," Drain commented:

> This business of estimating the likelihood of
> resistance is one in which Sherman Kent gave us an

---

* Hawkins was one of several senior personnel who, unbelievably, were in error about the capabilities of the B-26's to use the 4,000 foot strip at Trinidad.  During the session with Kirkpatrick after Hawkins commented that the airstrip at Trinidad "was shorter," Dick Drain added, "as far as we could tell."  The author wonders if Drain had done some homework after the defeat.  There was no evidence that anyone else had expressed reservations about the need to use the Playa Giron strip.
74/  In his response to the writer's inquiries in 1976, Hawkins did specify that one of the attractive features of Trinidad over Zapata was that the B-26s could have used the existing airfield at Trinidad.  The Cuban pilots had trained to land and take off the B-26s within 4,000 feet--the length of the runways at both Trinidad and Playa Giron.

51

Approved for Release: 2016/08/09 C01254908
SECRET

early primer, which conditions all of this resistance
business, and that is time is running against the
United States and in favor of Castro, that is to say,
with every day that went by there was less likelihood
that resistance would do anything.

This was something that tended to get lost as you
have these protracted negotiations. Everytime you
had a negotiation you lost another day. Castro's
control went up and the resistance went down. We did
not make daily, or weekly, or monthly estimates on
the likelihood of resistance; but nobody failed to
point out that the resistance potential lessened with
every passing day. We didn't even make a new
assessment of the likelihood of resistance after the
President's 13 [sic] April press conference speech in
which he said--and it went all over Cuba and
everywhere else--under no conditions whatsoever will
the United States of America overtly intervene or in
any way aid any action against Castro. I like to say
myself that this had some aspect [sic] on the
resistance. 76/

Not only did the IG's report ignore the above, but it

differed very little from the Taylor Committee Report in emphasizing

that the anti-Castro project had failed to make the best use of

dissident elements in Cuba. Perhaps if Drain had been called to

testify before the Cuban Study Group, his more realistic evaluation

of the internal Cuban situation would have been understood, and the

Agency not reprimanded for misestimating the internal situation in

Cuba.

Kirkpatrick also questioned the continued emphasis on

plausible deniability, suggesting that it was a recognized

international reality that the only countries in the world that

could afford to support third country dissidents were the USSR and

the USA. No argument for continued support of deniability was

forthcoming from the task force representatives. Esterline, in

fact, reported that State had suggested that in lieu of running the

operation through Trinidad that it either be launched out of

Guantanamo or that a new airstrip be constructed in the hills of

52

SECRET

Oriente Province in Cuba, with the anti-Castro troops being
airlifted into the new site. To this Esterline lamented:

> This is kind of funny, but I mean at the same time
> they [State] were shooting us down on what we thought
> and what were still really perfectly sound ideas and
> plausibly deniable, we were running into this kind of
> ridiculous proposals [sic]. 77/

The very negative picture which the IG survey painted of DDCI
Cabell's management of air drop operations--Cabell had over-all
supervisory responsibility for all air ops--is clearly traceable to
Kirkpatrick's meeting with Esterline, Drain, and Hawkins. The
discussion about the DDCI focused on Cabell's role at the time of
the cancellation of the D-Day air strike, and it reflected the very
strong feelings of the top three officers in the anti-Castro task
force. Their comments to the IG were much more critical of the DDCI
than any which were made to the Taylor Committee:*

> K. Did any of you ever ask Cabell what he had in
> mind by his discussion with [General David] Gray, "We
> have got to get your kind [JCS military support] of
> help?"
>
> D. We were all sitting there listening. At this
> point I was in a state of shock. When General Cabell
> and Mr. Bissell came back from the Secretary's office
> at 10:30 [p.m.] and said, "Well, now we have a little
> change in our marching orders we are just going to
> restrict our air." Well, God damn it, this is what
> it was, you know, just casual, like you were talking
> about buying nasturtiums instead of...
>
> E. Why in the hell didn't you go on the stage
> instead of...
>
> D. "Now we have a little change in our marching
> orders, and we are not going to strike those
> airfields; we are going to have close support at the
> beach, now we better get Stan [Beerli] over here and
> change the orders." Col. Hawkins hit the table like
> this, and said, "God damn it, this is criminal
> negligence." And Jake said, "This is the God damnest

---

\* K - Kirkpatrick; D - Drain; E - Esterline; H - Hawkins.

Approved for Release: 2016/08/09 C01254908

SECRET

thing I have ever heard of." And I said, "Don't you
realize that we can't even recall the force now they
are in the water." General Cabell said, "I know that
some of you have lived very close to this project for
a long time and feel very deeply about it, but when
you get a change in the marching order you have to
react now, and you have to just take your orders and
do what you are told." That's literal, verbatim.  I
don't exaggerate that a God damned bit, do I?  We
were all three sitting there.

H.  Well, I guess I was the one sitting there...

E.  This is merely a superfluous statement, but I
never have yet figured out why General Cabell just
suddenly decided to come down there, on Sunday
afternoon about 5:00...

D.  Saturday he had told us he was going to be in our
office helping us all day Monday, so we fixed Jake's
office up to look like a war room to keep him out of
the real war room, because we had things that had to
be done there.  Hung a lot of cables up on the wall,
made it look very impressive.  He called Sunday
morning and said, "Unless there was something on that
was very important, "he was going to play golf.  We
all heaved a sigh of relief.  He came in about 4:00.
We had the photography there, then Beerli was there
with the photography, [          ] was there, I was
there, and you two.  He came in and sat down and he
hardly got his tail in the chair when he began to
talk about, "Now we've got to be sure that we are
acting in good faith with the Department."

(b)(3)

H.  Yeah.

D.  And we didn't know what the hell he was talking
about.  Honest to Christ, I don't think one of the
five of us knew what he was talking about.

H.  Then he came right out and said, "You are going
to have those air strikes on those airfields in the
morning?"  I said, "Why, of course," said
"absolutely".  He said, "Now, you sure the State
Department will understand about that.  Maybe we are
not acting in good faith with them."  And so this was
in his mind at 5:00 that afternoon and I thought no
more about it.  But, I don't know what had happened,
but if...Stevenson and Rusk had been working on it at
that hour, if we could just have known for sure, we
could have tried to stop that invasion.

D.  We could have sent them all to the Vieques.  We
had the thing set up to divert them to the Vieques,
if for some good reason the President said, "no", or

54

Approved for Release: 2016/08/09 C01254908

if intelligence showed that there was a trap they were walking into. 78/*

In addition to the joint meeting in which they participated with Kirkpatrick, the records of the IG survey indicate that Esterline had a separate session with Robert D. Shea; but no date is given and no record of the meeting has been found.  Mr. Kirkpatrick's diary recorded that on 8 June 1961, "Dildine asked me if I would like to sit in on a round up session with Drain tomorrow.  I told him I would if I didn't go to Princeton."  The IG's Diary for 9 June 1961 shows that Kirkpatrick not only "met with the Cuban team for round-up with Drain," but also that he had lunch with Drain.

The Drain-Kirkpatrick relationship apparently was quite close before, during, and after the IG's survey.  Drain had been on the IG's staff prior to his assignment [          ], and he was in contact with Kirkpatrick shortly after his reassignment to the Cuban operation. 79/  On 24 April 1961, a week before the session he, Hawkins, and Esterline had with the IG, Drain's personal notes show terse entry which read:  "Kirk, 11:00-12:00."  Kirkpatrick's Diary

(b)(1)
(b)(3)

---

* Although it was not admitted to either Kirkpatrick or the Taylor Committee by any of the WH/4 personnel--particularly Esterline or Hawkins--the writer believes that even after Cabell returned to the war room at Quarters Eye (I) on the night of 16 April 1961, a withdrawal of the invading force with minimum losses was a realistic option.  Why this point was never raised is difficult to understand.  Even after the exploits of Lynch and Robertson in marking the beaches and initiating troop landings it should have been possible to reload the troops and evacuate the area.  All that would have been lost then was the materiel and a bit of "face," with a few casualties.

55

SECRET

Approved for Release: 2016/08/09 C01254908

Approved for Release: 2016/08/09 C01254908

SECRET

or that same date is more revealing.  It noted that:  "Drain came up

and briefed me on the Cuban operation."  Drain also had at least two

luncheon dates with the IG prior to the transmittal of the IG survey

to the DCI, but a more interesting meeting was reported on 29

January 1962 as follows:

> Drain reported to me on his discussion with Bissell
> on his [Drain's] fitness report.  He said that
> Bissell had agreed with his [Drain's] version of the
> way the [BOP] project was handled and planned to
> check it out with Barnes and then with J.C. King.  He
> said Bissell [sic] then turned to the question of the
> IG Cuban Report and asked what he knew about the
> background.  Drain told him of the meeting he and
> Esterline and Hawkins had with me and also that he
> had read the final draft and made about seven factual
> corrections.  He noted to Bissell that the report
> specifically stated it was not going to deal with
> decisions made outside the Agency and that this
> answered their inquiry as to why it would not take
> these into account. 80/

It seems that Drain was completely out of character in not

vigorously protesting the attempt to isolate the Agency's role,

particularly in view of the strong position which had been taken by

Colonel Hawkins during the Hawkins-Drain-Esterline meeting when the

IG had suggested the possibility of doing such a study.*

The so-called "round-up" session which the IG team of

Dildine, Shea, and Shaffer held with Drain on 9 June 1961, saw

Kirkpatrick in attendance.  The available records of that meeting

consist of two items.  The first is a two page list of questions

(most of them leading questions) which focused on many issues which

at best either were obviously marginal to the success or failure of

the operation or had been covered previously during the 1 May

session which Drain, Hawkins, and Esterline had with Kirkpatrick.

---

\* Kirkpatrick also took a strong interest in Drain's reassignment
  following the close-out of the Bay of Pigs operation. 81/

SECRET
Approved for Release: 2016/08/09 C01254908

Approved for Release: 2016/08/09 C01254908
SECRET

The second item is Shaffer's Memorandum for the Record of
Drain's debriefing. 82/ The memorandum of the debriefing provides
some explanations for Mr. Drain's negative opinion of the
qualifications of the IG team.  Shaffer first addressed himself to
Drain's lack of concern about developing the resistance potential,
followed those remarks with a foolish statement that "apparently the
marines were to land at some later time," and devoted the rest of
his memorandum to expressing his dismay at Drain's apparent lack of
empathy for the Cubans.  Characteristic of the fog in which Drain
believed Shaffer operated was the following comment in the paper:

> It was also suggested [by Drain] that they [the
> anti-Castro] Cubans needed some Greeks to lead them
> to victory and keep them under control.  In my view,
> we will never win the Cubans or anybody else away
> from Communism if we treat them like incompetent
> children whom we are coming in to save. 83/*

In addition to Hawkins, Drain, and Esterline, the Deputy
Director for Plans, Richard Bissell, and his Deputy for Action, C.
Tracy Barnes, both had one-on-one sessions with Mr. Kirkpatrick.
The Bissell interview did not take place until mid-August 1961,
although the IG had been urged to talk to Bissell as early as 25 May
1961.  Bissell did not make that meeting, and even through he had
agreed to a meeting for 19 July, he also failed to make it at that
time. The mid-August meeting, however, did provide a 50-page
verbatim transcript of the session; and a member of the IG's
investigating team prepared a nine-page memorandum of selected
highlights for use of the other team members. 84/

---

* Apparently Mr. Shaffer did not understand that the Greeks suc-
  ceeded in their fight against a Communist takeover because their
  hearts were in the struggle--and because of US assistance.

57

Approved for Release: 2016/08/09 C01254908

Approved for Release: 2016/08/09 C01254908
SECRET

The verbatim text reflects a high degree of apparent
agreement between Bissell and Kirkpatrick.  In contrast to
Kirkpatrick's stated intent to focus only on matters exclusive to
CIA, the session with Bissell dealt extensively with the impact
which decisions by other agencies had on the anti-Castro operation.
Problems related to modifications suggested by the White House,
State, Defense, and the Special Group were recorded; and the
Inspector General clearly was aware that the negative impact of such
modifications could not be blamed on the task force.  Kirkpatrick
also was alert to the "passionate" feelings which were engendered by
discussion of the Bay of Pigs operation and he told Bissell:

> Consequently we have to be very temperate in our
> remarks.  Now what we're going to try and do is to
> put together a document which will give as
> dispassionate as possible an analysis of the project
> and how it was carried out.  And recommendations as
> to,if we ever did it again how it should be done.
> 85/

In response to Kirkpatrick's questions, there were a number
of things which Bissell admitted he would change if the operation
were being done over.  Among these changes were the following:

> Restructuring the chain of command by pulling the
> task force out of WH Division and putting it under
> the ADD/P/A, Tracy Barnes.
>
> Placing a segment of DPD under the specific authority
> of WH/4 for the duration of this particular operation.
>
> Establishing a mini-JCS with Colonel Hawkins, Colonel
> Beerli, and Captain Scapa working together to provide
> military expertise in all principal operational
> activities--land, sea, and air.
>
> Providing retention copies of all important papers,
> requiring Presidential support or authorization to
> the Special Assistant for National Security Affairs,
> McGeorge Bundy to insure Presidential approval and
> understanding.

SECRET
Approved for Release: 2016/08/09 C01254908

Approved for Release: 2016/08/09 C01254908
SECRET

> Giving greater attention to the development of
> internal resistance elements inside Cuba and possibly
> placing a military man in charge of this activity as
> a co-equal to Colonel Hawkins.  Hawkins could devote
> full time to military planning for the invasion.

> Recognizing the limitations to maintaining plausible
> deniability.

As occurred with his testimony before the Taylor Committee,

Bissell also made some comments to Kirkpatrick which, at best, were

confusing--and at worst misleading and in error.  One of the gravest

errors concerned the discussion between the IG and Bissell on the

position of the Joint Chiefs of Staff regarding the necessity of air

strikes.  Bissell unfortunately gave credence to some hearsay that

several members of the JCS thought that air support and control of

the air were unimportant to the success of the operation. [86/]  In

fact, all five members of the JCS told the Taylor Committee that

control of the air over Cuba was vital to the success of the

operation.  The Chief of Staff, USAF, General Thomas D. White,

insisted that cancellation of the D-Day strike was "a very key

factor" in the defeat of the operation. [87/]

In addition to his criticism of the JCS's reputed lack of

concern about the need for air support, Bissell specifically faulted

General Lemnitzer and the Secretary of Defense for their failure to

speak up when military aspects of the operation were questioned

during various high level meetings.  Bissell said that too

frequently he, not the DOD representatives, was looked to for

military expertise.  He did say that if pushed for a response,

McNamara usually supported CIA's position. [88/]

Bissell did, however, emphasize that the restrictions that

came to be imposed on the use of the Brigade's B-26's was a key

factor in the failure of the invasion. With referemce to the

59

SECRET
Approved for Release: 2016/08/09 C01254908

Approved for Release: 2016/08/09 C01254908

SECRET

force at Red Beach (Playa Larga), Bissell stated that the reason
only half of the troops debarked from the Houston was:

> ...because of the lack of B-26's, because the B-26's
> cover could never be used for ground support to any
> great extent....If we had B-26's that were able to
> fly ground support missions I think it might have
> happened that way [that Castro's forces would have
> been prevented from using the access roads across the
> Zapata Swamp to reach the invasion sites]. 89/

The success of the Castro forces was insured when the D-Day
air strike was cancelled and the B-26 operations were limited to the
"immediate" beach area. As Bissell subsequently would recall, in
the original D-Day plan the B-26's were intended specifically for
ground support operations once the tactical strikes at the D-Day
targets--particularly the airfields--had been completed. 90/  In
fact, the original plan called for two B-26's to be on station over
Cuba throughout D-Day.

Bissell did tend to confuse the story of air operations when
he told the IG:

> As you know, I've said in many places that one grave
> error we made was in not having a good many more B-26
> air crews which would have made a very big
> difference...at the crucial time. 91/

Having more B-26 crews, like having had more B-26's, would have had
no bearing on the outcome of the operation after the D-Day strike
was cancelled. Once Castro's T-33's and Sea Furies were saved from
a D-Day strike, having had additional numbers of B-26's and crews
would have been meaningless.*

---

* The problem of not having planned for more B-26's and crews con-
  tinued to bother Mr. Bissell for many years. In an interview with
  this writer in the late fall of 1975, he still faulted himself and
  others for not having had a larger inventory. 92/

60

Approved for Release: 2016/08/09 C01254908
SECRET

Kikrpatrick engaged Bissell in a lengthy discussion
concerning the poor record of airdrops to dissident elements in
Cuba. 93/   There was no denying that the record was extremely bad,
but whether the fault was more on the side of the reception teams or
the aircrews led to differences between the IG and the DDP.  Bissell
strongly defended the pilots--his point being that pilot performance
had been tested over the months of training by US instructors.*
Both he and Kirkpatrick did agree that lack of adequate
communications between aircraft and reception parties was a major
problem.  Belaboring the obvious, Kirkpatrick specified that air
drop operations had been dismal and that:

> We are going to take all of the 27 scheduled
> clandestine drops and we're going to trace each one
> through from who was the ground party, what did they
> know about clandestine air drops, what had they been
> told about flare paths, the type of identification
> markers required, in turn who handled the information
> they gave out, that [sic] case officer, and find out
> how long a path it was. 94/

Exactly how such information was to be obtained from inside Cuba was
not spelled out, but it seems obvious that the technical problems
involved in such a survey would have been well beyond the competence
of the IG team even under the best of conditions.

In the course of the interchange with Bissell, the IG
consistently faulted the military planning for the operation but
without suggesting any realistic alternatives to what Kirkpatrick

---

* There was serious reason to have doubt about the performance of
the Cuban pilots on airdrop ops.  One of the problems was that US
personnel were prohibited from overflights of Cuba and could not
check crews out under actual operating conditions.

61

Approved for Release: 2016/08/09 C01254908

Approved for Release: 2016/08/09 C01254908

SECRET

called--in an obvious put-down of Colonel Hawkins--"the dominant force in this case, the amphibious mentality." 95/  He and Bissell did agree, however, that the Agency needed a small, competent staff section in the DDP to be responsible for the development and planning of all paramilitary operations--land, sea, and air. 96/ In terms of the impact of outside pressures--particularly from the Department of State--for modifications of the operational plan, there was no apparent disagreement between the IG and the DDP.

The summary of the meeting between Kirkpatrick and Bissell which was prepared by Robert Shea for use by the other two members of the IG review team--Gib Dildine and Bob Shaffer--was a hatchet job of the first order intended to cut Bissell off at the knees.  In the "Summary of Bissell's Comments" the number of absurdities is difficult to believe.  Among the more flagrant examples:

   1.  Hawkins was clearly running the task force.  It
   is interesting to note that Bissell refers to
   "Hawkins and Esterline", i.e., in that order. 97/

In fact there were only three references where both names were used by Bissell in the "and/or" context, and in two instances Esterline came first.  More significant was Bissell's statement that:  "What I had hoped ... on the DPD business was that Jake would treat Hawkins and Beerli as his two military commanders."  This would indicate clearly that Esterline, not Hawkins, was running the task force. 98/

   2.  Bissell makes no mention of SI evidence of the
   roll-up of our agents. 99/

There apparently was no specific set of questions prepared for Kirkpatrick's interview with the DDP and since there was no particular reference to this point, there was no reason why Bissell

62

Approved for Release: 2016/08/09 C01254908
SECRET

should have introduced it. Moreover there is no evidence that such
intelligence would have modified the invasion plan. Both D-2 and
D-Day operations caught the Cubans by surprise.

> 3. Shea strongly faulted Bissell for failing to take
> some "extraordinary step" to alert the President to
> the need for air support after he heard that some JCS
> members believed that air support was unimportant to
> the operation. 100/

The point was that no such opinions were known to Bissell
first hand, and, moreover, McGeorge Bundy, the President's Special
Assistant for National Security Affairs was known to Bissell--and
was on record--as a strong proponent of control of the air over
Cuba. Bundy even had proposed pre-D-Day air strikes to insure such
control prior to the time that the D-2 strike was developed. It is
unlikely that Bundy would have failed to inform both the President
and Bissell if there were serious differences on this matter between
the JCS and the Agency.*

> 4. With reference to the change in concept from
> infiltration of small teams to assist and train
> anti-Castro elements to the invasion supported by
> aircraft, Shea picked out Bissell's comment that in
> the early fall of 1960 "two developments, really
> basically both of them unfavorable began to force our
> hands" and suggested that this implied that "the
> Agency was under pressure to deliver the victory."
> 101/

Shea was completely off-track in claiming that Bissell was
suggesting that the Agency was being pressured "to deliver the
victory." Bissell's "two developments" concerned the fact that
between March and September 1960 the resistance potential in Cuba
had not been developed to the point that had been anticipated--not

---

* As noted earlier in this volume, The Taylor Committee records show
  that the JCS members unanimously understood the need to control
  the air.

63

Approved for Release: 2016/08/09 C01254908

Approved for Release: 2016/08/09 C01254908
SECRET

only because the Agency's training program had been beset by
difficulties (including some attributable to squabbling among the
exile leadership over recruitment) but also by increasingly
effective security measures being developed by Castro.  In addition,
as the anti-Castro task force was aware, the Agency estimative
staffs--ONE and OCI in particular--were reporting improvement in
Castro's armed forces, including the militia, and, also, lessened
prospects for successful development of internal anti-Castro
elements.

The improvement in Castro's security and armed forces also
made it obvious to Esterline, Hawkins, and Bissell that the
small-team concept had to be abandoned if the national policy of
getting rid of Castro were to succeed.  The shift to an
air-supported amphibious invasion did not represent a reaction to
pressure "to deliver the victory," but was a realistic change in
concept designed to meet the changed situation within Cuba.  Shea
was attempting to read meanings into some of Bissell's phrases, some
admittedly ill-chosen, which were not there.

> 5.  Shea's memorandum also distorted Bissell's
> comments on the quality of the intelligence available
> during the course of planning.  It was stated that,
> among other things, Bissell indicated:  "Our
> intelligence was weak in certain respects:  (1) in
> the estimate, which really was the JCS estimate, of
> how soon Castro could actually engage his forces; (2)
> in the estimate of Castro's will to fight; and (3) in
> the estimate of the degree of skill with which the
> Castro attack would be directed and coordinated....
> Thus we thought the 1,400 man strike force could do
> the job." 102/

The IG inspection team member, Mr. Shea, completely ignored
Bissell's reference to the JCS estimate of the time it would require
for Castro's forces to come into contact with the invaders.
Bissell's comment was:

64

SECRET

Approved for Release: 2016/08/09 C01254908

SECRET

> We were 100% on his weaponry.  That is to say what
> kind of weapons he had and pretty much where he had
> them.  The estimate, which really was a JCS estimate
> of how soon he could actually engage his forces was
> just about...[100%] these were the tangible factors.
> 103/*

In his comments about the will of Castro's forces to fight,

the skill with which they were employed, and the belief that the

invasion force was adequate, Mr. Bissell faulted himself and the

Agency unjustly because Castro's forces were never tested against

the operational plan.  Most important, cancellation of the D-Day

strike assured Castro complete control of the air and full freedom

of maneuver without fear of interdiction by the B-26's.

> 6.  "As a final item concerning the IG's interview
> with the DDP, Mr. Shea also noted that:  "Hawkins
> apparently thought Cochinos Bay was approximately as
> good as Trinidad before the invasion, but after the
> invasion he shifted his view." 104/

As noted with reference to his earlier testimony before the

Taylor Committee, Mr. Bissell sometimes did himself and others more

harm than good as a witness.  This was a case in point for the

transcript of his interview with the IG reports Bissell as saying:

> Well, I have a memorandum from Jack Hawkins, and I
> think he's forgotten this one too, setting forth the
> advantages of Cochinos Bay; and I think it was Jack's
> judgment I know when he wrote that...that Cochinos
> Bay was approximately as good as the other.  He
> slightly preferred Trinidad, but by a very small
> margin.  This is one respect in which Jack's
> hindsight thinking is a little different and a little
> clearer than his foresight. 105/

Bissell did Colonel Hawkins a great disservice with the above

comment.  So strongly did Hawkins (and Esterline) feel when learning

that the

---

\* The ellipses in the quotation appear in the original text of the
  transcript of Bissell's meeting with the IG, and probably should
  have read [100% correct].

65

Approved for Release: 2016/08/09 C01254908

Approved for Release: 2016/08/09 C01254908

SECRET

Trinidad site was not acceptable to the President and the Secretary of State, that both gave serious consideration to resigning. 106/ At no point after that is there support for the idea that Hawkins ever favored Zapata over Trinidad.  Both Hawkins and Esterline--and the JCS--did believe that Zapata could be <u>successful</u>, not that it was ever a <u>better</u> choice than Trinidad.*

One other senior planner of the anti-Castro operation who was interviewed by Mr. Kirkpatrick was C. Tracy Barnes, ADDP/A.  The date of the meeting between Kirkpatrick and Barnes may have been as early as 18 July 1961 and it was not later than 8 August.**  The session was taped, and there is little question but that Barnes was both out of touch and out of focus on some of the issues raised by Kirkpatrick.  It also is apparent from the transcript that the IG led Barnes into several booby traps where Barnes ended up apparently criticising Bissell, Hawkins, or Esterline.  Such negative comments were given more credence than Barnes's straightforward praise of each of the three men for their dedication, competence, and efforts.  As with other key personnel, the IG interview focused sharp criticism on the fact that political discussions pushed by the

---

\* Interestingly enough when the writer interviewed Mr. Bissell in the fall of 1975, Bissell indicated that during the IG's survey, he had spent relatively little time with the investigators.  He appeared reluctant to discuss the investigation, noting that DCI McCone had told him that the IG survey and DDP's response would be bound together.  He closed off discussion of the subject by saying, "I don't remember very well Kirk's [IG survey]." 107/

\*\* Kirkpatrick's Diary for 18 July 1961 noted:  "Lunch with Mr. Barnes for a general discussion of the Cuban Operation."  An Official Routing Slip from R.D. Shea of 8 August 1961 to other members of the IG team and to the IG pertains to the IG's session with Barnes.

66

Approved for Release: 2016/08/09 C01254908

Approved for Release: 2016/08/09 C01254908

SECRET

Department of State were responsible for the failure of the operation. As with other interviews he conducted, there was no indication that Kirkpatrick intended to limit his survey to the critique of internal Agency problems.

After reviewing the transcript of the IG's interview with Barnes, Robert Shea of the inspection team sent a memorandum to Kirkpatrick with the following note on the routing slip: "The Barnes memo is incomplete and obscure in many places. We believe it would be worth your time to fill in the gaps." [108] Kirkpatrick deferred, suggesting that he would first review the transcript of his meeting with Bissell; and if gaps remained, he would review the record of the session with Barnes. Shea was insistent, however, and resubmitted the MR to the IG with the following remark: "Re T. Barnes' remarks: it would be helpful if you could go over my short memorandum, confirm its sufficiency, and add some clarification on the 7 points marked in red crayon." [109]

In focussing on Barnes's negative comments about the operation, the IG and his team failed to pick up on Barnes's reference to an apparent about face by one of President Kennedy's principal advisers, McGeorge Bundy, on the matter of the cancellation of the D-Day air strike. With reference to President Kennedy's decision to cancel the D-Day air strike because he "never understood the operational necessity of the air strike," Barnes reported that on the evening of 16 April 1961, he urged Bissell to "get ahold of Mac Bundy because he's on our side and he'll understand this. And just tell Mac to go to the President and tell him for Christ's sake that this [D-Day cancellation of air strike] is cockeyed." [110] The point was that at the time of the

67

Approved for Release: 2016/08/09 C01254908

Approved for Release: 2016/08/09 C01254908
SECRET

cancellation of the D-Day strike, Barnes apparently was the only one who remembered what a consistently strong advocate Bundy had been for control of the air--even having suggested the launching of numerous pre-D-Day air strikes from Nicaragua in order to guarantee such control.

Barnes's recommendation that Bundy be called on for support presents an interesting problem.  In his book on President Kennedy, Arthur Schlesinger wrote:

> Rusk after his talks with Stevenson, concluded that a second Nicaraguan strike would put the United States in an untenable position internationally, and that no further strikes should be launched until the planes could fly (or appear to fly) from the beachhead. Bundy agreed, and they called the President at Glen Ora. 111/

If the Schlesinger report was accurate, then Bundy would have been of little help; and according to General Cabell, it appears that this was the case:

> At about 9:30 p.m. on 16 April (D-1), I was called in the CIA Headquarters for the Cuban Operation by Special Assistant to the President, Mr. McGeorge Bundy.  He notified me that we would not be able to launch air strikes the next morning [D-Day, 17 April] until they could be conducted from a strip within the beachhead.  Any further consultation regarding this matter should be with the Secretary of State. 112/*

In a memorandum of 4 May 1961 to General Maxwell Taylor, however, Bundy forwarded for the official record of the Taylor Committee a revised and corrected version of the testimony he had

---

* General Cabell wrote the memo containing this information and Mr. Bissell signed the copy in concurrence with Cabell.  Cabell repeated this information in essence in some personal notes found among his effects after his death.  The references to Bundy were even stronger:  "He [Bundy] made it quite clear to me that the decision had already been made by the President....Mr. Bundy further made it quite clear that the President had left for Glen Ora and that the Secretary of State would act for him." 113/.

68

Approved for Release: 2016/08/09 C01254908

Approved for Release: 2016/08/09 C01254908
SECRET

given on 1 May 1961 at the 7th meeting of the Committee.  Included
among other items in Bundy's memorandum were the following two
comments: 114/

>    1) It was clearly understood that the air battle
>    should be won.

>    2) In my meeting with General Taylor and his advisory
>    group, I was asked about the decision not to permit
>    an air strike by the Cuban invasion force early on
>    Monday morning.  This is a matter which arises from a
>    conversation with the President and the Secretary of
>    State, and I do not believe I am the right man to
>    comment on it.

Based on Bundy's expressed position favoring pre-D-Day
strikes and his understanding that "the air battle should be won,"
did his failure to respond to the Taylor Committee's question
concerning the D-Day cancellation indicate that he, too, had been
overridden by Rusk and did not wish to be responsible for creating a
brouhaha within the Kennedy administration?  There is no question
that before he departed Washington on the evening of 16 April to go
to New York to meet with Adlai Stevenson, Bundy had been made aware
of the Agency's position.  Dick Drain is reported to have said that:

>    McGeorge Bundy called Bissell, who said to him--in
>    Drain's hearing--that there was every operational
>    reason against such cancellation.  Bundy, who was
>    just leaving for New York to hold Stevenson's hand,
>    told Bissell to go see Rusk. 115/

Unfortunately, however, the question of Bundy's apparent change of
position on the importance of the air strikes was never followed up.

Although he was not officially in the chain of command in
WH/4, Colonel J.C. King, Chief, Western Hemisphere Division played
an active and responsible role in the Agency's anti-Castro

69

Approved for Release: 2016/08/09 C01254908

~~SECRET~~

operation; and he, too, had a session with Mr. Kirkpatrick.*
Despite the many requirements which were placed on him by Bissell
and Barnes, Colonel King said that too often he was informed of
meetings pertinent to WHD interest only because Jake Esterline kept
him informed.  King was upset particularly following the change of
administration in January 1961 because he, and frequently Esterline
and Hawkins, were excluded from high-level meetings on operational
and other matters about which he or they were most knowledgeable.
As one case in point, King contended that he had been unable to
convince the Department of State that a full-scale, air supported
amphibious operation supported by the US which ousted Castro would
have been welcomed by Latin America.  To prove his point, King cited
the relatively minor nature of the anti-US protests which had
followed the D-2 air strike and the invasion of Cuba.

King told the IG that the caliber of personnel sent to WH/4
generally was quite high, noting particularly personnel assigned
from the Deputy Director for Support (DDS); but he agreed with
Kirkpatrick that Colonels Egan and Hawkins--both military
assignees--had given short shrift to developing the guerrilla
potential inside Cuba, concentrating instead on the strike force.

---

* In his interview with the IG, Tracy Barnes claimed that although
he was never in the chain of command that J.C. King "was never
really out of the chain of command." 116/   Although King was
Esterline's superior in LA Division, Esterline was authorized
direct contact with DDP Bissell from the inception of the
operation.  Based on the records, however, it is apparent that
Esterline was conscientious about keeping King informed of de-
velopments.  King's most significant contributions were in the
area of political organization among the anti-Castro factions
in the US rather than in paramilitary planning.  King also had
been put in the background during the Guatemalan episode in 1954
which also had been directed by Esterline.

70

Approved for Release: 2016/08/09 C01254908
SECRET

King also pushed strongly for the use of US contract pilots for air operations in the future and lamented that the DPD element had not been subject to operational command of WH/4. 117/  King's responses to the IG appear to have been designed consciously to be protective of his Latin America Division, even at the expense of the WH/4 task force and particularly Colonels Hawkins and Egan who were responsible for planning the military operations and training the Cuban brigade for the invasion.

Considering that the interviews which Mr. Kirkpatrick and his team had with the most senior personnel in the anti-Castro task force focused in large part on CIA's relations with the White House and State and the disastrous modifications which they imposed on the operational plan, it is necessary to examine the testimony of other witnesses for an explanation of the criticism of the task force which characterized the IG's final report.  One of the most severe castigations of the WH/4 leadership came from ☐☐☐☐☐☐☐                (b)(3) ex-Chief of SI support for the project during an interview with Shea on 4 August 1961.  For whatever reasons, ☐☐☐☐☐☐ himself a                (b)(3) wounded, decorated, combat veteran of World War II, claimed that Colonel Jack Hawkins was "the strong mind, the dominant one" who led Esterline and company down the road to defeat. ☐☐☐☐☐☐ claimed                (b)(3) that none of WH/4's principals were sufficiently trained in clandestine "tradecraft," and that all failed to make proper use of the intelligence coming in through FI/SI channels.  He also stated that this information was ignored by WH/4. ☐☐☐☐☐☐ parochial                (b)(3) view prevented him from understanding that the same pictures of Castro's improved internal security and military postures were available to WH/4 from the more comprehensive estimates of ONE and

71

SECRET

Approved for Release: 2016/08/09 C01254908

SECRET

OCI--estimates which were based on all source intelligence, including SI.

      [                    ] made much of the so-called "Mexico City message"    (b)(3)
of 13 April 1961 which purportedly indicated that the Soviets had
learned that the invasion was set for 17 April.  Although charging
that it was ignored by the project's leaders [                ] himself    (b)(3)
overlooked the fact that even if Castro had been informed of this
date, no Cuban troops were waiting on the beaches in the Bahia de
Cochinos for the invading force.  In an apparent display of
tradecraft paranoia, [                ] stated that NSA had copies of all    (b)(3)
the CIA messages and would use the information against the
Agency--how and to what end were not specified.  Finally [        ]    (b)(3)
suggested, for whatever reason is unfathomable, that Agency
employees should be told that the operation failed because the
Agency screwed up, not because the President cancelled the D-Day air
strike.  At least three of the charges made by [            ] found    (b)(3)
their way into the IG's final report:

        That Col. Hawkins was pushing the operation, but had
        neither the training nor the talent to make it work.

        That proper use of FI materials could have helped to
        avoid planning errors.

        That project leaders were guilty of substituting
        their subjective views of enemy intentions for
        realistic appraisals of his capabilities. 118/*

* [              ] boss, William Harvey, Chief, FID also was inter-    (b)(3)
viewed by a member of the IG team; and even though he was in no
way involved in the operation, Harvey also charged that SI infor-
mation was being ignored.  He claimed that he told Barnes and
Bissell that SI showed that there would be no Cuban uprising
"unless the invasion was a complete success."  This point, of
course, was obvious to WH/4.  Harvey also included some obscure
reference to making his information available to Richard Helms,
C/OPS/DDP; and made a particularly stupid remark that "J.C. King,
as Chief of Division, should have followed the project closely and
continuously."  Col. King, of course, followed every move
throughout the course of the operation.  Some of Harvey's guff
about Helms and King also got into the IG's report. 119/

72

Mr. Shea conducted another interview with a decorated,
wounded combat veteran of World War II who was a member of WH/4 and,
like⬚⬚⬚⬚ was particularly disenchanted with Col. Jack
Hawkins.  Edward Stanulis who was Jake Esterline's deputy, claimed
that Hawkins believed the US Marines should have been running the
operation.  Apparently Stanulis found this idea objectionable and he
charged that Hawkins "hated the Agency and had no feeling for
anything of a clandestine nature."  This charge would seem to have
misinterpreted Hawkins's displeasure with various CIA administrative
procedures and chain of command confusion with hatred of the
Agency.  Based on the IG team's interview with Stanulis, it appears
that he may have been chagrined that Hawkins--an outsider--was put
in charge of paramilitary planning rather than Stanulis himself.
120/

(b)(3)

Another of the principals from WH/4 who was interviewed by
Robert Shea of the IG team was Colonel Frank Egan (USA) who was in
charge of the paramilitary ground training activity.  Egan's remarks
generally paralleled his testimony before the Taylor Committee--he
faulted the lack of centralized control, the independence of DPD,
interference from State, lack of a joint operation with DOD, and
General Cabell's ineptness.  Egan supported the operational plan as
developed for Trinidad and lamented the series of amendments which
led to adoption of the Zapata plan.  Egan was particularly critical
of the Agency for failing to talk directly to the President and of
both General Lemnitzer and Admiral Burke for their failure to
protest vigorously the cancellation of the D-Day air strike.  121/
More to the point, Egan might have criticized General Cabell

73

Approved for Release: 2016/08/09 C01254908

SECRET

specifically for his failure to get in touch with his military
counterparts on the JCS immediately upon leaving the meeting with
Rusk at the time of the D-Day cancellation.

Mr. Shea also was responsible for conducting an interview
with [        ] a senior PM officer who was assigned to WH/4 for    (b)(3)
only three months in the very early stage of the program (mid-May to
mid-August) in 1960.  Strangely enough, the record of the interview
with [      ]--which was conducted eleven months after his tour--was   (b)(3)
one of the most detailed that was prepared for the IG, exclusive of
the records of meetings with project principals.  Even stranger is
the fact that much of what [      ] had to complain about--his session   (b)(3)
was truly one of "bitching and moaning"--found its way into the IG's
report.  [        ] claimed that he volunteered for the project with   (b)(3)
grave reservations, and it is apparent that the problems he
anticipated became self-fulfilling.

In his three month sojourn, [      ] determined that there was   (b)(3)
"complete lack of direction and command in the project; the
operational plan was nothing short of ludicrous; ...and...there was
poor selection of personnel." 122/  Reading the record of the
three hour interview makes one wonder whether the IG interviewer or
[      ] was most in need of mental health counseling.  All was wrong
with the world and only right with [      ]  All of the personnel   (b)(3)
affiliated with WH/4, with the possible exception of Esterline, who
was a marginal case, were incompetent at best.  Colonel Egan
"snowed" Esterline and the others; Stanulis was "a disposal case, a
great talker, 100% hot air;" Colonel King, "a top sergeant, used to
playing dictator;" Barnes couldn't take a position "or make concrete

Approved for Release: 2016/08/09 C01254908

Approved for Release: 2016/08/09 C01254908
SECRET

suggestions," and Chick Barquin (a DPD assignee was was involved in
planning the deception phase of the D-2 air strike) "suffers from a
personality difficulty."

               had fixed on some strange version of the initial op        (b)(3)
plan which had the small teams, which would be infiltrated into
Cuba, marching their followers toward Havana and being joined by
peasants eager to oust Castro; and he was sharply critical of "some
30 unsuccessful air drops"--none of which were attempted prior to
           departure from WH/4! He also commented that "Esterline and     (b)(3)
company attempted the impossible in setting arbitrary dates for the
invasion. This demonstrated a complete lack of understanding of the
problem."

      In terms of the final IG report, elements of                 (b)(3)
testimony are apparent in the criticisms concerning failure to
develop internal resistance elements in Cuba; deficiencies in the
chain of command; doubts                   to lead       (b)(1)
WH/4; analysis of SI; Richard Helms's role; and the caliber of
personnel assigned to WH/4. Why such weight was given to Mr.
          remarks is puzzling. Equally puzzling was the       (b)(3)
inverviewer's comment about                   (b)(3)

             made the foregoing comments in a calm,       (b)(3)
dispassionate manner. He professes to have no hard
feelings against anybody in WH/4. He says that the
operation of the project and its failure caused him
deep concern, which he still feels strongly although
he has been away from the project for a year.... He
thinks that it will be years before the bad effects
of the Cuban fiasco wear off. I think that his
comments and view deserve considerable weight.... He
said he would be glad to return for further
discussion, if and when necessary. 123/*

---

\* This comment by Shea plus the language of the IG's Survey suggest
that Shea was the principal author of the IG's final report. It
also suggests that perhaps Mr. Shea's "personal problems" (noted
earlier in this chapter) were mental.

SECRET
Approved for Release: 2016/08/09 C01254908

Approved for Release: 2016/08/09 C01254908

The [          ] interview was the extreme example of an obviously    (b)(3)

deliberate attempt by one of the IG survey team to give the worst

possible marks to those who ran the Bay of Pigs operation.

Unfortunately, however, review of the records of the other

interviews reveals that the IG team not only seemed determined to

find fault whenever possible, but also seems to have selected some

of the most marginal witnesses conceivable in order to get the

desired results.  Among such cases were the following:

1.    Dildine's session with Al Cox:

One of the Agency's paramilitary specialists,
Cox, who had no role in the BOP, was more than
willing to talk about matters which were out of his
bailiwick, and suggested some political interference
with Esterline's work from Vice President Nixon and
William D. Pawley.

The insinuation regarding Nixon was groundless
and the Pawley connection was a useful channel
between the project and the Cuban exile
organizations. 124/*

2.    The Director of Training's report that there was
considerable adverse criticism about the management
of the Cuban operation from training officers who had
been involved in the project:

One of the training critics was a man who, after
spending only four days at a base, extensively
criticized the organizational set up of the base.
Others were "old hands" who were sent to operational
bases or foreign areas and worked under new and
different conditions.  In two other instances where
specialists were misassigned, one individual--a
security and logistics type--said that having to
provide assistance in ordnance and sabotage training
had made him a direct asset to the project; and an
air operations trainer who was forced to provide
paramilitary training for a continually growing cadre
on a crash basis had no complaints, recognizing the
immediacy of the need. 125/

---

* Pfeiffer, Jack B., "President Nixon's Role in the Bay of Pigs
Operation" (Draft MSS), Jan 84, refutes the suggestion that
Mr. Nixon played any significant role in the Bay of Pigs planning
or operation.

SECRET

Approved for Release: 2016/08/09 C01254908

Approved for Release: 2016/08/09 C01254908

SECRET

3.   More than thirty memorandums of interviews with Miami Base personnel:

> Selective extractions critical of the operation--need for more autonomy at Miami, lack of Spanish language capability, and more positive, long-range planning--were included in the final IG report in lieu of the equal number of favorable items--high morale, well qualified personnel, good support from Headquarters--which might have been cited. 126/

As one final note concerning the interviews by the Inspector General and the members of his review team, all of the sessions with the most senior personnel and a majority of the interviews with others emphasized that external factors rather than internal CIA failures led to the collapse of the invasion effort.  That the IG report could so cavalierly disregard the external pressures and, at the same time, claim to be providing a meaningful report was ridiculous on the face of it.  Just how ridiculous will be discussed in the following section.

4.   Conclusions and Recommendations

For all practical purposes the IG's investigating team revealed its basic conclusions as early as 20 August 1961 when it proposed that, among other items, the DCI be asked to comment on the following:

> It is the general view of the investigating team that the project was ill-conceived, badly administered, poorly led, and that tradecraft doctrine was violated on a massive scale.  Our report will reflect this view in detail, with a great deal of supporting evidence. 127/

Mr. Kirkpatrick, too, had made known his displeasure with the operation even prior to transmitting the survey to Mr. McCone and Mr. Dulles.  A note from the diary of the Deputy Director for Support, L.K. White of 11 October 1961, stated:

77

Approved for Release: 2016/08/09 C01254908

Approved for Release: 2016/08/09 C01254908

Dick Bissell raised a question this morning about
Project USEFUL.  He said that some of the people in
the Clandestine Services had become quite excited
about remarks attributed to the Inspector General
alleging that there had been a failure of
intelligence in the Cuban affair. 128/

Officially, however, the first conclusion was that when the
scale of operation escalated from the training of guerrilla cadres
to work with the dissidents inside Cuba to an air supported
invasion, plausible deniability went out the window.  The operators
failed to recognize that the effort was both beyond CIA's
responsibility and its capability, and failed to back off.  This
conclusion was almost identical to one of the findings of the Taylor
Committee.

The second conclusion continued the theme that because of its
concentration on the planned invasion the Agency failed:  "To
appraise the chances of success realistically.... To keep the
national policymakers adequately and realistically informed of the
conditions considered essential for success, and...[to] press
sufficiently for prompt policy decisions in a fast moving
situation."  This finding, too, was very similar to that of the
Taylor Committee and paradoxically, it extended the scope of
Kirkpatrick's findings beyond events within control of the Agency.*

The third and fourth conclusions of the IG's survey referred
to the Agency's relationships with the Cubans in terms of what the
Inspector General regarded as the Agency's failure to take advantage

* Even as the Taylor Committee was beginning its investigation,
Kirkpatrick had written a Memorandum for the Record noting that
failure to control the air over Cuba was the principal reason for
the failure of the operation. 129/  Obviously he fully under-
stood that the Agency could not make national policy and it is
difficult to understand how he came to believe that his attempt to
study the Agency's role could be segregated from such policy.

SECRET

Approved for Release: 2016/08/09 C01254908

Approved for Release: 2016/08/09 C01254908
SECRET

of the "active participation" of the Cuban leadership and also the
Agency's failure to develop any strong resistence elements inside
Cuba.  These issues were touched on, but not stressed to the same
degree, in the findings of the Taylor Committee.

The fifth conclusion stated:  "The Agency failed to collect
adequate information on the strengths of the Castro regime and the
extent of the opposition to it; and it failed to evaluate the
available information correctly."  The findings of the Taylor
committee did touch in part on the failure of the Agency to properly
evaluate the strengths and weaknesses of the Castro regime, but the
IG's statement presented an obvious paradox for if there was no
collection of "adequate information," then "correct" evaluation of
"available information" would have been meaningless.  The more
significant problem here was not that the Agency failed to collect
adequate information, but that the Agency failed to make fuller use
of the information and resources which were available within the
Intelligence Directorate of the CIA.  Use of such resources could
have avoided the problem (noted by Kirkpatrick) of the operators
doing their own intelligence analysis, but whether greater
interaction between DDP and DDI analysts would have led to
cancellation of the invasion is questionable because the WH/4
planners did make use of the available NIEs and SNIEs.

The remaining conclusions concerned bad organization, poor
quality of staffing, inadequate assets (in personnel and materiel),
and lack of clear plans and policies.  The IG report hoped that the
experience that had been gained in the course of the anti-Castro
operation would henceforth be put into practice.  The Inspector

79

SECRET

Approved for Release: 2016/08/09 C01254908

Approved for Release: 2016/08/09 C01254908
SECRET

General's report devoted three pages to pointing out how, in past
years, the Inspector General had made numerous recommendations on
the proper manner of conducting covert operations only to have them
completely ignored during the course of the Bay of Pigs operation.
Moreover, according to Kirkpatrick's report, many of the suggestions
for improvement which had been made applied specifically to
activities of the Deputy Directorate for Plans and the Western
Hemisphere Division in particular.  The IG's report modestly stated
that:  "The study of the Cuban operation shows that these criticisms
and many others discussed in previous Inspector General Surveys are
still valid and worthy of review." 130/

The Inspector General's survey then made ten recommendations
preceded by a statement which read as follows:

> The Inspector General, as a result of his study of
> the Cuban operations, makes the following
> recommendations regarding future Agency involvement
> in covert operations which have major international
> significance and which may profoundly effect the
> course of world events. 131/

Mr. Kirkpatrick's recommendations were:

> 1.  Such an operation should be carried out by a
> carefully selected task force, under the command of a
> senior official of stature on a full-time basis, and
> organizationally outside the DDP structure but
> drawing on all the resources of the Clandestine
> Services.

> 2.  The Agency should request that such projects
> should be transferred to the Department of Defense
> when they show signs of becoming overt or beyond
> Agency capabilities.

80

Approved for Release: 2016/08/09 C01254908

3.  The Agency should establish a procedure under
which the Board of National Estimates or other bodies
similarly divorced from clandestine operations would
be required to evaluate all plans for such major
covert operations, drawing on all available
intelligence and estimating the chances of success
from an intelligence point of view.

4.  The Agency should establish a high-level board of
senior officers from its operational and support
components, plus officers detailed from the Pentagon
and the Department of State, to make cold, hard
appraisals at recurring intervals of the chances of
success of major covert projects from an operational
point of view.

5.  A mechanism should be established for
communicating these intelligence and operational
appraisals to the makers of national policy.

6.  In return, a mechanism should be established to
communicate to the Agency the national policy bearing
on such projects, and the Agency should not undertake
action until clearly defined policy has been received.

7.  The Agency should improve its system for the
guided collection of information essential to the
planning and clearing out of such projects.

8.  The Agency should take immediate steps to
eliminate the deficiencies in its clandestine air and
maritime operations.

9.  The Agency should take steps to improve its
employees' competence in foreign languages, knowledge
of foreign areas, and capability in dealing with
foreign people, when such skills are necessary.

10.  The Agency should devise a more orderly system
for the assignment of employees within the DDP area
than that currently in use. 132/

Even a reviewer unfamiliar with the furor which the Inspector

General's report caused at both the DCI and DDP levels probably

could detect the personal element in Recommendation No. 1 where the

selection of the Inspector General himself as the "senior  official

of stature" might perfectly have met the requirements set forth.

Certainly, too, the Inspector General would be an obvious choice for

Approved for Release: 2016/08/09 C01254908
SECRET

membership on any joint board of review (Recommendation No. 4)
called on to evaluate the chances of success of planned covert
operations.  With no axe to grind and as a member of the senior
reviewing board, who would be in a better position to transmit to
and receive from national policymakers views about ongoing covert
operations impacting on national policy?

C.   The Question of Intent

As mentioned at the beginning of this chapter, upon
completion of the survey, the Inspector General forwarded a copy to
John A. McCone by a memorandum dated 20 November 1960.  Mr. McCone
had been named by President Kennedy as the replacement for Director
Dulles, but he did not officially assume the office of Director of
Central Intelligence until 29 November 1961.*  The Inspector
General's survey carried a date of October 1961.  The final
paragraph of Kirkpatrick's memorandum of transmittal to McCone read:

> This, in my opinion, is a fair report even though
> highly critical.  Unfortunately, there has been a
> tendency in the Agency to gloss over CIA's
> inadequacies and to attempt to fix all of the blame
> for the failure of the invasion upon other elements
> of the Government, rather than to recognize the
> Agency's weaknesses reflected in this report.
> Consequently I will make no additional distribution
> of this report until you indicate whom you wish to
> have copies.  In this connection, the President's
> Foreign Intelligence Advisory Board has requested a
> copy in time for Mr. Coyne to give a brief report on

---

* According to Kirkpatrick's Diary (20 September 1961): "[J. Patrick]
Coyne called and...mentioned that among the names as potential
candidates for Director had been: John McCone, Gerry Ford, Max
Millican [sic], and Andy Goodpaster."

SECRET
Approved for Release: 2016/08/09 C01254908

Approved for Release: 2016/08/09 C01254908

SECRET

it at their December 9 meeting.  I will await your wishes in this regard.*

In their contributions to the CIA historical program, both Kenneth Greer and Wayne Jackson have stressed that the delivery of the Inspector General's survey to Mr. McCone rather than to Mr. Dulles, who not only was still Director of Central Intelligence, but who also had directed that the Inspector General's survey be done, was at least unusual; and Jackson reported that Mr. Dulles was unaware of the fact that the IG's survey had been completed until he was so informed by Mr. McCone. 133/**

---

* For a complete copy of the IG's memo to Mr. McCone, see Appendix B.  J. Patrick Coyne was the Executive Secretary of the President's Foreign Intelligence Advisory Board.  Kirkpatrick's Diary for 25 April 1961 reported that "Coyne came over for a briefing on the Cuban operation."  One must wonder why Kirkpatrick was called on for this and why he accepted.

** The Greer and Jackson discussions of the IG survey obviously suffered because neither author had access to the Taylor Committee report which would have provided them with a better basis for comparative judgments.  In addition, both had strong antipathy toward Kirkpatrick.  Greer's review of the survey, however, is full of inexcusable errors which, at best, reflect sloppy research.  Among other demonstrable errors were the following: 134/

1.  That all the backup papers used in compiling the IG survey were destroyed:

As a former member of the IG staff, it is difficult to understand why Greer was unable to recover the plethora of such material that a persistent, non-IG researcher obtained.

2.  That "a review of Kirkpatrick's diary failed to find any entries relating to this survey between the date the survey began [27 April 1961] and the date the report was submitted [20 November 1961]":

There are numerous references in the diary to matters pertaining to the ongoing review.

3.  That a comment from an IG inspection team member that "Kirkpatrick did not follow the course of the survey closely" was accepted at face value:

Kirkpatrick's diary shows that he had numerous meetings with the inspectors, raised questions about the review, and offered suggestions.

Approved for Release: 2016/08/09 C01254908

SECRET

The only possible explanation of a non-controversial nature
that can be offered for Kirkpatrick's action in sending the first
copy of his report to McCone rather than Dulles has been found in
the following entry in Kirkpatrick's diary for 30 October 1961:

> Earman [John, EO/DCI] called to report that Mr.
> McCone and General Cabell would move into the new
> building on 20 November and that Mr. Dulles would
> stay here [2430 E Street, NW] and that he thought
> this would be the takeover date.

Perhaps the IG acted on the basis of this information, and he simply
goofed--in which case some sort of apology or explanation would seem
to have been in order, but neither was offered.

According to excerpts from Kirkpatrick's diary, he received a
call from McCone on 23 November 1961 "to ask that I give immediate
distribution of the Cuba report to Dulles, which I said I would do;"
and on 24 November 1961, the IG's diary reported that:  "Earman
called to ask who had prepared the Cuba report and what material we
had access to and I sent him a memo on it."  Whether a result of the
telephone call from Earman or the telephone call from McCone on 24
November, Kirkpatrick prepared a memorandum for Mr. Dulles
forwarding him a copy of the Inspector General's survey.  In this
memorandum, as noted earlier in this chapter, Kirkpatrick described
the procedures and the materials used in the preparation of his
survey.*

A memorandum for the record of 28 November 1961 from the
Deputy Director of Central Intelligence was indicative of the
displeasure engendered by the IG's survey.  General Cabell wrote:

---

* See Appendix C for a copy of this memorandum.

Approved for Release: 2016/08/09 C01254908

SECRET

General Cabell called Mr. Kirkpatrick to state that
the fact of the IG's report on Cuba should be
restricted on a must need-to-know basis.  No copies
other than those that have been distributed to Mr.
McCone, Mr. Dulles, General Cabell, Mr. Bissell,
Colonel King, and Mr. Esterline will be distributed
without authority of the DCI or the DDCI.

This restriction also specifically applies to the
distribution to the President's Board of Intelligence
Advisors, and Mr. Kirkpatrick so informed 27 November.

General Cabell has discussed holding this report
tightly with Mr. Dulles and Mr. Bissell, and the
latter is to pass on the guidance to Colonel King and
Mr. Esterline.  (Accomplished per report to DDCI 27
November). 135/

By 1 December 1961, it appeared as though Kirkpatrick was

aware that he had been caught in the fallout which had been

precipitated by the survey.  In a memorandum to Mr. McCone he stated:

In our conversation on Friday morning, the 1st of
December, you mentioned your concern that the
Inspector General's report on the Cuban Operation,
taken alone, might give an erroneous impression as to
the extent CIA is responsible for the failure of the
operation.  In my opinion, the failure of the
operation should be charged in order to the following
factors:

a.  An over-all lack of recognition on the part of
the US Government as to the magnitude of the
operation required to overthrow the Fidel Castro
regime.

b.  The failure on the part of the US government to
plan for all contingencies at the time of the Cuban
operation, including the necessity for using regular
US military forces in the event that the exiled
Cubans could not do the job themselves.

c.  The failure on the part of the US government to
be willing to commit to the Cuban operation, as
planned and executed, those necessary resources
required for its success. 136/

From placing the full blame for the failure of the Cuban

operation on the CIA as had been done in the IG's survey,

Kirkpatrick now shifted his ground and attempted to put the monkey

85

Approved for Release: 2016/08/09 C01254908

SECRET
Approved for Release: 2016/08/09 C01254908

on the back of "the US Government." By the fall of 1963, however,
he was again suggesting to McCone that CIA was responsible for the
failure at the Bay of Pigs; and after he had been retired from the
Agency for some years, Kirkpatrick had fully reverted to the
position which had been taken in the Inspector General's
survey--that the Agency was principally, if not solely, to blame for
the failure of the Bay of Pigs operation. 137/

On 15 December 1961, even as there was some indication that
Kirkpatrick might have been modifying his views about Agency
responsibility, General Cabell, who retained his position as Deputy
Director of Central Intelligence during the early part of the McCone
administration, fired the following broadside at Kirkpatrick's
report in a memorandum to DCI McCone.

> To comment on the subject report in detail would
> result in a paper approaching in length, that of the
> survey itself. Such a commentary would have to deal
> in depth with the aim of the survey, its scope, and
> the method used in compiling it. Such a commentary
> would, at a large number of pages, be required to
> note inaccuracies, omissions, distortions,
> unsupported allegations, and many erroneous
> conclusions.
>
> A detailed inquiry on the Cuban operation on elements
> other than clandestine tradecraft, has already been
> completed by the group headed by General Taylor.
> General Taylor's report was based on testimony by all
> the principal officers involved in the Cuban
> operation. The Inspector General's report is not
> based on complete testimony; some of its conclusions
> are in conflict with General Taylor's conclusions.
>
> It is not clear what purpose the Inspector General's
> report is intended to serve. If it intended
> primarily as an evaluation of the Agency's role, it
> is deficient. Neither Mr. Dulles nor I was consulted
> in the preparation of the Inspector General's
> report. As a result, there are many unnecessary
> inaccuracies.
>
> The report tries to do both too much and too little.
> On the one hand it attempts to describe the processes

86

SECRET

Approved for Release: 2016/08/09 C01254908

of national security policy-making as though this were a process in logical deduction like working a problem in geometry.  According to the Inspector General's account, firm propositions should be laid down in writing and in advance from which correct conclusions as to proper actions must inevitably be drawn.  In this respect the report was far beyond the analysis of the Agency's role and it is not accurate.  It tries to do too much.

On the other hand the report treats the preparations for the April landings as if these were the only activities directed against Castro and his influence throughout the hemisphere and the world.  It chooses to ignore all other facets of the Agency's intelligence collection and covert actions program which preceded, accompanied, and have followed the landings in April 1961.  Thus, it does too little.

The report misses objectivity be a wide margin.  In unfriendly hands, it can become a weapon unjustifiably to attack the entire mission, organization, and functioning of the Agency.  It fails to cite the specific achievements of persons associated with the operation and presents a picture of unmitigated and almost willful bumbling and disaster.

In its present form, this is not a useful report for anyone inside or outside the Agency.  If complete analysis beyond that already accomplished by General Taylor and his group is still required, then a new kind of report is called for--a report with clear terms of reference based on complete testimony.  Such a report could concentrate on clandestine tradecraft, an asset for which the Agency remains uniquely responsible. 138/*

By early January 1962 Kirkpatrick knew that in addition to the criticism from General Cabell, the DDP was undertaking a critical review of the IG's survey.  It also was clear that Mr. McCone had some reservations about the nature of the charges which had been raised by Kirkpatrick.  On 4 January 1962, Kirkpatrick's diary reported:

_____
* The original of this memorandum was earmarked for Mr. Earman for the Director of Central Intelligence and another copy was earmarked for Mr. Dulles.

SECRET

Approved for Release: 2016/08/09 C01254908

Approved for Release: 2016/08/09 C01254908

At the Deputies meeting the DCI said that he was
under pressure from the Attorney General and the
Killian Board for copies of the IG's report on the
Cuban operation and that inasmuch as this occurred
before he assumed responsibilities, he was going to
send the report over with the responses to it bound
with it.  He noted that he had the DDCI's comment but
he did not have the DDP's.  Helms said that Bissell,
Barnes, King, and Esterline were working on this and
that Barnes had advised they would probably have it
by the end of this week. 139/

The DDP response was dated 18 January 1962, and was

transmitted from Mr. Bissell through General Cabell to Mr. McCone.

As General Cabell had predicted, the DDP's response was almost as

long as the IG's survey and will be the subject of the next chapter.

Paradoxically, even as the IG was blasting Mr. Bissell and

the DDP for "the Bay of Pigs fiasco," Kirkpatrick was directly

involved in a covert scheme intended to brighten the Agency's

tarnished image.  This episode began slightly more than a week after

both the Taylor Committee and the IG investigations began.  On 8 May

1961, Kirkpatrick's diary noted:  "Called Wallace [R.] Deuel and

asked if he would get together with Grayson [sic] Lynch to write the

true story of the Cuban handling [sic]."  The Kirkpatrick diary for

5 July 1961 stated:  "Deuell [sic] called and said he had the story

of the Cuban invasion finished and would send it up."

The IG's diary contains no further reference to the Deuel

report, but a 29 September 1961 Memorandum for the Record from

Robert D. Shea--a member of the IG inspection team--read in part as

follows: .

In June 1961, Deuel, formerly a well-known foreign
correspondent for the Chicago Daily News, was
requested to write the story of the invasion.  He did
this in about three weeks, chiefly by debriefing
Grayson [sic] Lynch, who is not a "word man."  The
result was a 52-page article entitled "The Invasion
of Cuba:  A Battle Report," dated 4 July 1961, of

SECRET

Approved for Release: 2016/08/09 C01254908

Approved for Release: 2016/08/09 C01254908

which we have a copy.  The request to do this job,
which was transmitted to him by Mr. Kirkpatrick,
resulted from a suggestion made by Admiral Burke, or
another of the Joint Chiefs, in the presence of
General Taylor, the DCI, and J.C. K[ing], that the
true story should be written and published in order
to counteract the untrue accounts that were
circulating  A copy of the article was sent to
General Taylor, who forwarded it to State and DOD for
clearance.  State's reply, under date of 6 September
1961, was that they were against circulating this
sort of article and disapproved of the contents.
Deuel said that he is glad that the article was thus
killed, as he felt that it was somewhat fuzzy, due to
the fact that it was not slanted for any particular
magazine. 140/*

At best this was an interesting diversion from the IG's

assigned responsibility to ascertain the truth about the Bay of Pigs

operation.  Investigation of this subject revealed that on 28 July

and 1 August 1961, Thomas A. Parrott--an Agency employee assigned to

the White House and also the Executive Secretary of the Special

Group on Cuba--forwarded a copy of "Battle Report" and a memorandum

about the report to General Taylor seeking support for discussing

publication of the article in Life magazine. 141/  On 18 August

1961, Thomas Schreyer, Deputy Chief, Covert Action, DDP, forwarded

copies of the report to Joseph Scott, Department of State, and

General Edward Lansdale, Department of Defense with a memorandum

suggesting that:

> Thought has been given to the desirability of using
> this story as an outline for an article or series of
> articles to appear in some American publication.  The
> objective of such publication would be to cast a new,
> somewhat more favorable light on the Cuban affair.
> 142/

---

* Deuel was a CIA staff employee at this time.

89

SECRET

Approved for Release: 2016/08/09 C01254908

SECRET

On 11 September 1961, H. Bartlett Wells of the Bureau of
Intelligence and Research, Department of State addressed a
memorandum to Schreyer and General Lansdale saying:

> The Department of State holds strongly to the view
> that there should be no further encouragement by
> official agencies of stories on this subject until
> there is some change in the situation in Cuba.  The
> Department of State does not approve use of the
> material contained in the attachment to Mr.
> Schreyer's memorandum. 143/

The question of publication of "Battle Report" dragged on
until the last day of October 1961 when Mr. Parrott returned the
DCI's copy of the proposed report to Tom Schreyer and his
(Parrott's) memo to Taylor with the note that, "I guess this is dead
for all practical purposes so am returning it herewith."
Considering the overblown account of the "heroic Cubans" seeking to
oust Castro, it is well that this story has remained buried in CIA
files.*

Both Greer and Jackson indicated that the IG's survey took
the form that it did because Kirkpatrick wanted Bissell's job.  This
apparently simplistic view probably was basically at the heart of
the matter.  By focusing exclusively on internal CIA affairs, the
failure of the Bay of Pigs operation could be laid on Mr. Bissell.
Had the IG's investigation taken cognizance of the changes imposed
on the plan by the White House and the Department of State, Bissell
would look to be less the villain.  At risk of venturing into

---

* The proposed article was based in large part on the after action
reports that Grayston Lynch and Rip Robertson had prepared at the
time of the Taylor Committee hearings.  Although the writer has
found no evidence that Dulles was involved in this episode, it is
difficult--in view of his close contact with Kirkpatrick prior to
the release of the IG's survey--to believe that the DCI was
ignorant of the plan.

90

psychohistory, a part of the explanation of why Kirkpatrick wanted
Bissell's job is that he believed  (perhaps correctly) that if he
had not become physically handicapped when his career was in its
ascendency, he would have been named DDP before Bissell.*

Simplistic explanations aside, there is evidence in the IG
records which clearly indicates that despite the cordial nature of
their interview on the Bay of Pigs operation, Kirkpatrick wanted
Bissell out as DDP.  This was made apparent in one of the entries in
the IG's diary shortly after both the Taylor Committee's and the
IG's investigations of the Bay of Pigs were initiated.  Among other
items which he discussed with Mr. Dulles concerning the Cuban
operation was the following:

> We also talked about some of the problems in the DD/P
> and I urged that if Bissell stays on, a good
> professional be his Deputy if it was impossible for
> him and Helms to work together.  I told him that I
> would be willing to take that job if he wished, or
> any job, as I had been IG for eight years and thought
> a change might be appropriate.  He told me that they
> were giving thought of sending Helms to Europe and
> possibly bringing [        ] back to be Deputy, although    (b)(3)
> he was skeptical whether [        ] could handle the job    (b)(3)
> and I told him that the most important thing for the
> DD/P was to get somebody who could run it. 144/

Prior to the completion of his survey, Mr. Kirkpatrick
apparently was rated quite highly on DCI Dulles's list.  In late
August 1961, in the course of another visit to his office by Mr.
Dulles, the IG reported:

_____

* At the time that he was stricken with polio in mid-1952, Mr.
Kirkpatrick was Chief of Operations, DDP.  Soon after his return
to active duty in early 1953, Mr. Kirkpatrick became Inspector
General.  It was common knowledge that he retained a strong
affinity for operations.

91

> He then talked about Bissell's plans and said that he
> had a paper from Defense proposing the establishment
> of an office there to handle advanced projects with
> Bissell in charge.  I told him I had heard that
> Bissell was inclined to go to the Institute of
> Defense Analysis.  He then started to talk about
> candidates for the Directorship from within and
> mentioned that he was pushing Tracy Barnes and asked
> if I had any views on who else besides myself was
> qualified.  He mentioned that he didn't think Amory
> was acceptable because of his indiscretions and
> public advocacy of the recognition of Communist
> China. 145/*

Unfortunately, the IG did not record his responses concerning either

Mr. Barnes or Mr. Amory.  Considering the strange interview that

Kirkpatrick had with Barnes on the BOP operation, the thought of

Barnes as Bissell's successor must have been shocking!

Kirkpatrick's diary continued to make note of Mr. Bissell's

status, particularly references to positions outside the Agency

where he might be employed. 147/  In early October 1961, when

Allen Dulles indicated the possibility that new DCI, John McCone,

probably would not make any changes in the Agency hierarchy except

for a new DDCI, Kirkpatrick's true feelings about Bissell were

revealed.  His diary stated:

> The DCI raised the question of the new Director and
> had Walter Elder come in and brief me on the
> differences that Mr. McCone had with Dr. Killian, a
> story which had been given to him by Charles Murphy.
> When Elder left, the DCI said that he thought Mr.
> McCone was not going to make any changes except that
> of the DDCI.  I then asked him what he thought the
> appropriate actions of his senior lieutenants should
> be and said that I was giving consideration to
> submitting my resignation so that McCone could either

---

* At the beginning of the Kennedy administration, Bissell was
  seriously considered for the post of Deputy Undersecretary of
  State for Political Affairs, but he deferred to President
  Kennedy's wish that, for a while at least, he continue in CIA.
  146/

2016/08/09 C01254908

Approved for Release: 2016/08/09 C01254908

make a change or re-appoint me.  The DCI violently
disagreed with this and said that he thought it would
be a very bad precedent.

I then went on to say that it distressed me to hear
that no changes were to be made because the situation
in the Clandestine Services was critical.  I told him
that while I thought Dick Bissell was a brilliant
man, that I also felt he had no managerial capacity.
I said that we were looking at DPD and found it to be
badly organized, badly run, and with rather mediocre
personnel.  I pointed out that I had just been out to
the Watertown Base in which the most important
element was security, and that in my humble opinion
it had no security.  I said we were just completing
the Cuban survey and that this indicated extremely
poor management in all respects.

The Director then went on to say that he couldn't but
agree with me and asked what I thought should be done
with Bissell.  I said that if he were to continue in
the organization that he should be moved back to
special assistant to the Director and run such
projects as the one he is now working on with
Charyk.  I told him that if this wasn't done, we
might end up without a Clandestine Service and that
many of the good officers down there were simply
waiting to see what was going to happen and that if
no changes were made, they would leave.  I told him
that I had many calls from Clandestine Service people
asking to have lunch and that they all were very
concerned about the situation.

The DCI then asked me who the "good, young men" were,
and I cited the names of several but mentioned that
we were going to lose the good, young men because
there was deadwood among the supergrades and that we
ought to get rid of them before we could start
pushing good, young men along.  He then said that he
thought maybe he should make some changes before
McCone came in and asked what I thought about it.  I
told him that I was extremely enthusiastic and would
be glad to prepare some recommendations for him.  He
told me to go ahead. 148/

   This record of the IG's obvious dislike of Bissell is,

perhaps, the best evidence available to explain the strange approach

taken by the IG's survey of the Bay of Pigs.  It also is interesting

that in his first interview with any of the principal officers

involved in the operation—Colonel Hawkins, Dick Drain, and Jake

Esterline—some of Kirkpatrick's antipathy toward Bissell may have

93

SECRET

Approved for Release: 2016/08/09 C01254908

Approved for Release: 2016/08/09 C01254908

become apparent. Otherwise it is difficult to explain why, at the end of their session with the IG, both Jake Esterline and Jack Hawkins apparently felt compelled to volunteer the following remarks about Bissell. Esterline said:

> I would like to make one comment for the record to be used any way you see fit. I consider that Bissell has been one of the few outstanding people that I have seen operate with courage under all circumstances and I would hate to see the future of this Agency—to see anything happen to him, because if we lose him, in my judgment, we have lost one of the few people who will stand up and make his points where it counts at the appropriate time because we have a lot of what I call cloakroom commandos around here. They sound good, but, boy-oh-boy, when they get up to the Department or [General] Taylor, or storm some of these other places...nobody will say anything.... We take the brunt. These bastards that some months ago that stood...really from the inception...the architects of this failure, run along unchallenged, unsullied in every respect, to go and destroy any kind of productive thinking in any other area of the world and/or in this hemisphere, and I find that this is intolerable. 149/

Jack Hawkins then chimed in saying:

> I would like to add my voice there about Mr. Bissell, I have the greatest admiration for him, he has plenty here [head?] and plenty here [heart?], and he was doing everything he could, that's all. I have already stated what I thought of the task force itself. They were fighting their hearts out trying to do something. If there are faults to be found, those are not the places to find them. 150/

How the DDP responded to the charges made in the Inspector General's survey is the subject of the next chapter.

SECRET

Approved for Release: 2016/08/09 C01254908

Chapter 3

The Deputy Director for Plans Analysis
of the Cuban Operation, 18 January 1962

## A.  Description of the Report

The response from the Deputy Director of Plans to the survey
that had been conducted by the Inspector General on the Bay of Pigs
operation was entitled An Analysis of the Cuban Operation By the
Deputy Director (Plans) Central Intelligence Agency (18 January
1962), and like the Inspector General's survey it carried a TOP
SECRET classification.  The 194-page report included 15 pages of
attachments; and it was divided into 9 major sections.

In addition to working directly from the Inspector General's
survey, C. Tracy Barnes, ADDP/A who was the principal author, and
other members of the DDP review team also had access to the Taylor
Committee report, including the four memorandums which make up the
Taylor Committee Report, the records of the committee's meetings
with witnesses, and numerous memorandums prepared in response to
committee requests.  $\underline{1}$/*

In contrast to the more than six months which were required
for the preparation of the Inspector General's survey, the DDP
response was forwarded to the Director of Central Intelligence in
less than 60 days following the receipt of the IG Survey by the DDP.

---

* Despite his detailed interview with Lyman Kirkpatrick at the time,
Mr. Bissell claimed only slight recollection of the Inspector
General's report during a meeting with the writer in October 1975.
$\underline{2}$/

95

As noted in the preceding chapter, the DDP's response to the
Inspector General's report was undertaken during a period when
emotions were running quite high.  Mr. Dulles was just nine days
short of retirement from the date of transmittal of the IG report to
Mr. McCone, and Mr. Bissell's career with the Agency would come to
an end shortly after the beginning of 1962.  The introduction to the
DDP review stated:

> The purpose of this paper is to contribute to an
> understanding of the nature of the reasons for the
> failure of the Cuban operation and in so doing to
> suggest what are the correct lessons to be learned
> therefrom.  It is prompted by and is, for the most
> part, a commentary on the IG Survey.  That document
> gives a black picture of the Agency's role in this
> operation. 3/

Stating that, among other faults, the Inspector General's Survey had
alleged bad organization and execution, errors of judgment, and
failure to insure that the decision making process conducted by the
Executive Branch was effective, the DDP countered that its paper
would show:

> That a large majority of the conclusions reached in
> the [IG] Survey are misleading or wrong; that the
> Survey is especially weak in judging what are the
> implications of its own allegations and, therefore,
> that its utility is greatly impaired by its failure
> to point out fully or in all cases correctly the
> lessons to be learned from this experience. 4/

## B.  Refuting the Inspector General's Charges

In response to the IG's charge that the Bay of Pigs operation
had been badly organized and badly executed, the DDP response was a
flat out denial of the validity of any of the charges made by the
Inspector General and specified that the command and organizational
relationships developed by the Agency were correct and that the

96

intelligence on Castro and on the internal opposition to Castro was
accurate.  The rebuttal emphasized that if there were difficulties
in the internal planning process, these difficulties as well as the
difficulty of running successful air operations in support of
resistance elements inside Cuba were attributable to external
factors beyond the control of the Agency--specifically that the
imposition of policy guidelines were beyond control of the Agency.
In addition, the DDP report tried an interesting ploy of turning one
of the IG comments back on the IG's report.  Where the IG had stated
"there were some good things in this [the Cuban] project" with
specific reference to the logistics and communication activities and
to "the unstinting efforts of many of the personnel involved in
trying to make the project a success," the DDP report tried to apply
this comment to such things as successful small boat operations,
relations with the Cuban leadership, the training and placement of
the brigade into Cuba, and various other affirmative aspects of the
operation which had been severely and sharply criticized by the
Inspector General's report. 5/

    With reference to its defense of the adequacy of its military
plan and to the estimates of the chances for success of the invasion
operation, the DDP rebuttal was strangely ambivalent, particularly
in contrast to the testimony by the principal DDP officers before
the Taylor Committee that cancellation of the D-Day air strike
guaranteed the failure of the operation.  Claiming that the military
plan was never fully tested because of the cancellation of the D-Day
air strike, the DDP report stated that perhaps it had been a mistake
to have made the whole plan so dependent on the single factor of

97

SECRET

elimination of the Cuban Air Force because: "Although the D-Day air
strikes were essential to the destruction of the Cuban air, no
guarantee of such destruction was possible even had there been
authority for the strikes." <u>6/</u>

Such a concession was in sharp contrast to the very positive
assertions made to the members of the Taylor Committee by the CIA
principals that the D-Day air strike would have completed the task
of grounding Castro's combat aircraft. This, in turn, would have
insured that the artillery role could have been assumed as planned
by the brigade B-26s to prevent Castro's forces from freely bringing
armor and heavy equipment, including artillery, into action against
the brigade at Playa Larga and Playa Giron. Shifting gears again,
the DDP report pointed out: "If, then, one wishes to learn what
actually caused the military operation to fail, rather than what
might have done so, the starting point must be an inquiry into why
control of the air was lost and never regained." <u>7/</u>

Following that suggestion, the DDP report proceeded to the
question of whether the 17 Cuban air crews would have been adequate
to conduct all the operations planned for the B-26s. The report
stated: "The chance of success would have been greater (with or
without the D-Day strike) if it had been possible to assemble and
commit to action more trained Cuban or US air crews." <u>8/</u> The
availability of more B-26s and more crews to fly on D-Day would have
made no difference unless the D-Day air strike had in fact taken
place and had put the T-33s and Sea Furies of the Fuerza Aerea
Revolucionaria out of operation. Even with the limited numbers of
T-33s and Sea Furies, the B-26s could not have controlled the air
once Castro's aircraft left the ground. As mentioned in

Approved for Release: 2016/08/09 C01254908
SECRET

the preceding chapter, this subject had been touched on by Bissell during his interview with Kirkpatrick. 9/

The DDP review also argued that even with the failure to gain control of the air over Cuba, the brigade itself had been in action long enough to demonstrate that the IG's survey was in error with its charge that organization and execution in the build-up of the infantry brigade had been responsible for the military defeat. In contradiction to one of the major premises of the Taylor Committee report, the DDP's analysis of the brigade stated:

> The brigade fought long enough to prove its determination and tactical skill. It appears to have been well handled by its officers. There were ample supplies at hand to support continued ground action. And Castro himself has admitted that the terrain was well chosen. 10/

The question of course concerns the statement that there were "ample supplies at hand to support continued ground action." The Taylor Committee had emphasized that "the proximate cause of the failure was the lack of ammunition." If, as the DDP analysis stated, there were ample supplies on hand to support continued ground action, then either the Taylor Committee was wrong in its analysis about the lack of ammunition being a major cause of defeat or the DDP had stumbled on its tongue in suggesting that the brigade had proved its determination and tactical skill in surrendering to Castro forces while still having adequate ammunition supplies.*

The DDP made a good case against the charge leveled by the IG survey that there was a serious lack of comprehensive operational

---

* As noted in the volume on the Taylor Committee investigation, comments and photographs in Cuban publications indicated that large quantities of materiel did fall into the hands of Castro with the collapse of the invasion effort. The testimony of some of the Cubans who had escaped from Playa Giron suggested strongly that the courage of some of their compatriots was in doubt.

Approved for Release: 2016/08/09 C01254908

plans in writing which had been approved in advance by competent
authority. The DDP emphasized that as situations developed which
required changes or modifications of US policy to insure
deniability, it was the Agency's responsibility as the operating
organization to see to the implementation of these policies. This,
in turn, made it impossible to prepare such papers as the IG thought
were essential to the operation. 11/

The DDP response continued along this same line with
reference to the question that had been raised by the IG survey
regarding the failure to back-off from the operation in November
1960, at which time the survey claimed that the operation was no
longer plausibly deniable. The DDP's contention was that "up to and
through the invasion" the operation remained "technically" deniable,
citing as proof that the question of funding had never been exposed,
that no case officers had been identified by true name, and that no
Americans had been captured ("although the bodies of an American
B-26 crew were probably recovered after its loss..."). 12/

Technical deniability aside, the DDP analysis noted that the
IG was laying the blame in the wrong place:

No one in the Executive Branch was ready at any
point--until after the defeat--officially to avow US
support. Indeed, this alternative was never
seriously considered. Even the most inadequate
fig-leaf was considered more respectably [sic] than
the absence of any cover whatsoever. Indeed, the
final changes in the operational plan made in March
[1961], the official announcement in April that the
United States would not give support to the rebels,
and the cancellation of the D-Day strike were all
last minute efforts to shore up the plausible
deniability of an enterprise for which Governmental
support was bound to be conclusively surmised even if
it could not be proved.

These decisions were made by senior policy makers of
the Government who were reading the newspapers every
day and knew well to what degree the project had in
100

SECRET

fact become "overt." These men simply were not
willing to state officially either that the United
States itself was about to make war on Cuba or that
the US Government was openly supporting a group of
Cubans--not even recognized as a government in
exile--in a military invasion...

It was not the Agency's decision and, as the above
cited actions suggest, the pressure to strengthen
deniability in the last few weeks came from outside
the Agency and led to decisions which were unwelcome
to the Agency. To suggest, as the Survey seems to
do, that the Agency was responsible for this clinging
to deniability is demonstrably false. 13/

Before turning to the DDP's response to some of the more

specific allegations made in the Inspector General's survey, it

should be emphasized that the DDP's over-all summary reiterated that

none of the alleged weaknesses in organization or execution

mentioned by the IG had any bearing on the outcome of the invasion

effort. It repeated the point discussed above that had there not

been politically motivated restrictions placed on air operations in

terms of types of equipment, utilization of US bases, and the use of

US air crews, and if there had been more pre-D-Day air strikes, as

well as the D-Day strike as originally planned, the estimates of the

chances of success of the operation by Agency planners and JCS

representatives might well have proved correct. Pointing out that

the military plan which had been worked out between the Agency and

the Joint Staff was "a product of highly competent, professional

military planning," it at the same time suggested that the "possible

inadequacy" of the air arm tended to negate the foregoing opinion.

If the DDP believed that the original air plan was adequate--as they

had so stoutly maintained during the course of the Taylor committee

investigation and as they had stated initially in reviewng the IG

report--to suddenly suggest a possible inadequacy in the air arm

raises the question of whether the obfuscation resulted from poor

101

editing of the DDP's response or from second thoughts on the part of the DDP. 14/

In terms of the lessons which it learned as a result of the Bay of Pigs Operation the DDP analysis philosophized on several issues which were more responsive to the Taylor Committee's report then to the IG's survey. It stated that if the policy of the US was to use force in a given operation, sufficient force should be applied to make sure that the operation would be successful--including if necessary the overt use of US force. Barring this, the operation should be called off unless "the odds in favor of success within the politically imposed restrictions are very great." In this same context, the DDP analysis suggested that a department or agency charged with running a given operation had to learn to live with political decisions, even though such decisions might be made by unqualified people. In dealing with questions of policy, another aspect of the problem was whether decisions on major issues of a policy nature could be handled by an impartial adviser or whether all such decisions had to be dumped on the President. This last point, of course, was a direct reflection of the findings of the Taylor Committee that in the case of the Bay of Pigs, the absence of any authoritative decision making body led President Kennedy to support policies of questionable wisdom.

Also in the realm of national policy concerning operational involvement, realistic assessment needed to be made of the prospects for keeping a clandestine operation clandestine. Once deniability started to erode the question should have been asked as to the value of any degree of deniability that might remain. In the case of Cuba, for example, the DDP analysis suggested that hindsight indicated there would have been more to gain if the United States

102

SECRET

had said it was backing the Cuban Revolutionary Council and had
recognized the provisional government.  The DDP's report admitted
that the Inspector General's charge that the views of those who were
running the operation might have been given too much weight, but it
raised the question of where the line should be drawn with regard to
getting the opinions of skeptics. 15/  (Particularly if the
skeptics were, as characterized by General Lemnitzer, not only
inexperienced, but crippled "by arrogance arising from failure to
recognize their own limitations.")*

The second major topic covered by the DDP's analysis of the
Inspector General's survey is called "The Survey's Statements of the
Operational Concept."  This four page segment is basically a brief
resume of the planning for the invasion and the collapse of that
invasion as it appears in the IG survey.  Although the DDP analysis
stated that the Inspector General's survey said nothing about the
planned diversionary landing on D-2 in Oriente Province by Nino Diaz
and his 160 men, the Inspector General's survey did make a brief,
but specific, mention of this planned diversion. 16/**

The third major segment of the DDP report, "Why a
Military-Type Invasion," is another four page segment that added
nothing of significance to what had been covered in the DDP's
initial summary of the IG report.  It was stated that by the fall of

* For Lemnitzer's comment see Pfeiffer, Taylor Committee
  Investigation of the Bay of Pigs, p. 155.
**Considering the destructive nature of the survey, it was fortunate
  that the Inspector General not only omitted any detailed
  discussion of the Diaz operation but also failed to question the
  judgment of the DDP planners who authorized Iginio ("Nino") Diaz
  to lead the expedition.  Diaz was a certifiable coward who had
  aborted at least one previous anti-Castro operation inside Cuba
  and he had been identified as an undesirable and unwanted recruit
  for infantry training with the Brigade in Guatemala.

103

1960 intelligence reporting had indicated that improvements in
security measures within Cuba and improved training of the militia
made it unlikely that the infiltration of small units trained to
give instruction in guerrilla warfare would have much success. It
had become obvious that an air supported invasion had the most
likely chance of achieving success in the planned overthrow of Fidel
Castro. 17/

The fourth section of the DDP analysis of the Inspector
General's survey is a 20 page segment concerning "The Decision
Making Process," a matter about which the DDP contended that the
IG's survey was "particularly incomplete in the discussions of
decision making and planning." 18/  In response to the IG's charge
that "the Agency was driving forward without knowing precisely where
it was going," the DDP analysis noted the self-contradictory feature
of the IG report which, almost immediately following that statement,
reported that after briefings by the Agency on the status of the
operation both Presidents Eisenhower and Kennedy had authorized the
Agency to continue its efforts to develop the anti-Castro
program. 19/  The analysis further emphasied that during the period
between early January 1959 and the date of the invasion there had
been extensive meetings of the Agency's planners with Special Group
advisers to both Presidents Eisenhower and Kennedy and with other
high level, political appointees close to both administrations.  In
addition, members of the Joint Chiefs of Staff began to be read into
the act even prior to Kennedy's specific instructions on this matter
following his inauguration.

That there could be no possibility of confusion or
misunderstanding as to the direction which was being taken by the
Agency's anti-Castro planning, the DDP report makes specific

104

reference to the briefings received by Secretary of State Rusk,
Secretary of Defense MacNamara, Special Assistant for National
Security Affairs McGeorge Bundy, and members of the Joint Chiefs of
Staff and/or members of the Joint Staff.  It rejected the idea that
there were any senior officers in either administration who were not
familiar with the status of the project as it was evolving; and it
stressed the extensive participation by representatives of the
Department of Defense with the advent of the Kennedy administra-
tion.  In particular, the DDP analysis emphasized the role played by
the Department of Defense in evaluating the capabilities of the air,
land, maritime forces, and in the role played by representatives of
the Joint Chiefs during the critical discussions beginning in
mid-March regarding the selection of the specific target area and
the change from the Trinidad to the Zapata plan. 20/*

Having clearly established that from early February 1961
through the invasion, General Gray and members of the Joint Staff
were for all practical purposes full partners with the Agency in
planning the anti-Castro operation, the DDP analysis severly chided
the Inspector General's vague references suggesting that either the
JCS or individual members of the JCS found fault or had strong
reservations about the anti-Castro planning.  Taking one rather

---

* The discussion of the briefings contains one error which DDP
  representatives also had made during the course of their session
  with the Taylor Committee.  The DDP Analysis indicated that
  Secretary of State designee Rusk was briefed on the planned
  anti-Castro operation of 17 January 1961--prior to the Kennedy
  inaugural.  Although the Agency had prepared a detailed briefing
  for the planned meeting at 5:00 p.m. on that day in Mr. Rusk's
  office, the DCI's calendar for Tuesday, 17 January 1961, had
  crossed out that particular item.  There is no evidence of a
  briefing on Cuba for Mr. Rusk prior to the session on 22 January
  1961 when Rusk and other Kennedy cabinet members were briefed on
  the anti-Castro operations. 21/

105

SECRET

lengthy citation which the IG survey said had been made by
representatives of the JCS "in the course of another inquiry," the
DDP analysis pointed out that:

> Neither the "members of the JCS" nor the other
> "inquiry" are identified [in the IG survey] nor is
> there any citation supporting the alleged testimony.
> Being unable, therefore, to locate the full text from
> which the quotation was taken, it is not possible to
> analyze or clarify the points made.  Presumably the
> "inquiry" referred to was that conducted by General
> Taylor although no verbatim minutes were kept.  At
> least no transcript or full report of these hearings
> is available to the writer. 22/

Considering that the DCI had authorized the Inspector General to
have access to the Agency's collection of Taylor Committee papers
during the course of his investigation, it seems highly unlikely
that the DDP did not have similarly full access to such papers,
particularly since they had been put in the custody of Colonel J. C.
King, Chief, Western Hemisphere Division. 23/*

Why the DDP analysis attempted to play coy regarding
knowledge of and/or accessibility to the Taylor Committee report and
related papers is difficult to understand, particularly in view of
the ample evidence which the DDP's own report cited to illustrate
the coordinated records between the Agency and the Department of
Defense.  If this were not enough to establish DDP's point of view

---

* In his history of Allen Dulles as Director of Central
Intelligence, Wayne Jackson noted "the writer [Jackson] has found
no evidence that a copy [of the Taylor Committee report] was given
to the Agency.  The DDP rebuttal to the IG report makes it clear
that its author had access to the Taylor Report, and Barnes told
the writers that he had consulted it in McGeorge Bundy's office."
24/  The writer of this history cannot challenge the statement
that Mr. Barnes may have done some of his work on the Taylor
Committee report in McGeorge Bundy's office, but based on the
preliminary survey of materials available on the Bay of Pigs
operation (which he did about the time that Jackson's history was
published), he located not only a copy of the four memorandums
prepared by the Taylor Committee, but extensive back-up materials
which had been provided to the Taylor Committee during the course
of its investigations.

106

in contrast to the position taken by the IG survey, then the 11 page annex to Section IV of the DDP analysis outlining the tasks and time schedules for the Agency, the Department of State, and the Department of Defense in the pre-D-Day, D-Day, and post D-Day phases of the planned anti-Castro operation would seem to have negated the need to play games with hard evidence. 25/

The fifth section of the DDP analysis of the Inspector General's report, the "Assessment of the Adequacy of the Plan," was another of the segments to which the DDP took strong exception. The tone of the DDP position was set by the first few lines of this assessment which stated:

> Whatever conclusions or inferences may be drawn from the defeat of the Brigade, no one can deny that, in absence of the planned D-Day dawn air strikes, the operational plan was never tested. Perhaps these air strikes would have had no significant effect, but in view of the essentiality of eliminating Castro's Air Force, it can be asserted that without these air strikes the plan never had a chance. 26/*

The DDP analysis then submitted what amounted to a test of the reasonableness of the view that the D-Day air strikes could have changed the result of the Bay of Pigs operation. To do this they presented:

> The basic theory of the operation and what was accomplished, what failed, and what was not tested...The operational theory in outline was:
>
> a.  To destroy the enemy air force.  Not tested though partially accomplished.
>
> b.  To land the Brigade on the Zapata beachhead achieving surprise.  Accomplished successfully.
>
> c.  To maintain the Brigade on the beachhead perhaps for several weeks.  Not tested.

---

* The reader may recall that this was a much more forceful statement by the DDP than was made on this same subject in summarizing the IG's report. (See pp. 4-6)

Approved for Release: 2016/08/09 C01254908

SECRET

d.  To persuade the Cuban populace (both private
individuals and governmental, including military)
actively to oppose the regime.  It was never expected
that this would happen until the populace was
convinced that an opposition force supporting
democratic leadership receiving outside support was
able to maintain itself on Cuban soil.  How long this
would take was unknown.  Not tested. 27/

Picking up again from the summary in its analysis of the IG's

survey and from positions which had been expressed to the Taylor

Committee by Bissell, Esterline, and Hawkins, the DDP proceeded to

show the reasonableness of its belief that given the initial air

strike as planned for Zapata--particularly the D-Day air

strike--control of the air could have been achieved.  Having done

that, the presence of the brigade on Cuban soil and the visibility

of brigade aircraft would have encouraged the needed support from

inside Cuba.  Additionally, the DDP evaluation made it quite clear

that it was aware of, and had utilized, USIB reporting, National

Intelligence Estimates, and OCI reporting in making its judgments

about the prospects for both the nature of the opposition which

would be presented to them by Castro's militia and armed forces and,

also, the sort of stimulus it would take to gain the necessary

assistance from the Cuban population. 28/

The DDP cited as further evidence of a potential for internal

support the number of defections of individuals who had once been

close to Castro, including the leaders of some of the principal

exile groups operating in the United States.*  Reference also was

made by the DDP to the requests that had been received from groups

within Cuba for materiel support, reports of incidents of sabotage,

labor unrest, and economic difficulties which

---

* Among others were included Jose Mino Cardona, Manuel Ray, Justo
  Carrillo, and Manuel Artime.

Approved for Release: 2016/08/09 C01254908

Approved for Release: 2016/08/09 C01254908

gave credence to the belief that once a viable opposition could be established on Cuban soil there would be ample volunteers for the anti-Castro effort. Prospects along this line also would have been enhanced if the leadership of the Cuban Revolutionary Council (CRC) could have been brought into Cuba, particularly if the CRC could have gained recognition as a provisional government by the United States and any of the anti-Castro Latin American nations. 29/

In response to the IG's charge that the Agency's planners had failed to make a proper appraisal of the chances of success, the DDP argued that the events that did transpire tended to support the judgment that there had been a realistic appraisal of the chances of success. The DDP evaluation cited, for example, the success of the surprise landing of the brigade; the success of the brigade vis-a-vis the initial attacks by Castro's forces; and the defection to the brigade of some of Castro's militia during the very early stages of the invasion. It was emphasized that the potential success was eradicated by the presence of Castro's T-33's and Sea Furies--the aircraft which were the intended targets of the denied and cancelled air strikes subsequent to D-2.

The DDP analysis also repeated the point made by both Mr. Dulles and Admiral Burke to the Taylor Committee when they took exception to the opinion which had been expressed in Memorandum No. 1 of the Taylor Committee report suggesting that the beachhead could not have survived long without either direct US assistance or strong internal support from the Cuban population--the Dulles and Burke contentions being, of course, that if the anti-Castro forces had gained control of the air the situation could have been reversed.

109

SECRET

Approved for Release: 2016/08/09 C01254908
SECRET

With reference to the Burke-Dulles dissent from the position taken
by General Taylor and Attorney General Robert Kennedy, the DDP
concluded its section on the assessment of the adequacy of the plan
by noting:

> Therefore, even in retrospect the Brigade's inability
> to hold the beachhead for some time was not clear to
> well informed individuals who had soaked themselves
> in all the available evidence.  A prospective
> judgment in favor of success prior to the event
> would, therefore, seem understandable. 30/*

Section VI of the DDP assessment of the Inspector General's
survey was on the organization and command relationships and was the
longest segment (35 pages) in the report.  The DDP analysis examined
and rejected the IG's conclusion that the project was badly
organized, making the point that some of the Agency's management and
organizational problems were related--as the Taylor Committee had
pointed out--to the inability of the Executive Branch to handle a
major paramilitary operation involving CIA, DOD, and State.
Consequently, decision making devolved exclusively on the
President.  Despite the failure of the IG's survey to examine the
Bay of Pigs operation in this light, the DDP report proceeded apace
to justify

---

* The author of the DDP report, Tracy Barnes, was not the best
  choice to present the DDP's case.  In this discussion of possible
  failure at the beachhead, he suggested that there was more planning
  for a "worst case" situation--including a break out for the
  Escambray--than actually was the case.  It appears that Barnes was
  confusing the Zapata Plan with the Trinidad Plan which had con-
  sidered withdrawal to the Escambray,

110

Approved for Release: 2016/08/09 C01254908

the organization and command relationships--taking time along the
way to give the IG some pointers on semantics.*

     The DDP analysis defended the roles of the DCI and the DDCI,
DDP, ADDP/A, C/WH, C/WH/4.  It was stressed that since the ADDP/A,
C. Tracy Barnes, spent practically full time working on the
anti-Castro operation, problems regarding DDP decisions could be
obtained almost immediately.**  To the IG's charge that Jake
Esterline was too far down in the chain of command and of too low a
rank for the task he had been given, the DDP report noted that in
the military sense, Esterline would have had the rank of Colonel and
that the responsibilities which he carried for the Agency during the

---

\* As one case in point, the following paragraphs from the DDP
analysis:

> The DCI allegedly "delegated his responsibility for
> major project decisions to a considerable extent."
> ...The [IG] Survey appears to support this
> statement on two grounds, first that the DCI relied
> on the DDCI "for policy matters involving air
> operations" and for "military advice he relied on
> the military officers detailed to the project."
> The consequence of this "reliance" according to the
> Survey was that the DCI was deprived "of completely
> objective counsel."

> "Reliance on," according to normal usage, does not
> mean the same thing as "delegation of
> responsibility."  Whatever the Survey intends to
> say in this connection, it is a fact that the DCI
> <u>never</u> delegated any portion of this responsibility
> at any moment during the project.  Naturally he
> relied on others for many things (he could hardly
> run an entire project himself) and he even
> delegated <u>authority</u> (not <u>responsibility</u>) in some
> limited respects. 31/

\*\* The ADDP/A was referred to in the analysis as "an extension
of the DDP arm."  Barnes, as the principal author of the DDP
response, may have been somewhat less than impartial in his
judgment.

111

SECRET

course of the Bay of Pigs operation were comparable to those which would have been carried by a Colonel in the service.* The DDP also stated that the IG's report was incorrect in its contention that Esterline was too far from the top; and to support this claimed that the DCI and the DDP brought Esterline and/or Hawkins "with them to substantially all Presidential meetings on Cuba." 32/**

The DDP analysis also took issue with the IG's assessment of the role played by Col. J.C. King, Chief, Western Hemisphere Division, during the course of the Bay of Pigs operation. The IG's survey stated "the DDP and his Deputy dealt directly with the project chief, and gradually the Chief of the WH Division began to play only a diminished role." Even though admitting that King was offset from the basic chain of command, the DDP analysis emphasized that Colonel King played a very important role during the course of the Bay of Pigs operation. The DDP's review made this point far more strongly than it had been made during the course of the Taylor Committee investigation where the role of Chief, WHD had been raised almost as an afterthought.

The DDP analysis pointed out that King sat in on practically all of the DDP and DCI meetings on the project which had been attended by any other WH personnel, that he had dealt with numerous problems concerning the Cuban political leaders, and that he had

---

\* It appears that the DDP may have been shortchanging Esterline. As a GS-15, his rank would more closely approximate that of a Brigadier General than a Colonel.

\*\* It also was the opinion of the DDP analysis that Esterline or Hawkins were usually in attendance at all major briefings--not just Presidential briefings--where their expertise was required. As noted in the preceding chapter, both Esterline and Hawkins took a strong contrary view to this contention, saying that too frequently more senior personnel (meaning specifically Bissell, Barnes, or Cabell) were doing briefings that they should have been doing.

112

Approved for Release: 2016/08/09 C01254908
SECRET

handled special negotiations on problems of economic sanctions with representatives of other US agencies, private businessmen, and legal counsels.  The analysis also mentioned King's particular relationship with William Pawley.*  Because of his position as Chief, Western Hemisphere Division, and his extensive contacts with Latinos in all walks of life, there was no question but that King contributed significantly to the successful mounting of the invasion of 17 April 1961. 33/**

The DDP assessment also took sharp issue with the Inspector General's survey of the organization and command relationships between the Cuban task force and Chief of Operations, Deputy Director for Plans (C/OPS/DDP), the senior staffs of the DDP (FI and CI in particular), and the PRC (Project Review Committee).  With reference to the role of Richard Helms, C/OPS/DDP, the survey made

----

* William D. Pawley had served as US Ambassador to Peru (1945) and Brazil (1946).  He was the owner of the Havana Bus Company and was a strong supporter of extremely conservative anti-Castro Cubans, particularly Rubio Padilla.  He was a heavy contributor to the Republican Party and a strong supporter of Vice-President Nixon. Although he refused to support the Frente Revolucionario Democratico (FRD), which was the CIA-based anti-Castro Cuban organization, Pawley retained close contacts with both J.C. King and Jake Esterline throughout the Bay of Pigs operation.  Details of the relationships with Pawley are spelled out in Volume III of the series, Evolution of CIA's Anti-Castro Policies, pp. 249-258, 263-264.

** Review of the chronological files of WH/4 provides ample evidence of the strong support role played by Col. King.  In all probability, King's own papers would have added even more to this story.  Unfortunately, the "J.C. King papers"--initially reported to the author of this study to be the contents of eight safes, then reduced to two safes--have disappeared.  Jake Esterline conscientiously kept King informed of meetings, briefings, and other activities related to the task force.  It is clear, however, that Bissell's support was fully behind Esterline who, in 1954, also was head of the task force responsible for the ouster of President Arbenz in Guatemala.  Details on the relationship of King-Esterline-Bissell are spelled out in Volume III of this series, Evolution of CIA's Anti-Castro Policies, pp. 32-39.

Approved for Release: 2016/08/09 C01254908

Approved for Release: 2016/08/09 C01254908
SECRET

the same point that Richard Bissell made to the author of this
history nearly 20 years later:  that because he (Bissell) and his
other Deputy, C. Tracy Barnes, were involved almost full time in the
Bay of Pigs operation, Helms had to assume most of the
responsibility for running operations in the rest of the world.  The
DDP also focused sharp criticism on the Inspector General's charge
that C/OPS/DDP had received specific warnings concerning the
mismanagement of the anti-Castro operation but had taken no action
on such warnings.  The DDP pointed out quite correctly that the IG's
survey had provided no specific information about the reputed
warnings and consequently it was impossible to determine whether
such warnings were frivilous or serious.*  Mr. Helms could not
remember receiving any such warnings and the DDP assessment pointed
out that any project of the magnitude and duration of the
anti-Castro effort would be bound to cause disruptions in normal
procedures which might well have led to "warnings" of one sort or
another.  The tone of strong resentment at the Inspector General's
allegations was obvious in the DDP's comment that:  "Actually, the
Survey is unclear as to what it believes COPS should have done
though the inference is that he should have used the alleged
'warnings' as a basis for taking the project away from the DDP."
34/

        The DDP assessment quickly disposed of the IG's complaints
that the project planners had failed to consult the senior staffs of
the DDP and that clearance had not been received from the Agency's

---

* One such "warning" came from [         ]       a PM assignee to the
  project who spent only three months with the project during its
  early stages.  Note of [         ] testimony to the IG team is found
  on pp. 96-99.

(b)(3)

(b)(3)

Approved for Release: 2016/08/09 C01254908

Project Review Committee. In the instance of the senior staffs, it
was noted that representatives from all of the senior staffs had
been assigned to the project and that somewhere along the line a
limit had to be placed on the extent to which personnel not directly
involved with the project should be briefed and rebriefed about
ongoing developments. The DDP report noted that the Agency's
Project Review Committee was internal to the Central Intelligence
Agency and "advisory" to the DCI. It was further emphasized that
the anti-Castro project had been authorized by the President on an
interdepartmental basis and was well beyond the jurisdiction of the
PRC. 35/

    The Inspector General's survey was critical of the
relationship between the air arm of the Agency, DPD, and the
anti-Castro task force; but the criticism about the independent
position of DPD was simply a rehash of ground that had been more
adequately covered during the course of the Taylor Committee
investigation. This issue had been answered in writing by Mr.
Bissell in response to appeals which had been made by Chief, WH/4
(Jake Esterline) and Chief, WH/4/PM (Col. Jack Hawkins) in the fall
of 1960. 36/

    The DDP assessment also rejected the Inspector General's
criticism about weaknesses in intelligence collection and
evaluation. The DDP was particularly critical of the IG's failure
to grasp the operational theory concerning the relationship between
the successful invasion and lodgement and the potential for
development of support from the anti-Castro forces inside Cuba. The
DDP did concede that in future operations there should be closer

115

Approved for Release: 2016/08/09 C01254908
SECRET

cooperation between the DDP and the DDI on questions of intelligence
evaluations and estimates--a point on which the new DCI, John
McCone, subsequently "insisted that the estimative function of the
Agency be privy to planned operations and provide their estimative
judgments early and often." 37/

In response to the lengthy segment of the IG survey
expressing displeasure about the operations and activities of the
Miami base, the DDP defended all aspects of the Miami-Washington
relationships as not only understandable but also as the best
possible.  It was suggested that those who had prepared the
Inspector General's survey did not understand operational problems.
The DDP analysis also defended the security record of the task force
noting that pre-invasion moves of the anti-Castro brigade and the
landing on Cuban soil had not been discovered, despite the
traditional insecurity of the Cubans, particularly in the Miami
area, and the vigorous attempts of the press to expose the
operation. 38/

The seventh section of the DDP analysis of the IG's survey is
a 23-page review of the personnel situation.  As with the critiques
of other portions of the IG's survey, the DDP analysis lamented that
the generalizations and the failures to identify specific cases or
specific individuals made intelligent response very difficult.  It
was pointed out, for example, that the vague references to given
individuals contained in the IG survey made it impossible to
determine whether that individual was from the DDP, from the
Department of Defense, or from WH/4.  The DDP review made a strong
pitch to demonstrate that a serious and successful effort had been

116

SECRET

Approved for Release: 2016/08/09 C01254908

made to implement the DCI's suggestion in the spring of 1960
indicating that he wanted top quality people assigned to the
anti-Castro project. The DDP analysis emphasized that its senior
officers, including the Clandestine Services Personnel Officer
(CSPO), were particularly alert to this problem. In this instance,
however, the IG's survey probably was more accurate than the DDP's
rebuttal. The view of three very senior officers in the WH/4
project indicated that many of the assignees to WH/4 were stricltly
by chance, and in other instances the Divisions and Staffs saw an
opportunity to use the anti-Castro project as an elephant's burial
ground for marginal performers.*

The DDP's dismissal of the IG's charge that the competitive
ranking status of many of the assignees necessarily indicated a
low-caliber performer was probably correct. The DDP pointed out,
for example, that in the initial competitive rankings non-WH
personnel assigned to the project were rated by long-term WH
staffers in competition with long-term WH personnel. The results of
such rankings were obviously predictable--that they would work to
the disadvantage of the newcomers. As the DDP survey pointed out,
however, this situation was recognized and rectified. 40/

Except for its questionable statement that "PM instructors
were quite able to perform effectively without the [Spanish]
language since they taught by showing an example," the DDP response

_____
* The three senior officers in question were Jake Esterline, Chief,
WH/4; Dick Drain, COPS/WH/4; and Bill Eisemann, Chief, Support/
WH/4. 39/ Eisemann, in fact, specifically criticized the DDP
for its failure to abide by its own contingency planning regula-
tions which would have insured that only top people would have
been assigned to WH/4.

117

SECRET

Approved for Release: 2016/08/09 C01254908

Approved for Release: 2016/08/09 C01254908

also refuted the IG's charge that the lack of Spanish language
capability seriously hurt the anti-Castro project.  In an Annex to
the discussion of personnel, the biographic sketches of the senior
personnel assigned to WH/4 supported the conclusion of the DDP that:

> It can be asserted that Spanish speakers were
> available for all needed uses.  Some inconvenience
> may have been caused on occasion due to not having
> even more Spanish speakers, but a lack of adequate
> Spanish speakers cannot honestly be alleged as a
> ground for any major failure in the project. 41/*

The eighth section of the DDP's analysis of the IG's survey
is an 18-page segment on "The Political Front and Relations with the
Cubans."  The charges by the Inspector General that the Agency
treated the exile leaders as though they were puppets; that the
decision in November 1960 that the FRD would no longer have a
monopoly on paramilitary aid from the US; and that prevention of
"close contact between the political leaders...and the military
forces in training in Guatemala" worked to the disadvantage of the
anti-Castro effort were flatly denied by the DDP.  The DDP, however,
did not try to deny that relations with the FRD and various of the
Cuban leaders at times proved to be extremely difficult.  The DDP
report pointed out that such difficulties traced directly to the
evolution of the anti-Castro movement in Cuba, with many of the
exile leaders in Miami having once been either affiliated with, or
at least in philosophical agreement with, the Castro movement.  Once
having broken with Castro and becoming aware of the US interest in
his ouster, there was intense competition among both political and

---

\* As noted in the preceding chapter, the DDP analysis probably under-
stated the degree of "inconvenience" because there was a continuing
emphasis on the need for Spanish speaking personnel throughout the
course of the operation.

118

Approved for Release: 2016/08/09 C01254908

military leaders to try to insure positions of power and influence
for themselves in any government which might succeed Castro's.

The DDP's analysis then went into a great deal of rhetoric
about the ongoing competition among the Cubans and the increasing
difficulties of keeping exile politics out of the training camps.
It also emphasized that the CIA Inspector General's survey had
undertaken an impossible task in attempting to relate the problems
of the Cuban exiles exclusively to the CIA because the fate of the
Cuban exiles was closely tied to policies which were being evolved
by the White House and the Department of State--not CIA.  The
situation with regard to the IG's criticisms of the Agency's
relationship with the Cubans was perhaps best summarized in the
DDP's statement that the survey contained "a series of criticisms
and preachments which are so general, unsupported, or unconnected to
some specific consequence that we can only comment that they have
been noted with dismay and that we regret that until more detail is
furnished, an answer is not possible." 42/

The ninth and final section of the DDP analysis was
"Air-Maritime Operations" (18 pages).  The DDP made a desperate
effort to prove that black was white in an attempt to refute the
Inspector General's contention that the air drop operations prior to
17 April contributed nothing of significance to the anti-Castro
effort and that, in fact, the record was one of almost unmitigated
disaster.  After using such obvious excuses as the prohibition
against the use of US air bases, the prohibition against using US
pilots, untrained reception parties, lack of communications between

119

SECRET

ground and incoming aircraft, and difficult terrain, the fact remained that of 30 air drop missions flown up to 21 April 1961, there were only four drops in which a cargo was actually received by the people for whom it was intended. Despite this miserable record--which also included emergency landings by C-54's in Mexico and Jamaica--the DDP analysis had the chutzpa to state:

> In conclusion it might be said that the DPD overall air drop record is a good one and will stand close examination. The failures in Cuba were not the result of lack of competence nor poor organization. They were rather the result of many complex factors, some beyond Agency control, some undoubtedly within Agency control. During the project, the only real solutions were believed to be in the area of political infeasability [e.g., specifically the use of US pilots and US air bases], although an improved record might have otherwise been achieved. 43/

Indicative of the manner in which the DDP was willing to stretch the point with regard to the success of the air drop operation was the explanation for the loss of a 100-man arms pack. After citing various mitigating factors, the DDP analysis stated "the first drop was close but missed by 7 miles." 44/ The Cuban aircrew in the cockpit of that C-54 had 45,000 hours of flight time, but it not only missed the drop zone, it also missed the home field at Retalhuleu in Guatemala; and it ended up making an emergency landing in Mexico.

In similar fashion, the DDP also was willing to write off the operation which earned General Cabell the nickname of "Old Rice and Beans." Commenting on the operation, the DDP analysis stated:

> In order to fill out the load, the DDCI [General Cabell] decided to drop some food, as food shortages were clearly a problem with the resistance. Probably

120

too much food was dropped and the Agent was disturbed and angry. 45/*

With reference to maritime operations, the DDP did concede that the Inspector General's survey was correct in saying that the infil-exfil and materiel supply activities of a maritime nature left much to be desired. Even though suggesting that they faced difficulties, the DDP admitted that the maritime operations probably should have been under the supervision of a senior naval officer from the inception of the operation--Captain Scapa, the USN adviser, was not assigned this role until mid-February 1961. 47/  In concentrating on the nits and lice with which to castigate the DDP, the Inspector General's survey overlooked the very serious problems involving the acquisition of aluminum boats to be used in off-loading troops and supplies at Red Beach. As noted in the volume on the Taylor Committee Investigation, this involved an intensive search of the Atlantic seaboard in an attempt to match about three dozen boats and engines together--only to find that even after they were acquired additional modifications had to be made. More important, however, was the high rate of failure among these boats during a crucial period of off-loading the Houston at Red Beach on the day of the invasion.

---

* The 15-man reception team received, not only 1,500 pounds of materiel which was different from the original request...but also 800 pounds of beans, 800 pounds of rice, and 160 pounds of lard. This was the only drop to this Cuban agent. He was so vexed with the drop that he came out of Cuba specifically to make a complaint and to cancel a succeeding drop which had been planned. He stated that he would not accept another drop, no matter what the cargo was. He pointed out that the Agency had endangered his safety by dropping cargo which he had not asked for, did not need, and could not handle. Furthermore, the aircraft had stayed in the vicinity too long, had flown with its landing lights on, had circled around and made numerous U-turns, and even dropped propaganda leaflets on his property. He decided the Agency lacked the professional competence to make clandestine air drops. 46/

121

SECRET

The section on air-maritime operations also discussed training of underground leaders--something of a misnomer since the Inspector General's survey got into the story of the training sites in Guatemala and Louisiana (Belle Chasse) which involved the training of ground forces--not the training of underground leaders. Among other criticisms, the DDP analysis emphasized that despite the statements by the IG that the training facilities at Guatemala couldn't accommodate 500 men and that the training site near New Orleans was a near disaster area, both did serve the purposes for which they were intended.

In contrast to the IG's survey which criticized the failure to have all training done in the US, the DDP pointed out that it was not a question of "druthers," it was again a question of what was politically permissible. With the exception of the small cadre of tankers who were trained at Ft. Knox, the communicators who were trained at various US installations, and the two-week emergency session at the last minute for the Nino Diaz diversionary group near New Orleans, all other Cubans had to be trained outside of the United States.

The DDP concluded its comments on training by noting that:

Obviously, there is a good deal of adjusting to the needs of the moment in a project of this sort. It is believed, however, that the record will show that the training plans were reasonably detailed and complete. Moreover, that wherever a training course of any length was involved, there was a specific training plan. 48/

C.  Readers, Reactions, and Responses to the DDP Analysis
       of the IG's Survey

The DDP analysis of the Inspector General's survey of the Cuban operation was completed on 18 January 1962. There then

122

Approved for Release: 2016/08/09 C01254908

followed a series of memorandums which reflected the bitter feelings
which were engendered by Mr. Kirkpatrick's work.  In the month from
19 January to 19 February 1962, there were seven memorandums written
by the principals most closely involved with the two
reports--Messrs. McCone, Dulles, Cabell, Bissell, Barnes,
Kirkpatrick, and Kirkpatrick's inspection team.  Because the full
story of this dispute has been held so closely for so long,
presentation of the complete text of these memorandums more sharply
illustrates the differences between the Inspector General and the
DDP than can be done in paraphrased review.*

On 19 January 1962, John A. McCone, then Director of Central
Intelligence, forwarded copies of the Inspector General's survey,
the DDP analysis of the Inspector General's survey, and General
Cabell's 15 December 1961 memorandum on the Inspector General's
survey to Dr. James R. Killian, Chairman, President's Foreign
Intelligence Advisory Board.**  The memorandum to Killian read as
follows:

> Attached is [a] copy of the CIA Inspector General's
> "Survey of Cuban Operations" together with comments
> thereon by General C.P. Cabell, Deputy Director of
> CIA and [an] "Analysis of the Cuban Operation" by
> [the] Deputy Director (Plans).  This latter report is
> intended as a comment on the Inspector General's
> report.
>
> As you readily understand, I am not in any position
> to render a personal opinion concerning the validity
> of the IG's report or the statements by the DDCI and
> the DDP because I was not in CIA at the time.
> However, it is my personal opinion as a result of

---

\* Segments of the seven memorandums in question appear in the his-
tories of both Wayne Jackson and Kenneth Greer in the CIA histori-
cal series, but neither work does justice to the full story. 49/

** General Cabell's 15 December 1961 response to the IG's survey was
discussed in Chapter I of this volume and is not repeated here
(see pages 109-111).

SECRET

Approved for Release: 2016/08/09 C01254908

Approved for Release: 2016/08/09 C01254908

examinations I have made of this operation after the
fact that both the report and the rebuttals are
extreme.  I believe an accurate appraisal of the
Cuban effort and the reasons for failure rest some
place in between the two points of view expressed in
the reports.

I believe it is safe to say the failure of the Cuban
operation was Government-wide and in this respect the
Agency must bear its full share (though not the
entire) responsibility.  For this reason I would
recommend that your board, in reviewing the Inspector
General's Survey also review the comments and
analysis of the DDCI and the DDP. 50/

On 19 January 1962, C. Tracy Barnes, the principal author of

the DDP's analysis, forwarded a memorandum to Mr. Bissell and

suggested that Mr. Bissell forward the memo to DCI McCone.  The

thrust of Barnes's memo was that the Agency needed to decide on a

single CIA position vis-a-vis the Bay of Pigs operation and also to

lay out specific guidelines for any future IG surveys.  Barnes wrote:

> 1.  My work in support of your "Analysis of the Cuban
> Operation" gave me an unusual opportunity to study
> with care the document which caused the Analysis to
> be written, namely the "Inspector General's Survey of
> the Cuban Operation," October 1961.
>
> 2.  My consideration of the Survey has forced me to
> reach certain conclusions which I feel that I must
> record.  I do so in writing because these conclusions
> are, in my opinion, of sufficient significance to
> demand the discipline of a written expression.
> Moreover, I feel that those who disagree with me
> should have the opportunity to direct any replies
> that they may choose to make to specific identifiable
> comments.*
>
> 3.  I may say that my decision to write this
> memorandum was reached with considerable reluctance
> and only after long deliberation.  The deciding

---

* This was obviously a reference to the charge made throughout the
DDP analysis that the Inspector General's survey consistently
failed to identify individuals to whom specific statements were
attributed.  Considering the experience of some of the com-
plaintants and the nature of their complaints—frequently petty
and sometimes vicious—it is understandable why the IG did not pro-
vide identities.

124

SECRET

Approved for Release: 2016/08/09 C01254908

Approved for Release: 2016/08/09 C01254908

factor was my belief that the suggestions for action
in Paragraph 6 below are worthwhile and should be
submitted.  They would have been meaningless without
the reasons set forth in the earlier paragraphs.  The
views expressed are, needless to say, exclusively
mine.

4.  In my opinion the IG survey is most unfortunate
for three reasons:

   a.  It is an incompetent job.  The authors never
   understood the problems with which they were
   dealing and failed to express their views with
   any precision or proper use of relevant facts.

   b.  It is biased.  Basically relevant evidence on
   vital issues was not only left out but never even
   mentioned.  The survey undertook only to present
   those items which suggested failures or
   inadequacies.  These items, however, were not
   fully depicted so that a false picture was
   given.  Admittedly, an IG must expose fault but
   it is also his job to do so accurately.

   c.  It is malicious, or, to put it alternatively,
   it is intentionally biased.  Admittedly, this is
   a serious charge and is, at best, merely a
   statement of opinion.  I can only say I hold such
   opinion firmly.  In my view it could be supported
   solely on the basis of the survey's total
   omission in many places of significantly relevant
   evidence.  Such omissions are so excessive and
   one-sided as to substantiate the conclusion that
   they must have been intentional.  In addition
   however, I would like to mention four other
   points.

      1) The fact that the inspectors, in making
      their investigation, omitted any discussions
      of their findings with the senior officers
      responsible for the project.  Although,
      technically, the IG can accurately state that
      he talked to the DDP and the then ADDP/A
      about the survey, the fact is that these
      discussion[s] were exceedingly brief and
      covered none of the real issues in the
      survey.  The AC/DPD was not spoken to at
      all.  The Security Officer of WH/4 was not
      spoken to at all.  Other senior officers,
      such as C/WH and C/WH/4 were never given an
      opportunity to express their views in
      relation to statements in the survey.

125

SECRET

2) Some officers with whom the inspectors
had discussions felt after they had a chance
to see the survey, that it did not
impartially express the information which
they had provided and left out much of the
relevant information given. Moreover, some
officers have reported that the attitude of
the inspectors in their line of questioning
indicated a desire to obtain facts or views
to support judgments already formed.
Opinions contrary to these judgments were not
only disregarded but resisted.

3) The distribution of the final survey was
so peculiar and contrary to normal practice
that it raises an inference of intended
partiality. The method of distribution is
known and will not be repeated here. It
might be added that there were other facts
with respect to the distribution of the
survey worthy of mention. C/WH/4 was called
one day and asked if he wanted to read the
survey. He said that he would like to do so
but since both C/WH and DC/WH were away he
could not leave since he was Acting Chief of
the Division. Particularly, he could not
meet the requirements of the offer which were
that he would have only an hour from the time
of the telephone call to see the survey
(including travel time) since it had to be
sent to the printer. Why the urgency was so
great is not clear. As far as is known, only
one individual outside of the IG staff saw
the survey in final or substantially final
form before it was distributed, namely, an
officer who was the Chief of Operations for
WH/4 during the project. Why he was selected
instead of one of his superiors who was
connected with the project is not known.*

4) Since this particular operation, without
question, involved more political interest
and dynamite than any in which the Agency has
ever participated, there was every reason for
following regular procedures meticulously.
In addition to the distribution point
mentioned above, it seem relevant to wonder
how Dr. Killian and the Attorney General knew
of the survey's existence so as to request a
copy.

---

* The reference is to Richard D. Drain. Barnes apparently had
forgotten that Drain had been designated as the official point of
contact between the Inspector General and WH/4 when the IG survey
began. 51/

126

5.  I should say that, whatever the appearance of the
foregoing, I have not been trying to IG the IG.  The
information reported came to me unsolicited and in
the normal course of my work with you and your
analysis.  Maybe there is additional evidence of
importance, but I have not looked for it and do not
plan to do so.

6.  The significance of the foregoing is to provide
the reasons for the main purpose of this memorandum,
i.e., the submission of the following recommendations
for action:

   a.  The DCI should resolve to his own
   satisfaction the conflicts on major issues
   between the IG's survey and your Analysis.  Since
   both these documents are internal to the Agency,
   there is no Agency position on the Cuban
   Operation unless the conflicts are resolved.  In
   view of the importance of, and the continuing
   interest in, the operation at high levels of the
   government, an Agency position seems essential.
   Such a position is also important for the
   future.  The operation is bound to be studied for
   various reasons and there should be an Agency
   position at least as to what happened, what were
   the mistakes, and what were the lessons.
   Moreover, the DCI, having assumed office after
   the operation was thoroughly finished, has every
   reason for wanting to have some definitive
   findings and conclusions.

   b.  If the DCI agrees with a, above, each
   recipient of the survey and analysis (and it is
   understood that they will only be distributed
   together) should be advised of the fact that such
   an Agency position is being sought.  This might
   help to avoid independent conclusions outside of
   the Agency being reached first.

   c.  The following requirements should be imposed
   on all future IG surveys at least on any aspects
   of the DDP area of responsibility.

      1)  No survey shall be undertaken without
      specific written terms of reference approved
      by the DCI.

      2)  The DDP shall be satisfied that in each
      future survey covering any portion of his
      area of responsibility the IG or his staff
      will interview at least all officers having
      had responsibility for any part of the
      activity inspected by the IG; and prior to
      the distribution of the survey, the DDP and

127

SECRET

each such officer will be given an
opportunity to express his views on points
included in the survey.  Obviously the IG
need not accept these views.  Such procedure,
however, will save an enormous amount of time
required to answer surveys such as the Cuban
one which fail to present a full factual
picture regardless of the conclusions reached.

7.  I am addressing this memorandum to you as my
immediate superior.  I hope, however, that you will
agree with my request that the memorandum be passed
to the DCI for his consideration.  I do not, of
course, ask that you associate yourself with it or
any part of it merely because you transmit it. 52/*

On 22 January 1962, Lyman Kirkpatrick responded to the

Barnes's memo cited above.  Classified SECRET, it also was marked

PERSONAL and CONFIDENTIAL for C. Tracy Barnes.  The memorandum read

as follows:`

Dear Tracy:

Thank you for your courtesy in sending me a copy of
your memorandum of 19 January [1962] concerning the
Inspector General's survey of the Cuban Operation.**
I do hope that Dick [Bissell] forwards it to the DCI,
and I am enclosing a copy of this note to you in case
you wish to send a copy to Dick.

I have not had time to study your memorandum, or even
in fact, do more than glance at the DD/P analysis in
view of the meeting with the President's Board all
day Friday and the fact that I am going to be away
all this week.  However, I will make the following
comments.  Needless to say, I completely disagree
with your statement that it is an incompetent job.  I
feel that it is competent and I believe that the more
than one file cabinet drawer full of background
documents will prove its competence.***  I do not
believe that it is biased.  We made it very clear at
the start of the report that it would only deal with
inadequacies and failures and would not purport to be
a thorough analysis of the operation.

---

*   Barnes was relieved as ADDP/A shortly before Christmas 1961.
    He continued to serve as Senior Planning Officer (DDP/SPO) until
    March 1962 when he became Chief, Domestic Operations Division.
**  The only distribution shown on the copy of Barnes's memorandum
    used by the author of this history showed an original and one for
    the DDP.
*** Kirkpatrick obviously confused quantity with quality.

128

SECRET

Most of all I object most strongly to your third
observation, namely that it is malicious and
intentionally biased.  I have asked the men who did
this survey to review your memorandum and perhaps
acknowledge that more time should have been spent
with you or Bissell, but inasmuch as this devolved on
me, if there is a fault, it is mine personally.  But
to imply that for some reason, unknown to me, that we
would slant this report is an unfair comment.  You
apparently feel that there was something unusual in
the distribution of the final report.  The only thing
unusual in it was that we had two Directors at the
same time, and Mr. McCone having asked for it
received it as he was leaving for the West coast on
the day before Thanksgiving and everybody else got
their copies on the day after Thanksgiving.*  Your
concern as to how the President's Board and the
Attorney General knew of the survey's existence can
be answered very simply.  In 1956, the President's
Board, in writing, advised all Agencies that all
Inspector General reports should be forwarded to them
automatically.  I don't believe it was a week after
the Cuban operation that the direct question came
from that Board as to whether an inspection was going
to be done.  To which an affirmative reply was
given.  The Attorney General's source I do not know.

Finally, as far as to what should be done next, you
and Dick should know that at the conclusion of my
discussion with the President's Board I urged that a
group, or individual, who had not in any way been
associated with the operation be charged with taking
the Taylor Report, our report, and your comments, and
all background material and writing a truly national
and detailed report.  I believe that would be a far
better solution than trying to develop a CIA
position, which really is not very practical inasmuch
as there were so many outside factors affecting this
operation. 54/

This final statement was so eminently sensible that one can only

conclude that the purpose of Kirkpatrick's single-tracked approach

was to cause the controversy that it did.

---

* Obviously it is impossible under law to have two Directors of
Central Intelligence at the same time.  At the time that he re-
ceived the copy of the report, Mr. McCone was the designated
Director of Central Intelligence, but he had not yet been sworn in.
In his history of the Dulless administration, Wayne Jackson chal-
lenged Kirkpatrick's statement that the IG's survey was delivered
to Mr. McCone on Wednesday, the day before Thanksgiving.  Jackson
stated that Kirkpatrick's transmittal Memorandum was dated 20
November 1961, which would have been the Monday before Thanksgiving
rather than the Wednesday. 53/

Approved for Release: 2016/08/09 C01254908

In his "Personal and Confidential" memorandum of 22 January 1962 to Barnes, the IG had specified that he had asked his inspection team to review Barnes's memorandum and to provide comments on the reasons why Barnes thought that the IG survey was biased.  The 26 January 1962 report forwarded by members of the IG inspection staff stated:

1.  The scope of the IG Survey is briefly and clearly stated in the Introduction.  The Survey's intent was to identify and describe weaknesses within the Agency which contributed to the final result and to make recommendations for their future avoidance.  The IG had no authority to conduct a survey of the machinery for making decisions and policy at other levels of the government.  This field was covered by the group headed by Gen. Taylor.  The Survey expressly avoided detailed analysis of the purely military phase of the operation.

2.  Much of the DDP's Analysis is devoted, however, to a discussion of governmental decision making and to a rehash of the military operation.  It criticizes the Survey for insufficient attention to these matters, putting the major blame for the operation's failure on factors beyond the control of the Agency.

3.  The Analysis attempts to refute most of the weaknesses described by the Survey.  The few which it admits were, it contends, not significant to the final result.  It rejects the Survey's statements that intelligence was inadequate and misused and that staffing was inadequate.  It blames the failure of the air drops on the Cuban reception crews and air crews.  It states the small boat operations could not well have been handled in any other way.  And it states that other weaknesses were not important because they were not the decisive reason for failure.

4.  There is a fundamental difference of approach between the two documents.  While the Analysis is preoccupied with interdepartmental policy making and military strategy, the Survey is mainly concerned with the failure to build up internal resistance in Cuba through clandestine operations.  The Analysis fails to shed any further significant light on this fundamental issue.

5.  The Analysis shows a poorer grasp of what was going on at the case-officer level than of events in policy-making circles.  This is apparent in a number

130

SECRET
Approved for Release: 2016/08/09 C01254908

of inaccuracies in the Analysis. For example, the
discussion of activities in Miami is inaccurate and
misleading. Conduct of training in Miami is defended
although it was not criticized by the Survey. The
178 trainees alluded to in the Analysis as trained in
Miami were in fact trained in Guatemala. The PM
section in Miami was being <u>built up</u> beginning in
November 1960, rather than being deemphasized. These
and other inaccuracies suggest that the Analysis
should be read with caution where it deals with
events on a working level of the project.

6.  The IG investigators centered their
investigations on certain phases which were
significant to the success or failure of any
operation and of the Agency's overall mission
itself. They cannot be ignored or argued away just
because of policy decisions made outside the Agency.
55/

The memorandum prepared by the team which drafted the IG's

survey clearly indicated that the point which was made time and

again in the DDP analysis of the IG report and which was spelled out

in a single sentence in Barnes's memorandum of 19 January was

correct--"The authors [of the IG survey] never understood the

problems which which they were dealing and failed to express their

views with any precision or proper use of relevant fact." To attack

the DDP analysis because of its concern with policy decisions which

had direct, positive, and often immediate effects upon the operation

rather than being concerned with developments at "the case-officer

level" was unrealistic. Certainly if Kirkpatrick had made clear

that his investigation would ignore the interdepartmental aspects of

the operation in order to focus exclusively on internal CIA

problems, he would have been disabused quickly of the rationality of

such an approach--if indeed he were not laughed out of office.

Clearly he did not specify such an approach to Bissell, Barnes, or

Esterline; and when he did verge on it with Hawkins, he was quickly

informed that such an approach was invalid.

131

SECRET

Approved for Release: 2016/08/09 C01254908

If it had not been established before, the final sentence of the memorandum prepared by the IG inspection team was conclusive evidence of the team's complete dissociation from the very real world of the Bay of Pigs operation. They said that the bag of internal problems to which they had addressed themselves "cannot be ignored or argued away just because of policy decisions made outside the agency." One wonders how these three individuals explained the fact that even though the Agency had carefully selected and trained a group of Cuban pilots for a mission which might well have made the difference between victory and defeat at the Bay of Pigs, it was a last minute policy decision by the President of the United States to cancel that D-Day air strike--an act which guaranteed that the operation would fail.

On 27 January 1962, the Deputy Director for Plans sent a memorandum to the DCI forwarding copies of both Barnes's memorandum of 19 January and a copy of Kirkpatrick's 22 January memorandum in response to Barnes. The DDP's memorandum said:

> 1. As you are aware, Mr. Tracy Barnes did a major part of the work in preparing our comments on Mr. Kirkpatrick's Survey of the Cuban Operation. At the conclusion of the task, Mr. Barnes wrote me the attached memorandum which I hereby pass on to you.
>
> 2. I may say that I am in agreement with Mr. Barnes that the Survey, largely by reason of the omission of material relevant to its conclusions, constitutes a highly biased document and that the bias is of such a character that it must have been intentional.
>
> 3. I will be glad to discuss this with you if you so desire. 56/

That the failure of the Inspector General's survey to consider external factors apparently puzzled Bissell was indicated in the following entry in the IG's diary:

132

SECRET

[Dick] Drain reported to me that he had noted to
Bissell that the report (Cuban) specifically stated
it was not going to deal with decisions made outside
the Agency and that this answers their inquiry as to
why it would not take these into account. 57/*

Allen Dulles's response to Kirkpatrick's investigation was

forwarded to DCI McCone on 15 February 1962, and it read as follows:

1.  Upon receipt of the Inspector General's report of
October 1961, on the Cuban Operation, which reached
my desk prior to my resignation as Director of
Central Intelligence, I immediately transmitted a
copy to the Deputy Director (Plans) for his comment.
This was in line with the practice I had consistently
followed in dealing with the reports of the Inspector
General: namely, the Office which is the subject of
the inspection is given an opportunity to comment on
the IG report before the Director determines the
action to be taken thereon.  The reply of the Deputy
Director (Plans), dated 18 January 1962, of which I
have received a copy, was submitted to you following
my resignation.

2.  Meanwhile, I have also received and considered
the comments of the Deputy Director of Central
Intelligence, General Cabell.

3.  I remain at your disposal for any comments you
may wish me to submit on any phases of the matter
relating to CIA responsibilities.  Hence I will not
submit detailed written comment on the Inspector
General's report.

4.  At this time, however, I wish to make certain
general comments:

a.  As a member of the Taylor Committee appointed
by the President, I participated fully in the
work of his Committee and joined in his
Memorandum and oral reports to the President on
this subject.  While I do not now have a copy of
these documents, I made only one or two

---

*  It would appear that Mr. Kirkpatrick made a quantum jump in assum-
ing that his mere statement that external factors would not be
considered was in itself sufficient explanation.  Based on
Kirkpatrick's personal interview with Bissell, it is not surprising
that the DDP would have anticipated coverage of external matters--
these had been the focus of much of the interview.  Bissell also
would have been informed of the IG's joint session with Hawkins,
Drain, and Esterline--a session not limited to review of internal
matters.

reservations to the general conclusions and
recommendations to these reports.  I consider
them to be sound and believe they should be
accepted as the best available survey of this
particular operation.

b.  The Inspector General's report suffers from
the fact that his investigation was limited to
the activities of one segment of one agency,
namely, the CIA.  Opinions based on such a
partial review fail to give the true story or to
provide a sound basis for the sweeping
conclusions reached by him.

c.  Judgments could not properly be rendered in
this matter without a full analysis, as was made
by the Taylor Committee, of actions of all the
participating elements in the operation and the
influences brought to bear outside of the Agency
which affected the operation.  This applies
particularly to the participation of the
Department of State, the Department of Defense,
the Joint Chiefs of Staff, and to certain
elements of the Executive Department of the
Government.

d.  At no time during the preparation of his
report did the Inspector General request any
information from me and he made certain serious
errors in areas where my direct responsibility
was clearly involved.

5.  Two major areas of criticism in the IG report
cover (1) the operational arrangements for the
organization, training, transportation, and
deployment of the Brigade and, (2) the relations of
Agency personnel to the Cuban emigration [sic] and
their political organization.  As to these points, I
submit the following:

a.  First, while certain organizational matters,
in the light of developments, may be open to some
criticism, the Brigade with its entire complement
of men and equipment reached the landing area on
schedule and under circumstances which achieved
complete surprise.  The situation in the landing
area was substantially as predicted.  The enemy
battle order intelligence was essentially
correct.  The failur to get the ammunition and
supplies ashore was due to circumstances beyond
the control of the Brigade commander or its
personnel.

134

SECRET

b.  Second, with respect to the organization of
the Cuban emigre political committee in support
of the operations, I would point out that prior
to engaging in the operation  a broad coalition
of Cuban leaders, and one acceptable to our State
Department, was realized.

These two important achievements covered major areas
of CIA responsibility.

6.  As Director, I deemed it desirable and necessary
in view of my other duties to delegate certain
responsibilities within the Agency for the day-by-day
management of the operation, and on military matters
and judgments I relied heavily on military personnel
and the Joint Chiefs of Staff.  However, I assumed
throughout full responsibility for the Agency's
participation and actions and kept currently advised
of all important developments.  During the concluding
days of the operation, I was particularly influenced
by the judgments in Colonel Hawkins' dispatch dated
April 13, 1961, relating to the high state of
readiness of the Brigade (Annex A to Chapter IV [sic]
of DDP report...)*

7.  Whether or not the operation would have succeeded
if the Brigade had landed with its entire personnel
and equipment is a matter which can be debated and on
which even today military experts differ.**
Certainly, the responsibility for failure does not
lie primarily in the main areas of criticism stressed
in the Inspector General's report.

8.  Of course, there are lessons to be learned as
pointed out in the Taylor Reports.  These reports, I
believe, should be taken as the main basis for any
review of the Agency's actions in support of the
operation. 58/

Mr. Dulles's comment that the IG failed to interview him

(Par. 4d, above) raises the interesting question of why this was

done.  It seems particularly strange for at least two reasons:

_____
* The reference should be to "Annex A to Chapter VI of the DDP
Report."
** The question wasn't one of whether the operation would have suc-
ceeded even if the Brigade had landed intact.  The question was
whether the Brigade supported by control of the air could have
succeeded.  This obviously was a serious oversight on Dulles's
part.

135

SECRET

First, there were on-going, apparently familiar contacts between
Dulles and Kirkpatrick during this period as evidenced by their
discussions concerning the future of both Bissell and the DDP.*
Second, the IG's inspection team did draw up a list of questions on
the operation for Kirkpatrick to discuss with the DCI.  The
questions were prepared by Shea and Dildine on 20 August 1961 and
apparently were seen by the IG about that time; but no action
appears to have been taken then.  The questions were "Recirculated
per meeting [of] 9/29--for your talks with DCI and DDCI" by Shea on
1 October 1961; but there is no record of any subsequent discussions
between the IG and the DCI or DDCI.

The questions proposed for the interview, like the questions
asked Mr. Bissell, Jake Esterline, Dick Drain, and Jack Hawkins,
focused heavily on the relationships with State, DOD, and the Joint
Chiefs and their impact on the operation.  Many of the questions
were leading and others reflected on failures in the areas of
tradecraft and personnel--they seemed out of place for an interview
with the DCI.  As an example, the final item in the list surely
would have raised Mr. Dulles's ire for it requested the DCI/DDCI to
comment on the following:

> It is the view of the investigating team that the
> project was ill-conceived, badly administered, poorly
> led, and that tradecraft doctrine was violated on a
> massive scale.  Our report will reflect this view in
> detail, with a great deal of supporting evidence.
> 59/**

As Kenneth Greer noted in his history of the Office of the Inspector
General, Dulles's memorandum to McCone was quite temperate but:

---
\* See Chapter 3.
\** See Appendix D for a list of questions.

136

SECRET

Although there is no reference to it in Kirkpatrick's
diary or in any of the other papers available for
review, Dulles and Cabell confronted Kirkpatrick with
their views on the inadequacies of the survey in a
meeting in Kirkpatrick's office.  John Earman was
present and recalls that it was an extremely stormy
session.  Dulles, once a close friend of Kirkpatrick,
did not even speak to Kirkpatrick for over a year
following the meeting. 60/*

The concluding memorandum in this series of exchanges
involving the DDP's response to the Inspector General's survey of
the Cuban operation was McCone's 19 February 1962 letter to Allen
Dulles reading:

Dear Allen:

I have received your memorandum of 15 February 1962
containing your comments on the Inspector General's
Survey of the Cuban Operation.  Copies of this
memorandum, together with the DDP analysis of the
survey, the comments made by General Cabell, Mr.
Kirkpatrick, and the personal views expressed by Mr.
Tracy Barnes, will be bound in the report--and
therefore will be known to anyone who might have
occasion to read it. 61/

Based on an extract from Kirkpatrick's diary, it appears
probable that McCone consulted with Kirkpatrick prior to this
response to Allen Dulles.  The Kirkpatrick diary stated:  "The DCI
then talked about the Cuban report and we agreed that it should be
bound together with all of the comments and that the only copies to
be retained should be in the Agency." 62/  Possibly the last words
from any of the principals involved in the in-house evaluation of
the Bay of Pigs were recorded by Lyman Kirkpatrick in the early fall
of 1963 when he reported:

---

* Mr. Earman was Mr. Dulles's Executive Officer.  When Kirkpatrick
became Executive Director of CIA in the Spring of 1962, John Earman
became Kirkpatrick's successor as Inspector General.

137

SECRET

Approved for Release: 2016/08/09 C01254908

Meeting with DCI:  I asked him whether he thought the
Bay of Pigs report was a knife job.  He replied he
thought it was a tough report and perhaps bore
unnecessarily hard on the Agency.  He then mentioned
that he thought the most shocking failure in the Bay
of Pigs was the fact that Allen Dulles was off in
Puerto Rico giving a speech to the Young Executive
Group at the time the operation was being carried
out.  He said he had mentioned this to Eisenhower who
had been completely shocked, and had said that he
thought that this has [sic] been simply a cover
story.  I then said that I thought one of the
greatest failures on the part of the Agency in the
Bay of Pigs was that the Agency never acquainted the
President with the realities of the operation and its
chances of success or failure. 63/*

* At this time, Kirkpatrick was Executive Director of the Agency
having been appointed to that position 10 April 1962.

138

SECRET

Approved for Release: 2016/08/09 C01254908

## Chapter 4

## Evaluation of the Evaluations

Although Inspector General Lyman Kirkpatrick's "Survey" of the Bay of Pigs operation did offer some valid criticisms, it by no means deserved the kudos given it by Thomas Powers as "the only serious official investigation of the Bay of Pigs."* Even with its obvious bias toward protection of the reputation of John F. Kennedy's administration, the Taylor Committee report on the Bay of Pigs was far more objective than Kirkpatrick's post-mortem.

The thrust of the IG's review was to denigrate DDP Richard Bissell's management of the anti-Castro operation.  To this end, the IG's investigation made the unrealistic assumption that CIA's role in the Bay of Pigs could be examined and valid conclusions drawn without reference to the Agency's continuous interrelations with other US agencies and the White House.  Moreover, this unique approach was never made clear to those being interviewed by the IG and his team.  In fact, the record of his meetings with the key personnel of the operation, including Bissell, was quite to the contrary.  The focus of those meetings was on the impact of external pressures.

---

* The Man Who Kept the Secrets (New York: Alfred A. Knopf, 1979), p. 106.  Powers's evaluation of Kirkpatrick's inspection provides an excellent example of the difficulty presented to the author who attempts to write objectively about CIA activities which remain protected for security reasons.  If he had had access to IG interviews, it seems unlikely that Powers would have made the above statement, nor would he have regarded Kirkpatrick as the purist who "was determined not to whitewash a CIA failure of such magnitude that it threatened to destroy the Agency itself" (p. 332).  Completion of the Taylor Committee's report several months before the IG's survey--a report to which Kirkpatrick had access--made it clear that the CIA was not going to be "destroyed" because of the failure at the Bay of Pigs.

Approved for Release: 2016/08/09 C01254908

Approved for Release: 2016/08/09 C01254908

Even where the IG's survey had valid criticisms, many of its
suggested remedies could not have been made unilaterally.  Other
agencies were necessarily involved in an operation which was in
support of US policy and authorized by the White House.  Among the
viable criticisms found in the Kirkpatrick report were the following:

1.  Senior Agency personnel were negligent in failing to
recognize that there was a point beyond which they should no longer
have tolerated political interference with the planned military
operation.  Although the IG did not specify it, with the
cancellation of the D-Day strike, the project leaders should have
recognized that the margin between success and failure clearly had
been exceeded; and they should have ordered the immediate recall of
the invasion force, even if it meant the loss of materiel already
off-loaded.

2.  In this same context was the IG's suggestion that too
many important briefings were conducted by individuals not
thoroughly familiar with the operation.  This was a point which was
supported by Jake Esterline, Chief of the anti-Castro project.  Both
Esterline and the IG suggested that if Col. Jack Hawkins
(paramilitary chief for the operation) had been at the meeting with
Dean Rusk on the evening of 16 April 1961 when the D-Day air strike
was cancelled, the situation might have been reversed.

3.  The IG was far off base in his broad condemnation of
the caliber of the personnel assigned to the anti-Castro task force,
but there was justification for his criticism that DCI Dulles's
instructions that the best qualified people were to be selected for
the task force were not implemented.  There were no directed

Approved for Release: 2016/08/09 C01254908

assignments, even though the DDP was supposedly bound by its
contingency assignment policy.  Supportive of the IG's contention
that the DDP failed to provide its best people were Dick Drain,
Chief of Operations for the task force, and Bill Eisemann who was
Chief of Support for the operation.

4.  In this general context, the IG's criticism of the
lack of Spanish language capability in the project was, of course,
denied by the DDP which noted that many of WH/4's most senior
personnel were fluent in Spanish.  The cable traffic from the
training bases, however, requested the assignment of Spanish
linguists as an ongoing need throughout the course of the project.

5.  The IG's survey was sharply critical of the
independence of the Agency's air arm, DPD, from control by the
anti-Castro project chief.  If there had been direct control of the
air operations by the task force, there might have been better
coordination and greater effectiveness in air drop operations.
There is little doubt that the project officers should have made
stronger appeals concerning the selection of targets and the
armament--specifically pushing for the use of napalm--for the D-2
and D-Day air strikes.

The IG's survey lost its credibility by trying to limit its
review ecxclusively to the role played by CIA during the operation.
This course of action gave the IG as many straw men as he desired to
knock down, but as stressed throughout this volume, the anti-Castro
effort was an interagency program from the time of its inception
under the Eisenhower administration until its collapse on the beach
at Playa Giron.  Moreover, the IG's report suffered severely from

- 141 -

Approved for Release: 2016/08/09 C01254908

its obvious attempts to denigrate both DDP Bissell and DCI Dulles.
Even as he criticized the DCI and the DDP for failing to use Col.
Hawkins as a principal briefer, Kirkpatrick also was making
disparaging remarks about Hawkins--perhaps following the bias of the
Taylor Committee in portraying Hawkins as the dominant voice in
pushing for the invasion.

The Inspector General's survey also showed a complete lack of
understanding of the anti-Castro paramilitary plan.  The task force
was criticized at length for its failure to develop numerous cadres
of well-armed, well-trained guerrillas within Cuba.  The inability
of WH/4 to successfully supply the internal dissidents with adequate
material by either air drop or maritime operations drew extremely
harsh criticism.  From the IG's point of view the success of the
anti-Castro effort should have hinged on an almost immediate
uprising by dissident units which the Agency had trained and
supported.  As the Taylor Committee report had made clear and as the
IG and his inspectors has been told, any hope for such an internal
uprising had gone by the board as early as November 1960 and had no
place in the planning from that time forward.  This change in
concept was neither understood nor conceded by the IG.

The IG's survey also was seriously flawed by its extreme
emphasis on the organizational difficulties between Headquarters and
the Miami base--the IG concern being that the base was never
upgraded to a station.  The IG's criticism of Headquarters in this
instance focused on the treatment of the leaders of the various
Cuban factions in the Miami area.  Paradoxically, however, even as
Headquarters was being castigated for failing to give the Cuban
leaders--particularly the officers of the FRD and the CRC--a
stronger voice in planning operational activities against Castro,

the IG's survey specified that the impetuosity and emotionalism of
the Cubans could have led to precipitate action.

Such limited credibility as the IG's survey warrants is
negated almost completely by the dissumulative manner in which the
report was prepared.  When he conducted his personal interviews with
Richard Bissell, Jake Esterline, Jack Hawkins, and Dick Drain, the
IG's questions and comments clearly reflected his understanding of
the interdepartmental nature of the Bay of Pigs operation and his
clear recognition that Agency actions--on all critical issues--were
not judgments made solely by CIA.  As emphasized in the preceding
chapter on the IG's survey, on the one reported occasion when
Kirkpatrick tried to fly the idea that he could limit his review
solely to CIA, he was jerked up immediately by Col. Hawkins.  In his
ill-disguised attempt to discredit the DDP/DCI management of the
operation, it was apparent that the IG was determined to prove that
the anti-Castro effort was doomed from its inception.

As might have been expected, the DDP's "Analysis of the
Inspector General's Survey" took issue with every point and
criticism which was made by the IG.  The DDP's objection, of course,
was that the survey was based on the false and artificial assumption
that during the course of the operation, CIA was independent of
other agencies of government.  It seems unfortunate that the Deputy
Director for Plans and the Director for Central Intelligence did not
simply make this statement in lieu of any other response to the
Inspector General's survey.  Instead, however, the DDP's rebuttal
was even more lengthy than the Inspector General's survey and, with
minor exceptions, denied the validity of all of the charges made by

Approved for Release: 2016/08/09 C01254908

the Inspector General, including the IG's condemnation of the "rice and beans" air drop ordered by General Cabell.

After denying the validity of the Inspector General's focus on CIA alone, the DDP then proceeded to argue that the setup for air operations with DPD was successful; that the project had ample Spanish language capabilities; that the best possible use was made of the intelligence reports from USIB, ONE, and OCI; and never admitted to failure in terms of the IG charges that as the margin for success began to be diminished sharply by political considerations that the Agency should have called for a halt.  The DDP response was resentful of the personal nature of the attacks made by the Inspector General, and it was correct in that CIA could not be studied out of context from its relationships with other agencies in the government.  The fact that the Presidential authorization for the project had specified that CIA work with both State and DOD negated the IG's charge that the Agency's Project Review Committee should have been consulted about the operational plan.

With reference to the charge that the Agency had failed to estimate the chances of success, the DDP's analysis pointed out that the chances of success were judged to be favorable not only by CIA's planners, but also by the Joint Chiefs of Staff and the Department of Defense.  The basis for this estimate was that that the D-Day air strike would take place--and there was no dispute between the Agency and DOD about the essentiality of control of the air over Cuba if the project were to have any chance of success.  It was in light of the cancellation of the D-Day strike that the DDP was able to point

- 144 -

Approved for Release: 2016/08/09 C01254908

out--quite properly in response to the IG's charge that the plan was poorly conceived--that because of that cancellation the plan was never really tested.

DCI John McCone made a politic decision in ordering that the Inspector General's "Survey" and the DDP's "Analysis" should be bound together with the pertinent memos from the concerned parties. In choosing this course because of his unfamiliarity with the situation, it was unfortunate that McCone didn't arrange to have a copy of the Taylor Committee Report bound with the two Agency originated documents. As Kirkpatrick had suggested to PFIAB, the only way a realistic evaluation of the operation could be made was to put these documents in the hands of an impartial investigator. Reviewed without reference to the four memorandums which make up the Taylor report, the IG and DDP documents appear to be the results of a skunk pissing contest.

As with other aspects of the Bay of Pigs story, it is unfortunate that the effort to put the Inspector General's "Survey" and the DDP's "Analysis" in proper perspective has been so long delayed.  The erosion of records and memories in the more than twenty years between completion of those reports and this volume--particularly the paucity of papers from Bissell, Barnes, and J. C. King--makes for a less complete picture than desirable. Although it is unlikely that a volume such as this would be considered for overt publication, it would seem in order that

Approved for Release: 2016/08/09 C01254908

Approved for Release: 2016/08/09 C01254908

thought be given to broad circulation of this story on an internal

basis.*  As with other misinformation about the Bay of Pigs

operation, the only version of this story that has been publicized

has been based on Kirkpatrick's own less than objective writings.**

---

* This appears unlikely, however, considering the unchanging
resistance from the Operations Directorate even to the writing of
classified CIA histories.  Note, for example, the similarity of
the philosophies expressed on this subject by two DDO
principals--one in 1971, the other in 1981:

1.  The recent publications by the New York Times of the Top
Secret history of the Vietnamese war and related highly classified
documents suggest that we would do well to re-examine the
arrangements and procedures under which our own history program is
being administered.  Needless to say, there is enough highly
sensitive material in some of these histories to cause the
Government and the Agency tremendous embarrassment and to put a
real monkey wrench into large segments of our operational
activities, particularly those relating to other governments and
liaison services.

I know a lot of good work has gone into the history program and
yet I cannot conceal a nagging question as to what ultimate useful
purpose such a program serves for an Agency such as this one.  I
wish it were possible to terminate the program and destroy the
material that's been put together.  Because I realize that such a
course of action is improbable, I urge that those in charge of the
program be impressed once again with the importance of the
security aspects of it.  I for my part will do this with respect
to the Clandestine Service role in the program. 1/

2.  [Ben Evans] is hot on completion of BOP [the Bay of Pigs
history] and noted that he had given [a copy of] my work plan [on
the final volume of the Bay of Pigs history] to Mr. [Nestor]
Sanchez [Chief, Latin American Division]; and Sanchez opposes
[the] whole idea of BOP history. 2/

**Kirkpatrick, Lyman, The Real CIA (New York:  Macmillan, 1968) and
Kirkpatrick, Lyman, "Paramilitary Case Study:  The Bay of Pigs,"
Naval War College Review, Nov-Dec 72, pp. 32-42.

- 146 -

**Appendix A**

**Correspondence between Dr. Jack B. Pfeiffer and
Charles A. Briggs, 29 May 1981 - 4 June 1981.**

**- 147 -**

**CONFIDENTIAL**

Approved for Release: 2016/08/09 C01254908

29 May 1981

MEMORANDUM FOR :  Inspector General

THROUGH        :  Acting Chief, History Staff

SUBJECT        :  Seventy page report prepared by Lyman
                  Kirkpatrick on Bay of Pigs


    1.  In the course of the investigation which the Inspector
General's office conducted (May-October 1961) on the Bay of Pigs
Operation, Lyman Kirkpatrick personally interviewed three of the
principal officers of the Branch (WH/4/WHD) which ran the
operation.  Kirkpatrick identified two of the three officers in
attendance as "Mr. [Jacob D.] Esterline and Colonel [Jack] Hawkins
[USMC]."  Kirkpatrick also indicated that he prepared a report of
"some 70 pages" on this meeting.  If possible, I should like to
obtain a copy of Kirkpatrick's 70 page report and, also, learn the
identity of the third member of WH/4 who was a participant in the
interview.

    2.  .Reference to the 70 page report on his interview is
contained in two memos of transmittal of copies of the Inspector
General's Survey of the Cuban Operation from Kirkpatrick to Mr.
McCone (20 Nov 61) and to Mr. Dulles (24 Nov 61).

    3.  I am aware that Kenneth Greer's reference to
Kirkpatrick's report on the BOP in his history, The Office of the
Inspector General, Jan 52-Dec 71 (DCI-7, Oct 73) states that
"Kirkpatrick directed the [inspection] team members to destroy all
of their working papers relating to the survey because of the
report's sensitivity."  Hopefully, perhaps, Kirkpatrick excluded his
own working papers from destruction.

    4.  If there is any way that I can assist you in the search,
please let me know.


                              Dr. Jack B. Pfeiffer
                              CIA History Staff
                              316 Ames Bldg., x2621

CONFIDENTIAL

Approved for Release: 2016/08/09 C01254908

Approved for Release: 2016/08/09 C01254908

**4 June 1981**


MEMORANDUM FOR:   **Dr. Jack B. Pfeiffer**
                       **Acting Chief, CIA History Staff**

FROM:                **Charles A. Briggs**
                       **Inspector General**

SUBJECT:          **Seventy Page Report Prepared by Lyman Kirkpatrick**
                       **on Bay of Pigs**


     1.  I have searched OIG files for additional information on
the 70-page report referred to in the two memoranda cited in
paragraph 2 of your 29 May memorandum.  We cannot locate a copy of
this report, nor can we shed any light on the identity of the third
officer.

     2.  We have no record of any Kirkpatrick "working papers" on
this subject.  As far as we can tell, all of the OIG survey team's
working papers related to the Bay of Pigs Operation survey were
destroyed in accordance with Kirkpatrick's instructions.

     3.  I am concerned that your unclassified 29 May memorandum
to me contains information which I understand is still classified
and sensitive.  Since the Agency is in the process of denying
release in toto of these reports, I suggest that your memorandum be
classified CONFIDENTIAL.

                                         /s/ Charles A. Briggs

**CONFIDENTIAL**

Approved for Release: 2016/08/09 C01254908

Approved for Release: 2016/08/09 C01254908

TOP SECRET

Access Controlled by
CIA History Staff

OFFICIAL HISTORY
OF THE
BAY OF PIGS OPERATION

Appendices B, C, & D from

DRAFT Volume V

CIA's Internal Investigation of the Bay of Pigs

Jack B. Pfeiffer

Submitted to the
Center for the Study of Intelligence
Central Intelligence Agency

18 April 1984

(b)(3)

11/18/92 gklwO

TOP SECRET

SECRET

APPENDICES B, C, & D ARE TOP SECRET

AND REQUIRE SEPARATE HANDLING

J. K. McDonald
Chief, CIA History Staff

18 November 1992

SECRET

Approved for Release: 2016/08/09 C01254908

TOP SECRET

Access Controlled by
CIA History Staff

TS0096/92
copy 3 (series B of copy 1)

OFFICIAL HISTORY
OF THE
BAY OF PIGS OPERATION

Appendices B, C, & D from

DRAFT Volume V

CIA's Internal Investigation of the Bay of Pigs

Jack B. Pfeiffer

Submitted to the
Center for the Study of Intelligence
Central Intelligence Agency

18 April 1984

(b)(3)

TOP SECRET

Approved for Release: 2016/08/09 C01254908

TOP SECRET

APPENDIX B

Memorandum for Mr. McCone

from Lyman Kirkpatrick

20 November 1961,

Subject:  Survey of the Cuban Operation

- 150 -

TOP SECRET

Approved for Release: 2016/08/09 C01254908

COPY

20 November 1961

MEMORANDUM FOR:  Mr. McCone

SUBJECT       :  Survey of the Cuban Operation

     1.  Presented herewith is a 150 page survey of the Cuban
operation, together with the most important basic documents on the
operation which are included in the five annexes.  In this report we
have not attempted to go into an exhaustive step by step inspection
of every action in the operation.  Nor have we tried to assess
individual performance, although our inspection left us with very
definite views.  Rather, we have tried to find out what went wrong,
and why, and to present the facts and conclusions as briefly as
possible.  This report has been double-spaced for ease in reading.
The ten recommendations for corrective action start on page 148.

     2.  In conducting this survey we reviewed all of the basic
files and documents, including all of the material prepared by the
Agency for General Maxwell Taylor's Committee, as well as the
minutes of that Committee which were made available to us.  In
addition, we conducted extensive interviews with all of the
principal officers on the project from the DD/P on down, and made
detailed memoranda for our files on all of these discussions; e.g.,
my meeting with the top three officers of the Branch reviewing the
operation the week after the landing failed is reported in some 70
pages.  Thus, while the analysis and conclusions presented herewith
regarding the operation are those of the Inspector General, the
bases for these conclusions are extensively documented in the files.

- 151 -

TOP SECRET

Approved for Release: 2016/08/09 C01254908
TOP SECRET

3.   This, in my opinion, is a fair report even though highly critical.   Unfortunately, there has been a tendency in the Agency to gloss over CIA's inadequacies and to attempt to fix all of the blame for the failure of the invasion upon other elements of the Government, rather than to recognize the Agency's weaknesses reflected in this report.   Consequently, I will make no additional distribution of this report until you indicate whom you wish to have copies.   In this connection, the President's Foreign Intelligence Advisory Board has requested a copy in time for Mr. Coyne to give a brief report on it at their December 9 meeting.   I will await your wishes in this regard.


                              /s/ Lyman Kirkpatrick
                              Lyman B. Kirkpatrick
                              Inspector General


Attachment

TOP SECRET

Approved for Release: 2016/08/09 C01254908

TOP SECRET

APPENDIX C


Memorandum for Director of Central Intelligence

from Lyman B. Kirkpatrick,

24 November 1961

Subject:  Report on the Cuban Operation

TOP SECRET

COPY

24 November 1961

MEMORANDUM FOR: Director of Central Intelligence

SUBJECT       : Report on the Cuban Operation

    1.  The report on the Cuban Operation, as is true of all
Inspector General reports, was prepared under my personal direction
and worked on by myself and my deputy, Mr. David McLean, as well as
the three officers who did the principal collecting of information
and preparation of the text: Messrs. Dildine, Shaffer, and Shea.
The final editing was done by myself personally and the report
represents the views of the Inspector General.

    2.  In preparing the report we had access to all of the
material prepared by this agency and submitted to the Taylor
Committee, as well as the minutes of the Taylor Committee meetings,
and a chance to see their final conclusions and recommendations.  In
addition to this, we had all of the documentary material available
in the WH Division, WH-4, and other staffs and divisions of the
agency who had cognizance of or prepared material for WH/4.  These
particularly included ONE, OCI, and Staff D of the DD/P.

    3.  As is noted particularly in our report, we did not go
outside of the agency in any respect and tried to confine our
inspection to only internal agency matters, except where reference
had to be. made to ourside actions that affected the operation.  In
interviewing persons connected with this operation, we talked
initially to three of the top officers in the operation, commencing

- 154 -

TOP SECRET

Approved for Release: 2016/08/09 C01254908
TOP SECRET

with Mr. Esterline and Colonel Hawkins, and having our initial

lengthy discussions with them within a week of the operation. We

interviewed all of the appropriate supervisors in the DD/P, starting

with the DD/P himself and including: the A/DDP/A; Chief, WH; Chief,

WH-4; and some 130 other officers and employees directly involved in

the operation. We kept extensive notes and material of all of these

discussions which are documented in our files.


                      Lyman B. Kirkpatrick

                      Inspector General


cc: DDCI

    CC/P

Approved for Release: 2016/08/09 C01254908

Approved for Release: 2016/08/09 C01254908
TOP SECRET


APPENDIX D


QUESTIONS FOR MR. DULLES


- 156 -

TOP SECRET

Approved for Release: 2016/08/09 C01254908
~~TOP SECRET~~

COPY                                                8/20/61


## Appendix D

### Questions for Mr. Dulles


1.  Ask for his own view a to errors made and weaknesses disclosed
by the Agency in the course of the operation generally and under
specific headings of organization, staffing, and operational.

2.  <u>The JCS-developed overall—U.S. plan of action for Cuba:</u>

(Background:  Gen. Lemnitzer said to the Taylor Committee (meeting
of 18 May 61), following his statement that DOD had participated in
the Cuban operation only in the role of support, that JCS developed
an overall—U.S. plan of action for Cuba in late January, which he
discussed with Messrs. Rusk and Dulles on 22 January; also, that
Gen. Gray tried to interest State and CIA in preparing a national
plan based on the Trinidad concept.  State was receptive but the
people at CIA were not quite as receptive because they were involved
in planning this operation, as a result of the decision of 17 March
1960 by President Eisenhower.)


<u>Questions</u>:  Obtain Mr. Dulles' recollection of the foregoing.  Did
the Agency commit an error in not giving up its role as sole
director of the Cuban plan at that time?  Was Agency attitude the
result of considered judgment?

        What was the basic reason why the Agency did not see that the
changed operation (1,500 man force, overt) required joint operations
with DOD, e.g., by creation of a Joint Task Force?

~~TOP SECRET~~

Approved for Release: 2016/08/09 C01254908

Approved for Release: 2016/08/09 C01254908

Was the Agency on the "defensive" and did it therefore feel that it must carry the project through to completion?

Was it the case that Col. Hawkins' forcefulness and confidence in the strike force carried the others (Bissell, Barnes, Esterline) with him, thereby preventing them from giving a cold, objective look at the situation and where it was taking the Agency? Circumstances under which Col. Hawkins was brought into the project?

3.  Ineffectiveness of our clandestine PM efforts (in air and maritime operations; in establishing contact with the guerrilla bands, building them up, etc.)

Was this disclosed to the Director? To the Special Group and later to President Kennedy?  If not, did this failure to disclose amount to deception?

Was it the case that Bissell, Barnes, etc. accepted Hawkins ⎕⎕⎕⎕⎕⎕ optimistic intelligence sitreps without comparing them with the incoming reports, especially SI, of arrest of agents, compromise of nets, highly effective Castro counterintelligence action, etc.?  If so, why?  Where they too busy with other things?  Or was it lack of technical tradecraft skill on their part?

(b)(3)

4.  The role played by the DDCI:

(Mr. Dulles told the Taylor Committee that he asked the DDCI to follow closely the air side of the operation.)  Did this amount to an operationa role?  Did the DDCI in fact exercise operational functions, e.g., in changing instructions as to various technical details of air operations:  height of flight, amount of load, etc.

- 158 -

Approved for Release: 2016/08/09 C01254908

TOP SECRET

5.  Was Mr. Dulles aware that his **assurance** to WH/4 (in April 1960) that personnel with qualifications essential to the operation would be recalled from anywhere in the world was not being carried out by subordinates?

6.  It is the general view of the investigating team that the project was ill—conceived, badly administered, poorly led, and that tradecraft doctrine was violated on a massive scale.  Our report will reflect this view in detail, with a great deal of supporting evidence.  Comment?

TOP SECRET

Approved for Release: 2016/08/09 C01254908

SOURCE REFERENCES

## NOTES ON SOURCE REFERENCES

    1.  Unless otherwise indicated, the original classification of all source references was SECRET.  Original classifications to the contrary are shown in ()'s.

    2.  Commercial publications including books, magazines, newspapers, and articles are UNCLASSIFIED.

    3.  The writer's interviews, conversations, and correspondence are UNCLASSIFIED.

- 160 -

UNCLASSIFIED

The Internal Investigations of the Bay of Pigs Operation

## Source References

Chapter 1   No source references

Chapter 2   The Inspector General's Survey of the Cuban Operation

1.   Taylor Committee, 1st Meeting, 22 Apr 61, Verbatim Transcript, Reel 4, p. 1.

2.   Excerpts from Lyman Kirkpatrick's Diary, 22 Apr 61. (Hereafter as Kirk's Diary.)

3.   Kirkpatrick, Lyman. The Real CIA (New York: Macmillan, 1968), p. 200. U.

4.   Kirk's Diary, 30 Apr 61.

5.   Richard D. Drain, Personal Notes, 1 May 61. (Hereafter as Drain Notes.)

6.   Kirk's Diary:  1 May 61; 4 May 61.

7.   Drain Notes:  23 Apr 61; 1-2 May 61.

8.   Interview with Richard D. Drain by Jack B. Pfeiffer, 8 Jan 76, p. 45.  U.  (Hereafter as Drain-Pfeiffer Int.)

9.   Office Memo for Pauline from Diane, 11 Jul 61, sub: Green Group Material.

Inspector General's Survey of the Cuban Operation, Oct 61, p. 2. (Hereafter as IG Survey.) (TS 173040)

Memo for DCI from Lyman Kirkpatrick, 24 Nov 61, sub: Report on the Cuban Operation. (TS 173040/Add)

10.   Notes and Memos for TS 173040, Inspector General's Survey of the Cuban Operation, Oct 61 and TS 181884, An Analysis of the Cuban Operation by DDP, Jan 62.

11.   Drain-Pfeiffer Int., p. 34.

12.   Kirk's Diary: 1960: 28, 31 Mar; 1, 12, 27 Apr; 21 Jun; 5, 8, Jul; 30 Aug; 7-8 Sep.

13.   Kirkpatrick Interview with Col. Jack Hawkins, Richard Drain, and Jacob Esterline, 1 or 2 May 61, pp. 49-51. TS.

14.   Greer, Kenneth E. The Office of the Inspector General, Jan 52-Dec 71, Oct 73, pp. 86-87. (HS/DCI 7).

Kirk's Diary, 29 Sep 61.

15.   Greer, pp. 85-86.

16.   Notes on conve Approved for Release: 2016/08/09 C01254908 (IG) and
Scott Breckenridge (IG Staff) re: background information used in IG
Survey of Bay of Pigs from Jack B. Pfeiffer, 1 Jun 76. U.

17.   Memo for Dr. Jack B. Pfieffer from Charles A. Briggs, 4
Jun 81, sub:  Seventy Page Report Prepared by Lyman Kirkpatrick on
Bay of Pigs.  C.  (IG 81-0342)

18.   Memo for Mr. McCone from Lyman B. Kirkpatrick, 20 Nov
61, sub: Survey of the Cuban Operation. TS.

19.   Memo for DCI from Kirkpatrick, 24 Nov 61, sub: Report on
the Cuban Operation.

20.   Ibid.

21.   IG Survey, pp. 1-2.

22.   Ibid., pp 3-33.

23.   Ibid., pp. 34-36.

24.   Memo from General Cabell, 15 Dec 61 (no addressee),
sub:  The Inspector General's Survey of the Cuban Operation.

25.   IG Survey, p. 34.

26.   Ibid., pp. 34-35.

27.   Ibid., p. 37.

28.   Interview with Jacob D. Esterline by Jack B. Pfeiffer,
10-11 Nov 75, p. 98. U. (Hereafter as Esterline-Pfeiffer Int.)

29.   Interview with Richard M. Bissell, Jr., by Jack B.
Pfeiffer, 17 Oct 75, p. 98. U. (Hereafter as Bissell-Pfeiffer Int.)

30.   IG Survey, p. 38.

31.   Drain-Pfeiffer Int., pp. 15-17.

32.   IG Survey, pp. 38-40.

33.   Drain-Pfeiffer Int., p. 5.

34.   IG Survey, p. 41.

35.   Ibid., p. 43.

36.   Ibid., p. 44.

37.   Ibid., p. 43.
      Drain-Pfeiffer Int., pp. 9-10.

      L.K. White, Diary Notes, 5 Jul 61.

      Interview with William E. Eisemann by Jack B. Pfeiffer,
14 Nov 75, pp. 2-3. U.

- 162 -

UNCLASSIFIED

UNCLASSIFIED

38. Drain-Pfeiffer Int., p. 6.

39. IG Survey, p. 52.

40. Kirkpatrick. Lyman, "Paramilitary Case Study:  The Bay of Pigs," <u>Naval War College Review</u>, Nov-Dec 72, pp. 38-39. U. (Het after as Kirkpatrick, NWCR.)

41. IG Survey, pp. 54-58.

42. Thomas, Hugh.  <u>Cuba</u> (New York: Harper & Row, 1971 ed.), ftnt p. 1356. U.

Bissell-Pfeiffer Int., pp. 26-31.

43. Kirkpatrick, <u>The Real CIA</u>, p. 197.

44. Esterline-Pfeiffer Int., p. 84.

45. IG Survey, p. 56.

46. <u>Ibid</u>.

47. Esterline-Pfeiffer Int., pp. 45-46.

Bissell-Pfeiffer Int., p. 30.

48. Esterline-Pfeiffer Int., pp. 45-46.

49. IG Survey, p. 58.

50. Drain-Pfeiffer Int., pp. 8-9.

Letter to Dr. Jack B. Pfeiffer from Jack Hawkins, 14 Jan

51. IG Survey, pp. 61-62.

Kirkpatrick, <u>The Real CIA</u>, p. 188.

Kirkpatrick, NWCR, pp. 36,41.

52. Kirkpatrick, NWCR, p. 41.

53. IG Survey, pp. 67-74.

54. <u>Ibid</u>., pp. 75-80.

55. Kirkpatrick, <u>The Real CIA</u>, p. 204.

56. IG Survey, pp. 86-87.

57. <u>Ibid</u>., pp. 92-93.

58. <u>Ibid</u>., pp. 93-95.

59. <u>Ibid</u>., pp. 96-97.

60. MR from David R. McLean, 20 Oct 72, sub: Interview with

(b)(3)

61.  IG Survey, pp. 99-100.

62.  Ibid., pp. 100-109.

63.  Ibid., pp. 110-124.

64.  Ibid., pp. 119-124.

65.  Ibid., pp. 126-127.

66.  Ibid., p. 133.

67.  Ibid., p. 135.

68.  Ibid., p. 136.

69.  Ibid., pp. 140-142.

70.  Ibid., pp. 141-142.

71.  Pfeiffer, Jack B., Official History of the Bay of Pigs Operation, Vol. I, Air Operations, pp. 357-362, Sep 79 (HS/DCI 8). (TS 795052)

Memo for Assistant to DCI for Public Affairs from Bruce T. Johnson, 17 Mar 78, sub:  Possible Publicity about Flyers Killed at the Bay of Pigs.

Washington Post, 5 Sep 79.

Washington Star, 5 Sep 79.

Telecon between Dale Peterson (CIA/PAO) and Jack B. Pfeiffer, 14 Aug 81, sub: Medals for "Birmingham Widows."

72.  Kirkpatrick, NWCR, p. 37.

Kirkpatrick, The Real CIA, p. 196.

73.  Kirkpatrick Interview with Colonel Hawkins, Richard Drain, and Jacob Esterline, 1 or 2 May 1961, pp. 1/1-1/2. TS.*

74.  Ibid., pp. 1/11-1/12.

75.  Ibid., pp. 11-12.

76.  Ibid., p. 23.

77.  Ibid., pp. 33-34.

---

* Unless otherwise specified, all references to the IG and IG inspection team interviews in this section are from Job 80B0167R, Box 21.  All such interview material is unregistered (and overclassified) TS.  Also note that the Hawkins, Drain, and Esterline interview was prepared in two parts--a twelve page segment (pp. 1/1-1/12) and a 54 page segment.

- 164 -

UNCLASSIFIED

78.  Ibid., pp. 46-48.

79.  Kirk's Diary, 15 Nov 60.

80.  Ibid., 29 Jan 62.

81.  Ibid., 7 Jun 61 and 5, 8, 9, Jan 62.

82.  Suggested Questions for Mr. Drain, 9 Jun 61.

MR from Robert B. Shaffer, 9 Jun 61, sub: Comments on
Debriefing of Mr. Drain.  TS

83.  MR from Robert B. Shaffer, 9 Jun 61,  sub: Comments on
Debriefing of Mr. Drain.

84.  Kirk's Diary, 25 May 61, 14 Jul 61.

Official Routing Slip [from Lyman Kirkpatrick] to Mr.
Dildine, Mr. Shea, and Mr. Shaffer [14/15] Aug 61, sub: [Transcript
of Interview with Richard M. Bissell]. (Hereafter as IG-Bissel Int.)

Memo for Messrs. Dildine and Shaffer from Robert D.
Shea, 17 Aug 61, sub: Mr. Bissell's Comments to IG.

85.  IG-Bissell Int., p. 4.

86.  Ibid., pp. 14-16.

87.  Operation Zapata (Frederick, MD: University Publications
of America, Inc., 1981, pp. 249, 255-263, 270-271, 313-327, 346-347).

88.  IG-Bissell Int., pp. 16-17.

89.  Ibid., pp. 22-23.

90.  Bissell-Pfeiffer Int., p. 11.

91.  IG-Bissell Int., p. 47.

92.  Bissell-Pfeiffer Int., p. 10.

93.  IG-Bissell Int., pp. 25-29.

94.  Ibid., p. 25.

95.  Ibid., p. 35.

96.  Ibid., pp. 35-36.

97.  Memo for Messrs. Dildine and Shaffer from Robert D.
Shea, 17 Aug 61, sub: Mr. Bissell's Comments to IG, p. 1.

98.  IG-Bissell Int., pp. 9, 16, 36, 38.

- 165 -

UNCLASSIFIED

99.  Memo for Messrs. Dildine and Shaffer from Robert D. Shea, 17 Aug 61, sub: Mr. Bissell's Comments to IG, p. 1.

100.  <u>Ibid</u>.

101.  <u>Ibid</u>., p. 2 and Enclosure, p. 5.

　IG-Bissell Int., p. 40.

102.  Memo for Messrs. Dildine and Shaffer from Robert D. Shea, 17 Aug 61, sub: Mr. Bissell's Comments to IG, Enclosure, p.3.

103.  IG-Bissell Int., p. 20.

104.  Memo for Messrs. Dildine and Shaffer from Robert D. Shea, 17 Aug 61, sub: Mr. Bissell's Comments to IG, Enclosure, p. 6.

105.  IG-Bissell Int., pp. 17-18.

106.  Kirkpatrick Interview with Col. Hawkins, Richard Drain, and Jacob Esterline, 1 or 2 May 61, pp. 53-54.

　MR from Robert D. Shea, 6 Oct 61, sub: Interviews with Messrs. Esterline and Stanulis, 5 Oct 61.

107.  Bissell-Pfeiffer Int., p. 43.

108.  MR from RDS, 8 Aug 61, sub: IG Interview with Tracy Barnes, 19 (?) Jul 61.

109.  Transmittal Slip from R.D. Shea to Mr. Kirkpatrick, 11 Sep 61.

110.  Kirkpatrick Interview with C. Tracy Barnes, (1?) Aug 61, p. 28.

111.  Schlesinger, Arthur M., <u>A Thousand Days</u> (Boston: Houghton Mifflin Co., 1964), p. 273.

112.  Memo for General Maxwell D. Taylor from C. P. Cabell and Richard M. Bissell, Jr., 9 May 61, sub: Cuban Operation.

113.  Charles P. Cabell, Handwritten Notes on Cancellation of Second Strike (after 9 May 61 and presumably prior to 31 May 61). U.

114.  <u>Operation Zapata</u>, pp. 177-179.

115. .MR from Robert D. Shea, 12 Jun 61, sub: Interview with Richard Drain, 9 Jun 61 (second interview).

116.  IG-Barnes Int., (1?) Aug 61, p. 1.

117.  MR from Lyman B. Kirkpatrick, 22 Jun 61, sub: Discussion of the Cuban Situation with Col. J.C. King, 21 Jun 61.

118.  MR from R.D. Shea, 4 Aug 61, sub: Conference with ☐ 2 Aug 61.

(b)(3)
(b)(3)

- 166 -

UNCLASSIFIED

119.  MR from R.D. Shea, 3 Aug 61, sub: Conference with Mr. William Harvey.

120.  MR from R.D. Shea, 6 Oct 61, sub: Interview with Esterline and Stanulis.

121.  MR from Robert D. Shea, 5 May 61, sub: Conference with Col. Frank Egan.

122.  MR from Robert D. Shea, 24 Jul 61, sub: Interview with
[                    ]                                                          (b)(3)

123.  Ibid.

124.  MR from W.G. Dildine, 19 Jun 61, sub: Interview with Al Cox.

125.  Kirk's Diary, 16 May 61.

Memo for Director of Training from [                    ]          (b)(1)
[                    ] 26 Jul 61, sub: Details of [          ] Participation in     (b)(1)
WH/4 Project.

MR from W.G. Dildine, 25 May 61, sub: Interviews at
[                    ]                                                          (b)(1)

126.  Job 80B01676R, Box 21, Folder 33, sub: Varied Miami Base Subjects.

127.  Official Routing Slip from Shea and Dildine to Mr. Kirkpatrick, 20 Aug 61, sub: Questions for Mr. Dulles.  TS.

128.  L.K. White, Diary Notes, 11 Oct 61.

129.  MR from Lyman B. Kirkpatrick, 1 May 61, sub: The Cuban Operation. TS.

130.  IG Survey, pp. 145-148.

131.  Ibid., p. 148.

132.  Ibid., pp. 148-150.

133.  Greer, Office of the Inspector General, pp. 87-88.

Jackson, Wayne G., Allen Welsh Dulles as Director of Central Intelligence, 26 Feb 53 - 29 Nov 61.  Vol. III, Covert Action, p. 128.  (HS/DCI 2, Jul 73).)

134.  Greer, pp. 85-86.

135.  MR from C.P. Cabell, 28 Nov 61, sub: [IG Survey of the Cuban Operation].

- 167 -

UNCLASSIFIED

136. Memo for Director of Central Intelligence from Lyman B. Kirkpatrick, 1 Dec 61, sub: Report on the Cuban Operation.

137. Kirk's Diary, 4 Sep 63.

Kirkpatrick NWCR, pp. 39-42.

138. [Memo for the DCI] from C.P. Cabell, 15 Dec 61, sub: Report on the Cuban Operation.

139. Kirk's Diary, 4 Jan 62.

140. MR from Robert D. Shea, 29 Sep 61, sub: Interview with Wallace R. Deuel.

141. Transmittal Note for General Taylor from TAP [Thomas A. Parrott], 28 Jul 61 [sub: The Invasion of Cuba: A Battle Report ].

Memo for General Taylor from TAP [Thomas A. Parrott], 1 Aug 61, sub: The Invasion of Cuba: A Battle Report.

142. Memo for Mr. Joseph W. Scott (State) and Brig. Gen. E.G. Lansdale (Defense) from Thomas P. Schreyer, 18 Aug 61, sub: The Invasion of Cuba: A Battle Report.

143. Memo for Mr. Thomas P. Schreyer, CIA and Brig. Gen. E.G. Lansdale, Defense from H. Bartlett Wells, 11 Sep 61, sub: The Invasion of Cuba: A Battle Report.

144. Kirk's Diary, 30 Apr 61.

145. Ibid., 30 Aug 61.

146. Memo for the President from McG. B. [McGeorge Bundy], 25 Feb 61, [sub: Organization]. U.

147. Kirk's Diary, 12 Sep 61.

148. Ibid., 3 Oct 61.

149. Kirkpatrick Interview with Col. Hawkins, Richard Drain, and Jacob Esterline, 1 or 2 May 1961, p. 51.

150. Ibid., p. 52.

- 168 -

UNCLASSIFIED

Chapter 3   The Deputy Director for Plans Analysis of the Cuban
Operation, 18 January 1962


        1.  An Analysis of the Cuban Operation by the Deputy Director
(Plans), 18 Jan 62, II, p. 4.  (Hereafter as Analysis.)  (TS I181884)

        2.  Interview with Richard M. Bissell by Jack B. Pfeiffer, 17
October 75, p. 43.  (Hereafter as Bissell-Pfeiffer Int.)

        3.  Analysis, I, p. 1.

        4.  Ibid., p. 2.

        5.  Ibid., p. 4.

        6.  Ibid., p. 8.

        7.  Ibid., p. 10.

        8.  Ibid., pp. 12-13.

        9.  Interview with Richard M. Bissell by Lyman Kirkpatrick
[14] Aug 61, pp. 22-23.  (Hereafter as Bissell-Kirkpatrick Int.)

        10. Analysis, I, p. 14.

        11. Ibid., pp. 16-19.

        12. Ibid., p. 20.

        13. Ibid., pp. 21-22.

        14. Ibid., pp. 23-25.

        15. Ibid., pp. 26-33.

        16. Ibid., II, p. 3.

        Inspector General's Survey of the Cuban Operation, Oct
61, p. 52.  (TS 173040) (Hereafter as Survey.)

        17. Analysis, III, pp. 1-4.

        18. Ibid., IV, p. 1.

        19. Ibid.

        20. Ibid., pp. 2-9.

        21. DCI Calendar, 17 Jan-22 Jan 61.

        MR from C. Tracy Barnes, 23 Jan 61, sub: Conclusions of
Dean Rusk's 22 January meeting on Cuba.


                         - 169 -

                        UNCLASSIFIED

Approved for Release: 2016/08/09 C01254908

22. Analysis, IV, p. 9.

23. Ibid., p. 10; II, p. 4.

24. Jackson, Wayne, G., Allen Welsh Dulles as Director of Central Intelligence, 26 February 1953 - 29 November 1961, Vol. III, p. 143. (HS/DCI 2, Jul 73)

25. Analysis, IV, Annex A.

26. Ibid., V, p. 1.

27. Ibid., p. 2.

28. Ibid., pp. 3-8.

29. Ibid., pp. 9-14.

30. Ibid., pp. 15-17.

31. Ibid., VI, p. 3.

32. Ibid., pp. 3-12.

33. Ibid., pp. 7-11.

34. Ibid., p. 13.

35. Ibid., pp. 14-15.

36. Ibid., pp. 15-17.

37. Ibid., pp. 17-18.

Elder, Walter, John A. McCone as the Director of Central Intelligence, 29 November 1961 - 28 April 1965, (draft), Mar 73, p. 38. (CIA/HS Misc. 25.2)

38. Analysis, VI, 18-28.

39. Interviews by Jack B. Pfeiffer as follows:

With Jacob D. Esterline, 10-11 Nov 75, pp. 2-4.

With Richard D. Drain, 8 Jan 76, pp. 5-6, 9-10.

With William E. Eisemann, 14 Nov 75, pp. 1-2.

40. Analysis, VII, pp. 6-10.

41. Ibid., 10-12 and Annex A.

42. Ibid., VIII, p. 18.

43. Ibid., IX, pp. 1-7.

- 170 -

UNCLASSIFIED

44. Ibid., p. 4.

45. Ibid., pp. 4-5.

46. Survey, pp. 98-100.

47. Analysis, IX, pp. 9-10.

48. Ibid., P. 18.

49. Jackson, Dulles, III, 135-139.

Greer, Kenneth E., The Office of the Inspector General, January 1952 - December 1971, Oct 73, pp. 95-97. (HS/DCI 7.)

50. Memo for Dr. James R. Killian, Jr., from John A. McCone, 19 Jan 61 [sub: Transmittal of CIA Documents].

51. Drain, Richard D., Personal Notes, 2 May 61.

52. Memo for Deputy Director (Plans) from C. Tracy Barnes, 19 Jan 62, sub: [I.G.] Survey of Cuban Operation.

53. Jackson, Dulles, III, 140.

54. Memo for Mr. C. Tracy Barnes from Lyman B. Kirkpatrick, 22 Jan 62, sub [Barnes's 19 Jan 62 memo to DD/P re I.G. Survey of the Cuban Operation].

55. Memo for Mr. Kirkpatrick from W.G. Dildine, Robert B. Shaffer, and Robert D. Shea, 26 Jan 62, sub: The IG's Cuban Survey and the DD/P's Analysis of the Cuban Operation.

56. Memo for Director of Central Intelligence from Richard M. Bissell, Jr., 27 Jan 62, sub: Mr. Barnes's Memorandum on the IG Survey of the Cuban Operation.

57. Excerpts from Kirkpatrick's Diary, 29 Jan 62.

58. Memo for Mr. John McCone from Allen W. Dulles, 15 Feb 62, sub: The Inspector General's Survey of the Cuban Operation. TS.

59. Official Routing Slip from Mr. Kirkpatrick from Shea and Dildine, 20 Aug 61, sub: Questions for Mr. Dulles.

60. Greer, OIG, p. 95.

61. Ltr to the Honorable Allen W. Dulles from John A. McCone, 19 Feb 62.

62. Excerpts from Kirkpatrick's Diary, 19 Feb 62.

63. Ibid., 4 Sep 62.

UNCLASSIFIED

Chapter 4    Evaluation of the Evaluators

    1.   Memo for Executive Director-Comptroller from Thomas H.
Karamessines, Deputy Director for Plans, 21 Jun 71. (ER-713412)

    2.   Note on Meeting with Ben Evans, Executive Secretary
(DCI/CIA), 11 Feb 81 from Jack B. Pfeiffer. U.

UNCLASSIFIED